Matthew C. Helland, CA Bar No. 250451
helland@nka.com
NICHOLS KASTER, LLP
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

Paul J. Lukas, MN Bar No. 22084X*
lukas@nka.com
Kai H. Richter, MN Bar No. 0296545*
krichter@nka.com
Brock J. Specht, MN Bar No. 0388343*
bspecht@nka.com
Jennifer K. Lee, MN Bar No. 0399012*
jlee@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878

*pro hac vice applications forthcoming

ATTORNEYS FOR PLAINTIFF AND THE
PROPOSED CLASS

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| Philip Pinkert, individually and on behalf of a Class of similarly situated individuals, and on behalf of the general public,<br><br>        Plaintiff,<br><br>    v.<br><br>Schwab Charitable Fund, Charles Schwab Corporation, Schwab Charitable Board of Directors, and Schwab Charitable Investment Oversight Committee.<br><br>        Defendants. | **Case No. 20-7657**<br><br>**CLASS ACTION COMPLAINT**<br><br>**(1) Breaches of Fiduciary Duties at Common Law**<br><br>**(2) Third-Party Contribution to Breaches of Fiduciary Duties at Common Law**<br><br>**(3) Unlawful Conduct in Violation of California's Unfair Competition Law, California Business and Professions Code § 17200** |

## **NATURE OF THE ACTION**

1.      Plaintiff Philip Pinkert ("Plaintiff"), individually and as representative of the class described herein, and on behalf of the general public, brings this action under California common law and California Business and Professions Code § 17200.

2.      Plaintiff asserts his claims against Schwab Charitable Fund ("Schwab Charitable"), the Schwab Charitable Board of Directors ("the Board"), and the Schwab Charitable Investment Oversight Committee ("the Committee"), who collectively failed to manage the Schwab Charitable donor-advised fund ("Schwab DAF") in a prudent manner, and against Charles Schwab Corporation ("Schwab Corporation"), who facilitated and knowingly profited from these fiduciary breaches and statutory violations.

3.      As described herein, Schwab Charitable, the Board, and the Committee have breached their fiduciary duties with respect to their management of the Schwab DAF under the common law and California's Uniform Prudent Management of Institutional Funds Act, Cal. Prop. Code §§ 18501-18510 ("UPMIFA"), to the detriment of donors to the Schwab DAF and the charitable organizations that are the ultimate recipients of its assets and who suffer when excessive fees are deducted from those assets. As a result of these breaches and violations, Defendants have in turn violated Cal. Bus. & Prof. Code § 17200. Plaintiff brings this action to remedy this unlawful conduct, prevent further mismanagement of the Schwab DAF, recover the losses caused by Defendants' violations and fiduciary breaches, and obtain equitable and other relief as provided by California law.

## **PRELIMINARY STATEMENT**

4.      Private charitable giving is critically important to funding public and social goods in the United States.[1] Since as early as the Great Depression with the creation of the New York Philanthropic Trust, the donor-advised fund ("DAF") has served as an important philanthropic

---

[1] As some leading commentators have explained: "In other countries, it is common for universities, hospitals, art museums, symphonies, and social safety nets to be funded by governments. In the US, charitable organizations, supported by tax-favored private foundations, carry out many of the same social functions." Lewis B. Cullman *et al.*, *The Undermining of the American Charity*, N.Y. Review of Books (July 14, 2016).

**CLASS ACTION COMPLAINT**

vehicle and a staple of community foundations. As a less administratively burdensome alternative to a private foundation, DAFs provide a means for individuals to receive a present-year tax deduction for making a charitable donation while retaining the flexibility to delay the donation of those assets to future years, and earn investment income on the assets in the interim. In the 90 years since their inception, the availability of DAFs has grown to include those supporting various city and community needs such as the New York Community Trust and the San Francisco Foundation, as well as those devoted to specific causes such as the Catholic Charities Donor Advised Fund, the Stanford University donor-advised fund, and the National Christian Foundation Giving Fund. As of 2018, DAFs held more than $72 billion in assets, and four of the ten largest charities in the United States by assets were DAFs.

5.     DAFs are non-profit entities. When donors contribute assets to their DAF account, the nonprofit organization takes legal title to the assets, but donors typically direct how funds are invested (from among several investment options offered by the DAF) and ultimately distributed to charitable organizations. The National Philanthropic Trust describes DAFs as a kind of "charitable savings account." With a single donation, DAF donors can create a charitable legacy spanning decades or even generations, given that donors can name the successors who inherit their right to direct future charitable giving from the DAF account. Though prominent DAF donors include Facebook founder Marc Zuckerberg, Twitter founder Jack Dorsey, and Microsoft CEO Steve Ballmer, DAFs are not limited to the wealthy, as some DAFs have account minimums of only $5,000.

6.     DAFs are accounted for in and regulated by the tax code. The Internal Revenue Code defines a "donor-advised fund" as (1) a fund or account owned and controlled by a sponsoring organization, (2) which is separately identified by reference to contributions of the donor or donors, and (3) where the donor has or reasonably expects to have advisory privileges over the distribution or investment of the assets by reason of the donor's status as a donor. 26 U.S.C. § 4966(d)(2).

7.     Thus, although a DAF holds title to the money, donors possess broad rights and continue to receive significant benefits after their initial contributions are made. DAFs let donors choose the investment options in which DAF assets are invested, and give them a robust right to

"advise" how the funds will ultimately be distributed to existing public charities. The IRS Guide Sheet on DAFs sets the baseline for donors' advisory rights as "the right of a donor to provide noncompulsory recommendations, suggestions or consultative advice" about the disposition or investment of funds in the donor's account. Internal Revenue Service, *Donor-Advised Funds Guide Sheet Explanation* at 8 (July 31, 2008). In practice, for purposes of this case, donors control the disposition of account assets, subject only to Schwab Charitable's review to ensure donations are going to charitable organizations and will not provide personal benefit to the donor. Thus, the advisory rights granted to donors permit donors "to promote [their] own substantive, religious, or social goals" for many years after the DAF is first funded. *In re McCune*, 705 A.2d 861, 865 (Pa. Sup. Court 1997).

8.     DAF accounts are generally charged two types of expenses. First, there is an administrative fee that covers the expense of operating the accounts and processing charitable donations. This fee is generally charged annually as a percentage of the assets in the account, with the percentage charged declining as the amount of account assets exceeds certain breakpoints (e.g. the administrative fee might be 0.75% on the first $100,000 donated, 0.50% on the next $900,000, 0.25% on the next $1,000,000, etc.). Second, DAF assets are then invested in one or more pooled investment vehicles, and these vehicles charge annual investment management fees as a percentage of the assets invested.

9.     DAFs are maintained and operated by section 501(c)(3) public charities, called sponsoring organizations. As such, operating a DAF cannot be a for-profit enterprise. A DAF organized in the State of California cannot be "organized or operated for profit," and "no part" of its net earnings may "inure to the benefit of any private shareholder or individual." Cal. Const., Article XIII, § 4(b); Cal. Rev. Code 214(a)(1)-(2). The assets of a nonprofit corporation cannot facilitate a third party's "more advantageous pursuit of their business," meaning that the DAF cannot, through its dealings with a third party, provide the party "a benefit better than a person might obtain through arm's length negotiation." Cal. Rev. Code 214(a)(4); *Scripps Clinic & Research Found. v. Cnty. of San Diego*, 53 Cal. App. 4th 402, 410 (1997).

10.     The directors of a DAF established in the State of California are also subject to fiduciary duties under California law. The duties of care and loyalty require that "[a] director shall perform the duties of a director … in good faith, in a manner that director believes to be in the best interests of the corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." Cal. Corp. Code § 5231(a).

11.     The duty of care extends to the management of institutional assets, § 5240(b), and those assets must be managed in accordance with the provisions of the Uniform Prudent Management of Institutional Funds Act ("UPMIFA") as codified in the California Probate Code. *See* Cal. Prob. Code §§ 18501–18510.[2]

12.     UPMIFA incorporates the aforementioned state law fiduciary duties while also imposing rules as to how institutional funds[3] shall be managed. These rules were designed to emulate the Uniform Prudent Investor Act and trust law's prudent investor rule,[4] but tailored to the nonprofit context. In managing institutional assets, DAF directors are required to "manage and invest the fund in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." Cal. Prob. Code § 18503(b). UPMIFA further states than an institution "may incur only costs that are appropriate and reasonable in relation to the assets, the purposes of the institution, and the skills available to the institution." Cal. Prob. Code § 18503(c)(1). Additionally, to facilitate this goal of cost minimization, the law provides that "[a]n institution may pool two or more institutional funds for purposes of management and investment." Cal. Prob. Code § 18503(d).

13.     The fiduciaries of DAFs have common law duties as well. The donation of property to a DAF for a charitable purpose creates a charitable trust under common law. *L.B. Research &*

---

[2] Section Three of the Schwab Charitable Investment Policy Statement states that "[t]he Committee shall exercise prudence and appropriate care in accordance with the Uniform Prudent Management of Institutional Funds Act."

[3] "Institutional fund" means a fund held by an institution exclusively for charitable purposes. Cal. Prob. Code § 18502(e).

[4] *See* Uniform Prudent Management of Institutional Funds Act (2006) at 14 (explaining that prudence standard in UPMIFA is meant to emulate the "prudence norms of the Restatement and UPIA"), https://www.uniformlaws.org/HigherLogic/System/DownloadDocument File.ashx?DocumentFileKey=d7b95667-ae72-0a3f-c293-cd8621ad1e44&forceDialog=0.

*Educ. Foundation v. UCLA Foundation*, 130 Cal. App. 4th 171, 177 (2005); *Amer. Ctr. for Education, Inc. v. Cavnar*, 80 Cal. App. 3d 476, 486 (1978). A charitable trust is a fiduciary relationship, and the fiduciary duties owed by a trustee include a duty to act loyally and prudently in the investment of the assets of the charitable trust. *See L.B. Research*, 130 Cal. App. 4th at 177; *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 483 (1998); American Law Institute, Restatement (Third) of Trusts: Prudent Investor Rule, at 190–91 (1992) (stating that "absent a contrary statute or other provision, the prudent investor rule applies to investment of funds held for charitable corporations."). Third parties who actively participate in a trustee's breach of fiduciary duty to advance their own financial position are liable to the trust's beneficiaries for the breach. *Atascadero*, 68 Cal. App. 4th at 483–84.

14.     Though DAFs have existed in the United States for upwards of ninety years, a more recent development has been the establishment of DAFs by several financial service companies such as Charles Schwab, Fidelity, and Vanguard. Unlike prior DAFs which traditionally sought to support specific regions or advance particular causes, the financial service-affiliated DAFs generally provide only the administrative and investment function of the traditional DAF, while allowing donors greater discretion to determine the charitable causes to which their funds are applied. Although these affiliated DAFs may help facilitate charitable giving, their affiliation with a financial services company presents a significant risk that the DAF may be used to generate profits for its financial services affiliate through the DAF's investment decisions and service provider contracts.

15.     Schwab Charitable was founded in 1999 and sponsors a DAF with accounts that range in size from $5,000 to more than $500 million. As of its most recent financial statement, the Schwab DAF has more than $15 billion in assets, making it one of the ten largest charities in the United States.

16.     The Charles Schwab Corporation ("Schwab Corporation"), which made the initial investments and contributions necessary to create the Schwab DAF, is a financial services company founded in 1971 with over $3.5 trillion in total client assets. Through its operating subsidiaries, Schwab Corporation provides a full range of brokerage, custodial, banking, investment management, and financial advisory services to retail and institutional clients.

17. Though Schwab Charitable is legally independent of the Schwab Corporation, several members of the Board of Schwab Charitable are affiliated with the Schwab Corporation or worked there prior to working at Schwab Charitable. Schwab Corporation permits Schwab Charitable to use all of its trademarks, and virtually all of the service contracts Schwab Charitable has entered into for the provision of administrative, custodial, and brokerage services are with the Schwab Corporation. In addition, every person working for Schwab Charitable is actually an employee of the Schwab Corporation.

18. The result of this close relationship is that Schwab Charitable does not act independently, with a sole focus on advancing its charitable purpose, but instead has helped maximize the profits of the Schwab Corporation by making imprudent investment decisions and paying grossly excessive administrative fees for the benefit of Schwab Corporation. And these excess profits all come at the direct expense of the "charitable purposes" that Schwab Charitable was supposedly established to promote,[5] because every dollar of fees charged to donor accounts is one less dollar that can be donated to a charitable organization.

19. Schwab Charitable offers donors fourteen pre-selected investment pools, each of which is invested entirely in a single underlying mutual fund.[6] Thirteen of these underlying mutual funds do not reflect the purchasing power possessed by one of the nation's largest charities. Instead, they benefit Schwab Corporation. This has manifested itself in two ways.

20. First, Schwab Charitable promoted the financial interests of the Schwab Corporation by using uncompetitive mutual funds affiliated with Schwab as underlying investment options. Five of the underlying investment pools were invested in index funds, and one pool was invested in a money market fund. Although the marketplace for both index funds and money market funds is highly competitive, Schwab Charitable utilized a Schwab-affiliated investment for each of these pools, despite the availability of lower-cost and better-performing alternatives from managers such

---

[5] Schwab Charitable Fund (originally called Schwab Philanthropy Fund) Articles of Incorporation, § IV.A (filed with CA Sec. of State Jan. 4, 1999), https://businesssearch.sos.ca.gov/Document/RetrievePDF?Id=02129372-4718625.
[6] Donors with accounts of more than $250,000 may select an independent investment advisor to actively manage a customized investment portfolio subject to Schwab Charitable's investment policies and oversight.

**CLASS ACTION COMPLAINT**

as Vanguard and Fidelity. This resulted in higher fees paid to Schwab Corporation and lower investment returns, reducing the amount of money that could be donated to charitable corporations.

21.    Second, Schwab Charitable caused donors to pay excessive administrative fees to Schwab Corporation by failing to prudently negotiate fees for custodial services at arm's length. Among the standard services that Schwab Corporation provided to Schwab Charitable were standard brokerage and custodial services such as holding securities and executing trades (collectively referred to as "custodial services"). Institutional investors with billions of dollars of assets, like a DAF, minimize these types of expenses by (1) seeking bids from multiple service providers in the marketplace to get the most competitive price available, and (2) monitoring all sources of compensation to the custodian in addition to any direct fees, such as revenue sharing rebates to the custodian from investments on the custodian's investment platform. If an institutional investor is going to invest in mutual funds, for example, it must be aware of all service fees the custodian can collect from the mutual fund company for holding the assets, and if those fees exceed the negotiated price, negotiate for the excess to be refunded to the institutional investor.

22.    Had Schwab Charitable acted prudently and loyally in negotiating its contract with Schwab Corporation, it would have both negotiated a lower rate for brokerage services, and had all available revenue sharing rebates from investment providers that exceeded that rate refunded to donors, or worked with a third-party custodian who would have done the same. But Schwab Charitable failed to do so, and as a result, Schwab Corporation received excessive compensation.

23.    In addition to failing to negotiate marketplace rates for brokerage services, Schwab Charitable also caused Schwab Corporation to receive excessive administrative fees by using higher-cost versions of several third-party mutual funds in order to generate additional profits for Schwab Corporation. For example, the "Large Cap Equity Managed Pool" was invested entirely in investor shares of the Parnassus Core Equity Fund, ticker PRBLX, with an annual expense ratio of 0.86% as of 2019. Schwab Charitable has continued to use this fund and not the lower-cost (but otherwise identical) institutional version of this fund, ticker PRILX, which cost only 0.63% and was available to investors that satisfied a $100,000 investment minimum. The Schwab Charitable DAF

could satisfy this minimum thousands of times over,[7] yet has continued to use the more expensive version of the fund.

24.     Not coincidentally, all of the additional fees paid by donors for the more expensive version of these funds ended up in the pockets of Schwab Corporation. Investor share classes of the Parnassus Core Equity Fund are part of Charles Schwab's "OneSource" program in which certain mutual funds are given preferred status on Schwab's brokerage platform in exchange for paying the Schwab Corporation a minimum of 0.40% in revenue sharing payments every year.[8] Institutional shares of Parnassus Core Equity are not part of the "OneSource" program and thus would have generated much lower revenue sharing payments for the Schwab Corporation.[9] And those extra fees (amounting to millions of dollars each year) did not result in the provision of additional services of comparable value to donors; the "shareholder services" those extra fees supposedly paid for would have cost 10 to 30 times less had Schwab Charitable prudently negotiated for their provision at arm's length with an unaffiliated party, as other DAFs have done.

25.     By managing the administration and investment of the Schwab DAF for the benefit of Schwab Corporation and failing to exercise the requisite prudence for an investment fund of its size, Schwab Charitable, the Board, and the Committee violated their fiduciary duties under common law, and their statutory duties under UPMIFA, California's non-profit corporation code, and California's unlawful business practice and unfair competition statute (Cal Bus. & Prof. Code § 17200). Further, by colluding with Schwab Charitable to perpetrate and/or promote the foregoing

---

[7] It is standard practice for investment companies such as Parnassus to permit institutional investors overseeing a large number of individual accounts to pool the assets within those accounts to satisfy the investment minimum.

[8] *Schwab's financial and other relationships with ETFs and mutual funds*, https://www.schwab.com/legal/financial-and-other-relationships (stating that funds participating in the OneSource program pay "Schwab's standard OneSource/NTF Fee of 0.40% per year).

[9] *See generally* Charles Schwab, Mutual Fund Quotes & Research Tools, https://www.schwab.com/public/schwab/investing/investment_help/investment_research/mutual_fund_research/mutual_funds.html?path=%2FProspect%2FResearch%2Fmutualfunds%2Foverview%2Fscreener.asp%3Fsymbol%3D (Schwab mutual fund screener allowing investors to view which funds are part of the OneSource program; applying a filter of large cap stock funds in the OneSource program reveals that while Investor shares of the Parnassus Core Equity Fund are part of the OneSource program, its Institutional shares are not).

fiduciary breaches and unlawful conduct, Schwab Corporation is also liable for the losses caused by such fiduciary breaches and unlawful conduct and disgorgement of all profits it earned therefrom.

## JURISDICTION AND VENUE

26. **Jurisdiction:** Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of Connecticut. Defendant Schwab Charitable is a California nonprofit corporation with its principal place of business in California. Defendant Schwab Corporation is a California corporation with its principal place of business in California. Each member of the Board and Committee is believed to be a California resident. Therefore, complete diversity of citizenship exists. The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000. This Court also has original jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). Plaintiff is a citizen of the State of Connecticut, and at least one Defendant is a citizen of a different state. The amount in controversy in this action exceeds $5,000,000, and there are more than 100 members of the Class.

27. **Venue:** Venue in the Northern District of California is proper pursuant to 28 U.S.C. § 1391 because Defendants are located and transact business within this District. Additionally, a substantial part of the events giving rise to the claims asserted herein occurred within this District.

28. **Intradistrict Assignment:** Pursuant to L.R. 3-2(c) and (d), this action is properly assigned to the San Francisco or Oakland Division of the Northern District of California because a substantial part of the events giving rise to the claims asserted herein occurred in San Francisco County.

## THE PARTIES

### Plaintiff

29. Plaintiff Philip Pinkert is a resident of Greenwich, Connecticut. Mr. Pinkert opened an account with Schwab Charitable in approximately 2007. For at least the past five years, his account on behalf of the Pinkert Family Trust has been invested in the Schwab Treasury Inflation Protected Securities Index Fund, one of the pre-selected investment pools made available by Schwab Charitable.

30.     Mr. Pinkert has a direct and personal interest in the administration of his Schwab Charitable account. He uses the assets in his DAF to advance his own philanthropic goals, support organizations that are personally meaningful to him and his family, and to cultivate the family value of charitable giving. And because all donations are made under the Pinkert Family Trust name, each donation confers recognition from his community and peers.

31.     Mr. Pinkert has made multiple donations to At Home in Greenwich, a nonprofit membership organization that helps seniors live in their homes as they age by providing a network of services, activities, and volunteers. The membership dues are modest and the organization relies heavily on charitable donations to maintain their operations. Mr. Pinkert is especially cognizant of the impact of his donations to At Home in Greenwich from his time serving on its finance committee, where he saw how limited the organization's budget is. In addition to financially supporting At Home in Greenwich, Mr. Pinkert volunteers as a driver to take members to and from appointments. Every dollar that is diverted away from his Schwab DAF account to pay for excessive fees directly impacts Mr. Pinkert's ability to financially support At Home in Greenwich. Mr. Pinkert has also donated multiple times to Jewish Family Services in Greenwich, which provides a wide range of services to poor families emigrating to the United States. His daughter-in-law is an immigrant and donating to organizations like Jewish Family Services in Greenwich is an expression of a shared family value of supporting immigrant communities in America. These organizations are but a sample of the charities Mr. Pinkert has supported through his Schwab DAF. The more money that is in Plaintiff's account, the better Plaintiff is able to achieve his charitable objectives.

## Defendants

### Schwab Charitable

32.     Defendant Schwab Charitable is an independent public charity created in 1999. Schwab Charitable is recognized as a tax-exempt public charity as described in sections 501(c)(3), 509(a)(1), and 170(b)(1)(A)(vi) of the Internal Revenue Code. Schwab Charitable is based in San

Francisco, California and is the sponsoring organization of the Schwab DAF, a donor-advised fund with over $15 billion in assets.[10]

***Schwab Charitable Board of Directors***

33. Schwab Charitable is governed by a seven-person Board of Directors (the "Board"). The Board has full discretion over Schwab Charitable and its activities, including overseeing and appointing members to the Investment Oversight Committee. The Board is composed of various institutional investment professionals, including its chairperson who is the daughter of Charles R. Schwab, founder of Schwab Corporation.

***Schwab Charitable Investment Oversight Committee***

34. The Board of Schwab Charitable delegates to the Investment Oversight Committee (the "Committee") the responsibility for fulfilling its responsibilities with respect to the investments of Schwab Charitable. The Committee, comprised of at least three members of the Board, is obligated to review the performance of the investment funds and investment managers used by Schwab Charitable consistent with the Investment Policy Statement adopted by the Committee. As defined in the Investment Policy Statement, "[t]he Committee shall exercise prudence and appropriate care in accordance with the Uniform Prudent Management of Institutional Funds Act."[11] Further, "each member of the Committee shall act, in good faith, in a manner such member believes to be in the best interests of Schwab Charitable and with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances."[12]

35. Schwab Charitable, the Board, and the Committee are referred to collectively herein as the "Fiduciary Defendants."

---

[10] The Conversation, *Donor-Advised Funds: Charities with Benefits*, April 5, 2017, https://theconversation.com/donor-advised-funds-charities-with-benefits-74516.

[11] *Schwab Charitable Investment Policy Statement*, https://www.schwabcharitable.org/public/file/P-8085399/#:~:text=The%20investment%20objectives%20of%20Schwab,aggregate%20grants%20equal%20to%20at.

[12] *Id.*

*The Charles Schwab Corporation*

36.     Defendant Schwab Corporation is based in San Francisco, California and provides a full range of brokerage, banking, and financial advisory services through its operating subsidiaries. With over $3.5 trillion in total client assets, it is one of the largest broker-dealers in the United States. Schwab Corporation provides administrative and research services to Schwab Charitable, and the workforce of Schwab Charitable are employees of Schwab Corporation.

## FACTUAL ALLEGATIONS

I.     THE EMERGENCE OF DAFS, INCLUDING THOSE SPONSORED BY FINANCIAL INSTITUTIONS

37.     In recent years, DAFs have become an increasingly popular vehicle for charitable giving, largely because they fill a gap in the landscape of philanthropic vehicles. Outside of DAFs, donors have two basic, and very different, options to accomplish their philanthropic goals. They can either engage in private philanthropy, exemplified by the creation of a private foundation, or they can give directly to a public charity that is already in existence.

38.     Private foundations give donors complete control over their charitable giving—donors can contribute assets at any time (and thus receive an immediate personal tax benefit), while spreading the distribution of those assets to charitable causes over a longer period.

39.     But private foundations are expensive to set up and maintain. Moreover, given the lack of oversight—and the resulting potential for abuse by individuals hoping to avoid taxes—Congress has imposed limits on the tax benefits available for donations to private foundations. For example, whereas a donor may deduct the full fair market value of an appreciated stock when that stock is given directly to an existing public charity, the donor may deduct only her cost basis in the stock (*i.e.*, the amount she originally paid) if she gives it to a private foundation.

40.     Instead of setting up a private foundation, donors can give directly to existing public charities. This has the obvious advantage of immediately benefiting social causes that depend on philanthropy to function. Additionally, as noted, direct donations receive favorable tax treatment compared to donations into private foundations.

CLASS ACTION COMPLAINT

41.     But giving directly to public charities eliminates the donor's ability to control the timing of donations relative to the donor's broader financial and philanthropic objectives. For example, some public charities are unable or unwilling to accept a donation of appreciated stock or an even more complex asset. Or a donor may wish to ensure that her large donation is used over time, but the charity may lack the ability or willingness to accommodate that desire. At the simplest level, it may be tax-efficient for a donor to make a large donation at one particular point in time, but the donor may not yet know where that money will do the most good.

42.     DAFs have come to prominence because they strike a sweet spot between private giving via the paradigmatic vehicle of a private foundation and direct giving to an already-existing public charity.

43.     DAFs have existed in some form since the 1930s, but for decades were little utilized. As recently as 1995, DAF accounts held only around $2.4 billion in assets, compared to over $72 billion in 2018. In recent years, however, for-profit financial institutions like the one affiliated with Schwab Charitable have learned to leverage DAFs' unique characteristics to bridge the gap between private foundations and direct giving. And once these financial institutions recognized the opportunity this presented, "a number of [them] ... formed charitable corporations for the principal purpose of offering donor advised funds..." H.R. Rep. No. 109-455, at 180 (2006).

44.     As a result of this development, there are now donor-advised funds offered by mutual fund companies, such as Vanguard, Fidelity, and Franklin Templeton; brokerage firms, such as Raymond James and Charles Schwab; and banks, such as Bank of America and Goldman Sachs.

45.     At a high level, DAFs work as follows: Donors create an account with a sponsoring organization, here Schwab Charitable. When donors contribute assets to fund their DAF account, the sponsoring organization takes legal title to the assets. Thus, in accordance with rules and regulations regarding charitable contributions described in the Internal Revenue Code, all contributions to Schwab Charitable, both initial and subsequent, are irrevocable.

**A.     Donors' Robust Rights Under the Schwab Charitable DAF**

46.     Although donations to a DAF are irrevocable, DAFs guarantee donors a right to choose how the DAF account's funds are invested and a robust right to "advise" about how the

funds will ultimately be distributed to existing public charities. Federal law requires DAFs to give donors "advisory privileges with respect to the distribution or investment of amounts" held in the account. 26 U.S.C. § 4966(d)(2).

47.     A sponsoring organization has latitude to offer donors even stronger advisory rights, short of allowing them to retain legal title to the funds. Here, Schwab Charitable gives account holders particularly robust advisory rights over the funds they contribute.

48.     Schwab Charitable account holders can recommend a name for their donor-advised fund account "to honor an individual or a family, to cultivate a legacy of charitable giving, or for another charitable purpose."[13] Additionally, account holders may update account names at any time, including after the initial contribution.

49.     Schwab Charitable account holders retain the power to recommend grants to eligible charities and change successors or charitable beneficiaries.[14]

50.     Schwab Charitable account holders can recommend a portfolio asset allocation among the investment pools or recommend a qualified investment advisor to professionally manage their account.[15]

51.     Schwab Charitable may not recommend a grant without obtaining client approval unless an annual giving threshold of 5% of average net assets is not met, and only if sufficient grant recommendations are not received from the donor within 90 days from notice of the deficiency.[16]

52.     Further, Schwab Charitable may decline or modify a grant recommendation, but only if the recommendation is inconsistent with program policies or used for improper purposes, generally limited to personal gain.

53.     Thus, although Schwab Charitable holds title to the money and reviews grants to make sure donors give to proper organizations, donors' rights are very broad and exist long after the initial contribution to a DAF account is made. In addition, Schwab Charitable advertises the

---

[13] *Schwab Charitable Program Policies* (as of September 2020) at 4, https://www.schwabcharitable.org/public/file/P-5252372.
[14] *Id.* at 5.
[15] *Id.* at 4.
[16] *Id.* at 24.

reputational benefits that donors continue to receive after their donations have been made. For example, each grant to a recipient charity is accompanied by an award letter that can be personalized to include the name of the donor and contact information.[17]

54. Schwab Charitable prominently displays a "Charitable Donation Calculator" on its website, stating that the "donor-advised fund can continue for years—and can even provide a legacy of generosity for generations."[18] This legacy-building sentiment is echoed in Schwab Charitable sales literature that states, "DAFs are designed to make it easy for donors to bequeath their account and enable others to support charitable causes after their passing."[19]

55. Because of these robust advisory rights, which are possessed indefinitely after the initial donation is made, Plaintiff has a personal interest regarding the management and disposition of his donations, including an interest in ensuring that they are managed in accordance with state and federal laws. These special rights and interests differentiate accountholders like Plaintiff from general members of the public that may simply benefit from the DAF and its disbursements.

56. As the California Supreme Court explained in *Holt v. College of Osteopathic Physicians and Surgeons*, "[t]he prevailing view of other jurisdictions is that the Attorney General does not have exclusive power to enforce a charitable trust and that a trustee *or other person having a sufficient special interest* may also bring an action for this purpose. This position is adopted by the American Law Institute (Rest.2d Trusts, s 391) and is supported by many legal scholars." 61 Cal. 2d 750, 753 (1964) (emphasis added) (citations omitted). This broader enforcement authority recognizes the reality that "[b]eneficiaries of a charitable trust, unlike beneficiaries of a private trust, are ordinarily indefinite and therefore unable to enforce the trust in their own behalf." *Id.* at 754. However, donors maintain "a special relationship sufficient to confer standing to sue regarding the

_____

[17] *See* Sample: Smith Family Charitable Fund Letter, https://www.schwabcharitable.org/public/file/P-6528490 (sample grant award letter that includes the identity of the donors, the donor's address, an honorarium, and a personalized message from the donors to the charity, and is sent on personalized letter that features the Schwab Charitable logo and the donors' names).

[18] Schwab Charitable Donation Calculator, https://www.schwabcharitable.org/charitable-donation-calculator.

[19] Rande Spiegelman, *Donor-Advised Funds: Making Giving Strategic, Easy, Tax Smart*, https://www.schwabcharitable.org/public/file/P-5252372.

disposition of their donation" especially where "they retained certain future rights to the donation," such as those Schwab Charitable provides donors. *See supra ¶¶ 47-52. Fairbairn v. Fidelity Investments Charitable Gift Fund*, No. 18-cv-04881-JSC, 2018 WL 6199684, at *6 (N.D. Cal. Nov. 28, 2018).

**B.    Conflicts and Potential for Abuse in DAFs Sponsored by Financial Institutions**

57.    In order to maintain compliance with the Internal Revenue Code, DAFs must be independent, nonprofit organizations. Though DAFs are often created by a financial services company, the financial services company cannot have an ownership role or serve as parent company to the DAF.

58.    Despite the technical legal independence of Schwab Charitable, potential conflicts of interest are rampant. For example, Schwab Corporation "provides administrative and back-office services as necessary to administer and maintain all of the donor-advised accounts[,]" and "all [Schwab Charitable] employees are employed by [Schwab Corporation]."[20] Thus, even though Schwab Charitable is an independent legal entity, it is dependent upon Schwab Corporation for its operation and administration.

59.    The structure of the Schwab DAF here creates further potential for abuse. The investment options made available to donors include mutual funds affiliated with and providing undue benefit to Schwab Corporation. Additionally, because nearly all of Schwab Charitable's service contracts for administrative and investment services are with Schwab Corporation and its subsidiaries, nearly every aspect of the Fund's operations generates fees for the Schwab Corporation.

**C.    Legal Safeguards**

60.    Fortunately, checks on abuses are provided by applicable law. For example, the common law imposes fiduciary duties upon the trustees of a DAF. Restatement (Third) of Trusts § 2, cmt. b. ("The trust relationship is one of many forms of fiduciary relationships[.]"). As part of these duties, the trustees must administer the trust as a prudent person would, in light of the purposes,

---

[20] *Schwab Charitable Fund Financial Statements as of and for the Years Ended June 30, 2019 and 2018* at 6, https://www.schwab.com/public/file/P-6528471.

terms, and other circumstances of the trust. Restatement (Third) of Trusts § 77. Additionally, the duty of prudence requires the exercise of reasonable care, skill, and caution. *Id*. If, however, the trustee possesses special facilities or greater skill than that of a person of ordinary prudence, the trustee has a duty to use such facilities or skill. *Id*.[21]

61.     Schwab Charitable's fiduciary directors possess special facilities and greater skill than that of a person of ordinary prudence. Included among Schwab Charitable's seven directors are a managing partner of a private investment firm; a chief investment officer who manages funds on behalf of pensions, endowments, and foundations; a chief executive officer of the nation's largest accounting organization; and "a leading advocate for financial literacy and one of America's most trusted sources for financial advice."[22] Six of the seven members hold MBAs.

62.     Schwab Charitable's status as an institutional fund also subjects it to statutory fiduciary duties imposed by California's Uniform Prudent Management of Institutional Funds Act ("UPMIFA").[23] Similar to common law fiduciary duties, UPMIFA requires "that each person responsible for managing and investing an institutional fund shall manage and invest the fund in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." Cal. Prob. Code § 18503(b). Further, UPMIFA provides the institution "may incur only costs that are appropriate and reasonable in relation to the assets … and the skills available to the institution." *Id*. § 18503(c)(1). Additionally, "[a]n institution may pool two or more institutional funds for purposes of management and investment." *Id*. § 18503(d). Lastly, as with common law fiduciary duties, UPMIFA provides that a person with special skills or expertise has a duty to use those skills or that expertise in managing and investing institutional funds. *Id*. § 18503(e)(6).

---

[21] These duties have been codified in the California Probate Code. *See supra* ¶¶ 11-12.

[22] *See* About Carrie Schwab-Pomerantz, Board Chair, Schwab Charitable, https://www.aboutschwab.com/carrie-schwab-pomerantz; *see also Schwab Charitable board of directors*, https://www.schwabcharitable.org/about-schwab-charitable/board-of-directors

[23] An institution means "a person, other than an individual, organized and operated exclusively for charitable purposes." Cal. Prob. Code § 18502(d). "Institutional fund means a fund held by an institution exclusively for charitable purposes." *Id.* § 18502(e).

-18-

63.     "[A] trustee is to 'incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.'" *Tibble v. Edison International*, 843 F.3d 1187, 1198 (9th Cir. 2016) (quoting Restatement (Third) of Trusts § 90(c)(3)). "'[C]ost-conscious management is fundamental to prudence in the investment function' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Id.* (citing Restatement (Third) of Trusts § 90, cmt.b). As the Uniform Prudent Investor Act observes: "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs." *Id.* at 1198 (citing Uniform Prudent Investor Act § 7).

64.     In addition, "under trust law, a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828-29 (2015). The Restatement (Third) of Trusts explains that "a trustee's duties apply not only in making investments but also in monitoring and reviewing investments, which is to be done in a manner that is reasonable and appropriate to the particular investments, courses of action, and strategies involved." § 90, Comment b, p. 295 (2007). This is consistent with the Uniform Prudent Investor Act, which commands that "[m]anaging embraces monitoring" and that a trustee has "continuing responsibility for oversight of the suitability of the investments already made." § 2, Comment, 7B U.L.A. 21 (1995) (internal quotation marks omitted); *see also* 4 A. Scott, W. Fratcher, & M. Ascher, Scott and Ascher on Trusts § 19.3.1, p. 1439 (5th ed. 2007) ("When the trust estate includes assets that are inappropriate as trust investments, the trustee is ordinarily under a duty to dispose of them within a reasonable time."); Bogert 3d § 685, at 156–157 (explaining that if an investment is determined to be imprudent, the trustee "must dispose of it within a reasonable time"). Given this ongoing duty to monitor imprudent investments, each failure to monitor and remove imprudent investments is a separate fiduciary breach. *Tibble*, 135 S. Ct. at 1829.

## II.     SCHWAB CHARITABLE DONOR-ADVISED FUND

65.     An account with Schwab Charitable can be established with a minimum contribution of $5,000 if invested in any of the pre-approved investment pools. Appointing a professional account manager requires at least a $250,000 account size. Donors that opt to use an investment advisor

must choose one that conducts advisory business on the Schwab Advisor Custody and Trading Platform and is approved by Schwab Charitable. According to the account opening forms and the Schwab DAF Program Policies, all Schwab Charitable-related contribution agreements are deemed to be entered into in the State of California, all contributions to Schwab Charitable are intended to be administered and managed in the State of California, and any disputes are governed by California law.[24]

66. Donors are charged fees both for the administration and investment of their accounts. As reported on the account application and the program policies, Schwab Charitable charges an administrative fee that covers expenses of operating a donor's account, including online donor services, phone support, grant due diligence and administration, tax filings, quarterly account statements,[25] annual account summaries, and communications. The annualized administration fee is 0.60% on the first $500,000 of a donor's account, decreasing over six additional asset thresholds before reaching a minimum level of 0.10% of assets over $15,000,000.[26] Administrative fees are charged under the same structure for both professionally managed accounts and pre-selected investment pools.

67. Investment fees charged to donors vary depending on how an account is invested. Each investment pool charges fees related to the management of the underlying mutual fund that are disclosed by Schwab Charitable on its website. Mutual funds incur costs stemming from investment advisory fees, marketing and distributing expenses, brokerage fees, and custodial, transfer agency, legal, and accountant fees. Typically, mutual funds pay these regular and recurring, fund-wide operating expenses out of fund assets in the form of an expense ratio.[27]

68. Investors possess the option to invest in one or more of fourteen investment pools offered by Schwab Charitable. Although donors can choose among the fourteen options, Schwab

---

[24] Schwab Charitable Program Policies, *supra* note 13, at 30.

[25] Schwab Charitable Administrative Fees for Core Accounts and Professionally Managed Accounts (as of October 2020), https://www.schwabcharitable.org/public/file/P-6215154/.

[26] Schwab Charitable Program Policies, *supra* note 13, at 7.

[27] Because Schwab Charitable does not make any of the investment management or asset allocation decisions for any of the underlying investments, the investment pools are not charged any additional investment fees on top of the expenses associated with each underlying mutual fund.

Charitable is responsible for selecting the investments underlying each investment pool. Each investment pool invests entirely in an underlying mutual fund and assumes all fees and expenses associated with the underlying fund, as well as an additional annualized administrative fee for charitable services. The available pools are divided into asset allocation and individual investment pools.

69.     The asset allocation pools consist of three options which reflect varying investor risk tolerance (the Conservative Pool, Balanced Pool, and Growth Pool) and a fourth, socially responsible option (the Socially Responsible Balanced Pool). The individual investment pools are further divided into index pools, which include five lower-cost passively managed funds that track a benchmark index, eight actively managed pools that consist of higher-cost mutual funds where managers seek to exceed market returns, and finally a money market pool that offers stability of capital liquidity and current income.

### III.    SCHWAB CHARITABLE IMPRUDENTLY SELECTED AND RETAINED ONESOURCE MUTUAL FUNDS AS DAF INVESTMENT OPTIONS

70.     On its brokerage platform, Schwab Corporation offers the Schwab Mutual Fund OneSource service ("OneSource"), which offers "no-load, no transaction fee mutual funds" that allow consumers who wish to invest without going through a broker, to do so without paying a commission.[28] As of October 23, 2020, there were over 4,200 mutual funds offered through OneSource, managed by investment management firms such as American Funds, PIMCO, and T. Rowe Price.[29] Such "no-transaction-fee" brokerage platforms are highly popular and many large investment management firms offer their own version.

71.     The purported benefit of such platforms is that they allow individual investors access to purchase mutual funds without paying a transaction fee. However, nothing is free. Because mutual fund companies must make substantial revenue sharing payments to get on a brokerage firm's "no-transaction-fee" platform, the mutual funds available on such a platform charge much higher annual

---

[28] No-Load, No Transaction Fee Mutual Funds, https://www.schwab.com/mutual-funds/no-load-mutual-funds.

[29] *See* Mutual Fund OneSource Select List, https://www.schwab.com/mutual-funds/no-load-mutual-funds/onesource-select-list.

fees—generally costing much more per year than the transaction fee itself would have been.[30] This is true of OneSource.

72.     In order to have access to the OneSource platform, investment managers must make annual revenue sharing payments to Schwab Corporation as a percentage of the assets held in the manager's funds on the platform. While most mutual funds offer a certain amount of revenue sharing payments to brokerage firms holding their funds, Schwab's large customer base has allowed it to negotiate a much larger revenue sharing rate on OneSource mutual funds—40 basis points annually, or 0.40% per year.[31] To put that fee in perspective, 0.40% is more than half of the *entire* expense ratio of 0.74% charged by the average actively managed equity mutual fund.[32] This additional revenue sharing was retained by Schwab Corporation, and not rebated to donors or the Schwab Charitable trust.

73.     Thus, in selecting and retaining investment options that were almost entirely OneSource mutual funds, Schwab Charitable utilized mutual funds that charged significantly higher fees than many marketplace alternatives and that multiplied the revenue sharing received by Schwab Corporate, even though retaining those mutual funds was not in the best interests of the charitable trust.

74.     A large institutional investor such as the Schwab DAF has no need to purchase OneSource mutual funds, which are marketed to *individual* investors who wish to purchase mutual funds without going through a broker. Whereas an individual investor investing $10,000 would be effectively spending $40 per year in revenue sharing payments on a OneSource mutual fund, an institutional investor like the Schwab DAF with $250,000,000 invested in a particular option would effectively be spending $1,000,000 per year. An institutional investor can and should use its

---

[30] *See* Steven Goldberg, *Don't Be Fooled by No-Transaction-Fee Funds*, KIPLINGER, Jan. 23, 2013, https://www.kiplinger.com/article/investing/T041-C007-S003-don-t-be-fooled-by-no-transaction-fee-funds.html ("We'd like every dollar possible in the [lower-cost] institutional share class…. But you need a no-transaction fee share class to get traction in this business. Investors would rather pay no transaction fee because they don't do the math.").

[31] Schwab's financial and other relationships with ETFs and mutual funds, s*upra* note 8.

[32] Investment Company Institute, 2020 ICI Fact Book, at 127 (2020), https://www.ici.org/pdf/2020_factbook.pdf. As ICI notes, "Expense ratios are measured as asset-weighted averages." *Id.*

significant market power to negotiate custodial services (that would include all transactions) costing ten to forty times less on an annual basis, while negotiating contractual rebates of any revenue sharing payments that exceed those rates (discussed further below).

75.     Twelve of the 14 mutual funds underlying the pooled investments in the Schwab DAF were OneSource funds. Each of these mutual funds was more expensive than comparable, and sometimes even identical, investment options available in the marketplace to an institutional investor like the Schwab DAF.

## IV.     SCHWAB CHARITABLE SELECTED AND RETAINED SCHWAB CORPORATION ONESOURCE MUTUAL FUNDS

76.     Under the OneSource program, Schwab Corporation receives even more compensation from the Schwab-affiliated mutual funds than it does from unaffiliated mutual funds.[33] Not coincidentally, the Fiduciary Defendants selected Schwab-affiliated mutual funds to underlie almost half of the Schwab DAF's investment pools (the money market and index investment pools) when there were less expensive, comparable (if not superior), unaffiliated mutual funds available. This was imprudent, disloyal, and unlawful.

77.     Money market funds are capital preservation investments that provide investors an option to purchase a pool of securities that generally provides higher returns than interest-bearing bank accounts. Money market funds invest in high quality, short-term debt securities and pay dividends that generally reflect short-term interest rates. The market for them is highly competitive.

78.     Index funds provide investors the option to invest in a portfolio constructed to match or track the components of a financial market index, such as the Standard & Poor's 500 Index. Index funds provide broad market exposure, low operating expenses, and low portfolio turnover while following a passive investment strategy. The market for index funds is also highly competitive.

---

[33] According to Charles Schwab's disclosure to retirement plan customers, "Schwab Funds have adopted a shareholder servicing plan with fees for shareholder services ranging from 0.02% to 0.25% annual . . . In aggregate, the fees Schwab receives from Schwab Affiliate Funds are greater than the compensation Schwab receives from unaffiliated fund companies participating in the Schwab Mutual Fund OneSource Service." Charles Schwab, *ERISA 408(b)(2) Fee Disclosure Report*, at 8 (2019), https://www.schwab.com/public/file/P-5358937.

79.     Trustees of prudently run DAFs investigate the marketplace for the best available money market and index funds rather than blindly selecting options affiliated with the sponsor of the DAF. For example, Pershing LLC, a subsidiary of the Bank of New York Mellon, serves as custodian of the multi-billion-dollar New York Community Trust. Despite the convenient availability of BNY Mellon money market funds, trustees of the New York Community Trust prudently investigated the marketplace and selected an unaffiliated fund, the Vanguard Federal Money Market Fund, as the trust's capital preservation option. Similarly, BNY Mellon offers a variety of index fund investments. But again, the trustees examined the marketplace for prudent options and selected Vanguard passively managed funds for the New York Community Trust.

80.     Because of the similarity in investment objective and holdings, a significant source of competition among money market fund providers is the fees charged to investors. As a result, prudently run DAFs will offer a money market fund with low fees.

81.     Schwab Charitable, through the Schwab Government Money Market Fund, charges donors 0.35% for investment in its money market pool.[34] There are countless alternative money market funds with similar investment objectives, significantly lower fees, and better performance. For example, the Vanguard Federal Money Market Fund utilized by the New York Community Trust, which has a fraction of Schwab Charitable's assets, carries a 0.11% net expense ratio. The amount of assets held by Schwab Charitable's money market investment pool would additionally qualify for investment in the State Street Institutional U.S. Government Money Market Fund charging 0.15%, and the Fidelity Investments Money Market Funds Government Portfolio charging 0.14%. Though these funds charge much lower fees than Schwab, they offer the exact same set of services, and the quality of investment management is comparable if not superior.

82.     As illustrated by the above, the Schwab Government Money Market Fund's fees are at least two to three times higher than marketplace alternatives and provide donors inferior returns as a result. Use of the Schwab Government Money Market Fund as the Schwab DAF's capital preservation option is the result of a failure of the Fiduciary Defendants to discharge their duties

---

[34] *Schwab Government Money Fund – Investor Shares*, https://www.schwabfunds.com/products/snvxx.

loyally with the care, skill, prudence, and diligence that an ordinarily prudent person in a like position would use under similar circumstances.

83.     Because index funds track identical or similar market-based indices, a significant source of competition among index fund providers is also the fees charged to investors. Prudently managed DAFs will seek to capitalize on this price competition by utilizing index funds with low costs, and avoid index funds with high fees.

84.     Schwab Charitable, through its five index investment pools, offers donors the Schwab U.S. Aggregate Bond Index Fund, Schwab Total Stock Market Index Fund, Schwab International Index Fund, Schwab Small Cap Index Fund, and Schwab Treasury Inflation Protected Securities Index Fund.[35] A prudent review of the marketplace for similar index funds would have revealed options with fees as low as half the cost of the Schwab-affiliated index funds.

85.     For example, as of the beginning of 2017, the Schwab Treasury Inflation Protected Securities Index Fund that was offered as one of the pre-selected investment options charged fees of 0.19% per year. Given the assets in this fund, Schwab Charitable could have instead invested in Institutional shares of the Fidelity Inflation-Protected Bond Index Fund, which tracks the exact same index, for only 0.06%. As would be expected, the Schwab fund subsequently earned lower investment returns than the Fidelity option given the higher fees.

86.     In other instances, the Schwab fund had a demonstrably poorer track record than another fund in the marketplace, but was retained by Schwab Charitable despite this persistent underperformance. For example, consider the annual returns of the Fidelity Small Cap Index Fund and the Schwab Small Cap Index Fund, each of which tracks the same underlying index, from 2013 to 2019:

---

[35] *Schwab Charitable Investment Options*, https://www.schwabcharitable.org/investment-options.

**CLASS ACTION COMPLAINT**

| | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|
| **Fidelity Small Cap Index** | 25.71% | -10.88% | 14.85% | 21.63% | -4.24% | 5.19% | 39.02% |
| **Schwab Small Cap Index** | 25.60% | -10.95% | 14.68% | 21.33% | -4.41% | 4.97% | 38.69% |

87.     Yet despite the Schwab index fund materially underperforming marketplace alternatives for seven consecutive calendar years, the Fiduciary Defendants continued to retain the Schwab-affiliated index fund.

**V.     SCHWAB CHARITABLE SELECTED AND RETAINED MORE EXPENSIVE ONESOURCE MUTUAL FUNDS.**

88.     Many mutual funds offer multiple types of shares, known as "classes." Generally, the more expensive share classes are targeted at smaller investors with less bargaining power, while the lower-cost shares are targeted at institutional investors with more assets, and therefore greater bargaining power. All classes of a fund invest in the same pool of securities, have the same investment manager, and have common investment objectives and policies. Therefore, differences in investment returns between share classes are directly attributable to differences in their fees and expenses.

89.     Schwab Charitable's reliance on OneSource Funds for the overwhelming majority of its investment pools also caused them to select higher-cost share classes of non-proprietary investment options, when the Schwab DAF, as a large institutional investor, could have qualified for lower-cost share classes.

90.     As Schwab Charitable holds legal title to the moneys contributed by donors, it has sufficient assets and negotiating power to qualify for institutionally priced share classes. For example, in employer-sponsored 401(k) plans, although accounts are technically divided among investors and may not individually meet institutionally priced share class thresholds, this does not inhibit fiduciaries from leveraging the plan assets as a whole to obtain favorable pricing. Similarly, UPMIFA allows the pooling of funds "for purposes of management and investment." Cal. Prob. Code § 18503(d).

91.     Because there is no meaningful difference between share classes other than cost, prudent fiduciaries will select the lowest-priced share class available to them. However, in several instances, the Fiduciary Defendants failed to do so.

92.     The Fiduciary Defendants' failure to monitor the investment pools and investigate the availability of institutionally priced share classes cost donors, and ultimately recipient charities, millions of dollars in fees each year. For example, the Conservative Pool invests entirely in Manning & Napier Pro-Blend Conservative Series Class S, which has a prospectus net expense ratio[36] of 0.87%. However, throughout the statutory period the institutionally priced share class of this same fund was available to Schwab Charitable with a prospectus net expense ratio of 0.64%.[37]

93.     Another example is the Income Pool, which invests entirely in Metropolitan West Total Return Bond Class M and charges a prospectus net expense ratio of 0.67%.[38] Available to Schwab Charitable throughout the statutory period was the institutional share class of this fund, which charges investors 0.44%.[39]

---

[36] The prospectus net expense ratio is the percentage of fund assets, net of reimbursements, used to pay for operating expenses and management fees, including 12b-1 fees, administrative fees, acquired fund fees (i.e. the cost of owning other pooled investment vehicles such as mutual funds or exchange-traded funds), and all other asset-based costs incurred by the fund. The prospectus net expense ratio is an estimate of the expenses that investors are likely to be charged in the current year, and is publicly disclosed in the prospectus that each mutual fund must file with the SEC on an annual basis, though mutual funds can update their estimated expenses throughout the course of the year by filing a summary prospectus with the SEC, which is also publicly available to investors.

[37] *Manning & Napier Pro-Blend Conservative Term Series Class I*, Charles Schwab Mutual Fund Quotes & Research Tools, https://www.schwab.com/public/schwab/investing/investment_help/investment_research/mutual_fund_research/mutual_funds.html?path=%2fProspect%2fResearch%2fMutualFunds%2fSummary.asp%3fsymbol%3dMNCIX.

[38] *Metropolitan West Total Return Bond Fund Class M*, Charles Schwab Mutual Fund Quotes & Research Tools, https://www.schwab.com/public/schwab/investing/investment_help/investment_research/mutual_fund_research/mutual_funds.html?path=%2fProspect%2fResearch%2fMutualFunds%2fSummary.asp%3fsymbol%3dMWTRX.

[39] *Metropolitan West Total Return Bond Fund Class I*, Charles Schwab Mutual Fund Quotes & Research Tools, https://www.schwab.com/public/schwab/investing/investment_help/investment_research/mutual_fund_research/mutual_funds.html?path=%2fProspect%2fResearch%2fMutualFunds%2fSummary.asp%3fsymbol%3dMWTIX.

94.     In total, the Fiduciary Defendants failed to utilize the least expensive available share class of *six* investments that were included in the Schwab DAF. The chart below shows the expense ratio of each fund's institutionally priced share class compared with what Schwab Charitable's investment pools held, as listed on Charles Schwab's website and in each fund's most recently filed statutory or summary prospectus:

| Investment Pool | Underlying Mutual Fund | Expense Ratio of Underlying Mutual Fund (Ticker) | Expense Ratio of Institutionally Priced Share Class (Ticker) |
|---|---|---|---|
| **Conservative Pool** | Manning & Napier Pro-Blend Conservative Series Class S | 0.87% (EXDAX) | 0.64% (MNCIX) |
| **Balanced Pool** | Janus Henderson Balanced Fund Class T | 0.83% (JABAX) | 0.65% (JBALX) |
| **Growth Pool** | T. Rowe Price Spectrum Moderate Growth Allocation Fund | 0.78% (TRSGX) | 0.66% (TGIPX) |
| **Socially Responsible Balanced Pool** | Pax Sustainable Allocation Fund Individual Investor Class | 0.92% (PAXWX) | 0.67% (PAXIX) |
| **Income Pool** | Metropolitan West Total Return Bond Class M | 0.67% (MWTRX) | 0.44% (MWTIX) |
| **Large Cap Equity Managed Pool** | Parnassus Core Equity Fund Investor Class | 0.86% (PRBLX) | 0.63% (PRILX) |

95.     Schwab Charitable does not provide information regarding the asset levels of each investment pool. However, it is clear from public SEC filings for the underlying mutual funds, as well as Schwab Charitable's total assets of over $15 billion, that the at-issue investment pools hold more than enough assets to meet institutional pricing investment minimums.

96.     For example, the Growth Pool, which currently invests in the T. Rowe Price Spectrum Moderate Growth Allocation Fund, previously invested solely in the American Century One Choice Aggressive Fund.[40] SEC filings for the American Century fund show that 36% of its assets, or nearly $500 million, were owned by Schwab Corporation in the months preceding the

---

[40] "As of 8/15/2019, the Growth Pool underlying fund was changed from the American Century One Choice Aggressive Fund to the T. Rowe Price Spectrum Moderate Growth Allocation Fund." Quarterly Performance Report (March 31, 2020), https://www.schwabcharitable.org/public/file/P-10140962.

investment change in the Growth Pool. Following the transition to the T. Rowe Price fund, Schwab Corporation's ownership in the American Century fund dropped to just 9% of total assets. In contrast, Schwab Corporation's ownership in the T. Rowe Price fund jumped from less than 5% prior to the transition to nearly 20% after, equating to over $500 million in assets. This supports an inference that approximately 75% of the assets in each fund, or $375 million, were part of the Schwab DAF. The Growth Pool therefore would have held nearly four-hundred times the investment minimum required to use the institutional share class. Despite this, Schwab Charitable selected the investor share class in 2019 when the Growth Pool's underlying mutual fund was changed, opting to utilize a share class with an investment minimum designed for individual investors instead of massive institutions:

| | Underlying Mutual Fund T. Rowe Price Spectrum Moderate Growth Allocation Fund (TRSGX) | | Institutionally Priced Mutual Fund T. Rowe Price Spectrum Moderate Growth Allocation Fund I (TGIPX) | |
|---|---|---|---|---|
| Estimated Growth Pool Assets | Minimum Investment | Expense Ratio | Minimum Investment | Expense Ratio |
| $375 million | $2,500 | 0.78% | $1,000,000 | 0.66% |

97.     Despite the additional cost paid by donors for such higher-cost share classes, no additional services are received in return. As noted above, each share class of a specific mutual fund invests in the same underlying securities and employs the same managers.[41] By not utilizing the institutionally priced share classes available, the Fiduciary Defendants breached their fiduciary duties at common law and under UPMIFA.

## VI.   SCHWAB CHARITABLE'S SELECTION AND RETENTION OF ONESOURCE MUTUAL FUNDS CAUSED THE SCHWAB DAF TO PAY EXCESSIVE ADMINISTRATIVE FEES

98.     In selecting mutual funds from OneSource—a platform designed for small, individual investors—Schwab Charitable also caused donors to pay excessive administrative fees.

---

[41] Though Schwab purports that the more expensive funds benefit shareholders because they are part of the "No-Transaction-Fee Program," it was not prudent to pay between 0.13% and 0.25% of additional fees given that Schwab Charitable could have obtained brokerage, custodial, and transactional services for between 0.01% and 0.04% in the marketplace. For example, the Silicon Valley Community Foundation charges donors only 0.03% per year for custodial and brokerage services, covering not only transaction fees but a whole host of other services.

OneSource mutual funds carry high fees in part to pay for shareholder servicing, recordkeeping, brokerage, and custodial services.[42] These fees contemplate the provision of services on an individual level. However, institutional investors can achieve economies of scale for such services and pay significantly less. Schwab Charitable should have used its significant bargaining power and negotiated and monitored the fees paid to Schwab Corporation for custodial services, such as brokerage and custodial services.

99.     As noted above, institutional investors with billions of dollars in assets typically seek to minimize these expenses by (1) seeking bids from multiple service providers in the marketplace to get the most competitive price available, and (2) closely monitoring of all sources of compensation to the custodian. However, the Fiduciary Defendants failed to do so with respect to the Schwab DAF.

100.     Similar to other administrative services, custodial services can be paid for directly by a DAF or indirectly as a built-in component of the fees charged for the investment products offered within the DAF. When custodial services are paid for indirectly, this practice is known as "revenue sharing." Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16. These "revenue sharing" payments from investment managers to plan service providers typically happen on a quarterly basis based upon an agreed-upon contribution formula.

101.     As noted above, the OneSource mutual funds used by Schwab Charitable made substantial revenue sharing payments to Schwab Corporation to compensate Schwab Corporation for the provision of custodial services. These revenue sharing payments were in many cases 0.40% or more. However, these indirect payments far exceed the amount needed to pay for custodial services for a DAF of this size. An institutional investor with billions of dollars in assets such as Schwab Charitable could have negotiated the provision of custodial services from providers such as State Street or BNY Mellon for between 0.01% and 0.04%. Schwab Charitable should have known this and used a different administrative service provider, used lower-cost investments without the built-in revenue sharing (or less revenue sharing), or capped the amount of revenue sharing that Schwab Corporation received with the excess refunded to donor accounts. But Schwab Charitable

---

[42] *Schwab's financial and other relationships with ETFs and mutual funds*, s*upra* note 8.

failed to act diligently or loyally, and as a result Schwab Corporation kept all of the revenue sharing payments that were made by the underlying investment options.

**VII.  SCHWAB CORPORATION HAD KNOWLEDGE OF AND PARTICIPATED IN SCHWAB CHARITABLE'S FIDUCIARY BREACHES**

102.    Schwab Corporation had knowledge of and participated in the fiduciary breaches and unlawful conduct outlined above. Because Schwab Charitable was "established with the support of [Schwab Corporation]" and "[a]ll Fund employees are employed by [Schwab Corporation]," Schwab Corporation is an active participant in Schwab Charitable's breaches. Additionally, Schwab Corporation played an active role in Schwab Charitable's breach by processing the transactions within the Schwab DAF associated with the at-issue investment pools and receiving and retaining the extra fees borne by the OneSource program.

103.    For example, Schwab Corporation had knowledge that superior alternatives existed to its proprietary money market and index funds. Schwab Corporation is aware of these alternative options because it offers all of them on its own brokerage platform, which is an "open architecture" platform, meaning that it offers investments from numerous different companies. Indeed, numerous retirement plans that work with the Schwab Corporation offer their participants these superior index and money market funds from providers such as Vanguard, Fidelity, State Street, and Blackrock.

104.    Schwab Corporation also had knowledge of the excess administrative fees paid by Schwab Charitable given that it was a party to the custodial services contract. Further, given its industry status, Schwab Corporation had knowledge that Schwab Charitable was paying many times above marketplace rates. Schwab Corporation further facilitated this fiduciary breach by leveraging its close relationship with Schwab Charitable to secure this contract.

105.    Finally, Schwab Corporation was also aware that Schwab Charitable failed to obtain the lowest-cost share class for its investment options. Schwab Corporation's knowledge of the availability of institutional share classes is exhibited through publicly available SEC filings showing Schwab Corporation's substantial investment in institutionally priced share classes, including institutional share classes of the very funds at issue. For example, Manning & Napier's most recent Statement of Additional Information reveals that Schwab Corporation owns 7.75% of *all*

institutional shares, the cheapest share class of the Manning & Napier Pro-Blend Conservative Series fund.

106.    This is not an anomaly. Schwab Corporation maintains substantial ownership in an institutionally priced share class of each at-issue fund. According to recent SEC filings, Schwab Corporation owns 5.44% of all Janus Henderson Balanced institutional shares, 16.29% of all T. Rowe Price Spectrum Moderate Growth Allocation institutional shares, 7.08% of all Pax Sustainable Allocation institutional shares, 16.33% of all Metropolitan West Total Return Bond institutional shares, and 27.17% of all Parnassus Core Equity institutional shares.

107.    Schwab Corporation knew that the Schwab DAF was eligible for these lower-cost institutional share classes, but gladly accepted the significantly higher fees associated with the share classes offered through its OneSource program, and indeed appears to have recommended the higher cost share classes. As such, it is a third party who "received and retained trust property from the trustee in knowing breach of trust." *Atascadero*, 68 Cal. App. 4th at 462.

## CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200

108.    California Business and Professions Code § 17200 proscribes unlawful business practices and authorizes an action resulting from unfair competition. "By proscribing 'any unlawful' business practice, Bus. & Prof. Code, § 17200, borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 165 (1999).

109.    "An unlawful business practice under section 17200 is 'an act or practice, committed pursuant to business activity, that is at the same time *forbidden by law*.'" *Progressive W. Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263 (2005) (citing *Bernardo v. Planned Parenthood Federation of America*, 115 Cal. App. 4th 322, 351 (2004)). Therefore, "[v]irtually any law—federal, state, or local—can serve as a predicate for an action under Business and Professions Code section 17200." *Ticconi v. Blue Shield of California Life & Health Ins. Co.*, 160 Cal. App. 4th 528, 538 (2008) (citing *Smith v. State Farm Mutual Automobile Ins. Co.*, 93 Cal. App. 4th 700, 717-18 (2001)). In addition, violation of common law can serve as a predicate legal violation for purposes of § 17200. *See Mercado v. Allstate Ins. Co.*, 340 F.3d 824, 828 n.3 (9th Cir. 2003).

110. By engaging in the conduct described above, the Fiduciary Defendants violated fiduciary duties imposed by common trust law, California state law, and UPMIFA. These violations of fiduciary duties imposed by law also constitute violations of California Business and Professions Code § 17200.

<u>**CLASS ACTION ALLEGATIONS**</u>

111. Plaintiff seeks certification of this action as a class action pursuant to Federal Rule of Civil Procedure 23. Plaintiff asserts his claims in Counts I, II, and III on behalf of a class of all account holders defined as follows:[43]

> All account holders of Schwab Charitable Donor-Advised Fund accounts that have had a balance in any of the investment pools at any time on or after October 30, 2016, excluding members of the Schwab Charitable Board of Directors, Schwab Corporation Board of Directors, and any other Schwab Charitable or Schwab Corporation employees with responsibility for the Donor-Advised Fund's investment or administrative functions.

112. <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. As of the end of 2018, more than 56,000 donors had donor-advised accounts invested with Schwab Charitable.

113. <u>Typicality</u>: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff donated assets to the Schwab DAF and maintained control over his donations through the robust advisory rights offered by Schwab Charitable. Additionally, like other Class members, Plaintiff suffered injuries regarding the disposition of donated assets as a result of the imprudent management of investment pools by Defendants. Defendants managed the assets of each investment pool collectively, and all donors investing in a particular investment pool were invested in the same underlying mutual fund.

114. <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and he has retained counsel

---

[43] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

experienced in complex class action litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

115.    Commonality: Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

a)    Whether Defendants Schwab Charitable, the Board, and the Committee are fiduciaries with respect to the Donor-Advised Fund;

b)    Whether the Fiduciary Defendants breached their fiduciary duties at common law by engaging in the conduct described herein;

c)    Whether the Fiduciary Defendants are additionally or alternatively liable for the unlawful conduct described herein pursuant to Cal. Corp. Code § 5231(a);

d)    Whether the Fiduciary Defendants are additionally or alternatively liable for the unlawful conduct described herein pursuant to Cal. Prob. Code §§ 18501-10;

e)    Whether the Fiduciary Defendants are additionally or alternatively liable for the unlawful conduct described herein pursuant to Cal. Bus. & Prof. Code § 17200;

f)    Whether Defendant Schwab Corporation liable for the unlawful conduct described herein by knowingly facilitating and benefitting from such unlawful conduct;

g)    The proper form of equitable and injunctive relief; and

h)    The proper measure of monetary relief.

116.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

117.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. As an example, any award of equitable relief

by the Court, such as removal of particular investment pools or removal of a Schwab DAF fiduciary, would be dispositive of non-party participants' interests.

118.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I

### Breaches of Fiduciary Duties at Common Law
### (as to the Fiduciary Defendants)

119.     Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

120.     The donation of property to the Schwab DAF for a charitable purpose creates a charitable trust under California common law. *L.B. Research & Educ. Foundation*, 130 Cal. App. 4th at 177. A charitable trust is a fiduciary relationship, and the fiduciary duties owed by a trustee apply to the investment of the assets of the charitable trust. *Id.*

121.     As to the Schwab DAF, among other things, the Fiduciary Defendants are responsible for prudently selecting appropriate underlying funds for the investment pools, evaluating and monitoring the underlying investments on an ongoing basis and removing and replacing those that are no longer appropriate, and taking all necessary steps to ensure that the Schwab DAF's assets are invested prudently and in a low-cost manner.

122. As described throughout this Complaint, Defendants failed to employ a prudent process for selecting, monitoring, and reviewing the underlying investments held by the investment pools. Defendants imprudently selected and retained higher cost OneSource mutual funds and proprietary funds affiliated with Schwab Corporation, despite the availability of better-performing, lower-cost alternatives. In addition, Defendants caused donors to pay excessive administrative fees and allowed Schwab Corporation to retain excessive indirect compensation by failing to monitor the administrative fees being paid to Schwab Corporation and negotiate a service provider contract for the provision of custodial services at arm's length.

123. Each of the above actions described in paragraph 122 and elsewhere in this Complaint demonstrate that the Fiduciary Defendants failed to discharge their duties with the care, skill, prudence, and diligence that an ordinarily prudent person in a like position would use under similar circumstances. In addition, the Fiduciary Defendants placed the interests of Schwab Corporation and its affiliates over those of persons like Plaintiff who entrusted their assets to Schwab Charitable. As a result, the Fiduciary Defendants breached their fiduciary duties at common law.

<u>**COUNT II**</u>

**Third-Party Contribution to Breaches of Fiduciary Duties at Common Law**
**(as to Schwab Corporation)**

124. Defendant Schwab Corporation is a knowing contributor to and beneficiary of Schwab Charitable's fiduciary breaches and unlawful conduct, and is therefore liable for the same.

125. As described throughout this Complaint, Schwab Corporation knowingly benefited from Schwab Charitable's fiduciary breaches. In receiving increased revenues resulting from Schwab Charitable's utilization of higher cost index funds, money market fund, and other mutual funds found within the OneSource program in the investment pools, Schwab Corporation enriched itself as a result of Schwab Charitable's breaches of fiduciary duties and other unlawful conduct.

126. Further, through its status as one of the largest financial services firms in the world, its operation of an open architecture brokerage platform, and as exhibited through substantial holdings in institutionally priced versions of the at-issue mutual funds, Schwab Corporation was cognizant of the availability of and Schwab Charitable's eligibility for institutionally priced share

**CLASS ACTION COMPLAINT**

classes and superior index and money market fund investments. Therefore, Schwab Charitable is a knowing and benefitting participant in Schwab Charitable's fiduciary breaches and unlawful conduct.

127. Plaintiff is entitled to disgorgement of all profits received by Schwab Corporation on account of the fiduciary breaches and unlawful conduct that it contributed to and/or benefitted from.

## COUNT III

### Unlawful Conduct in Violation of California's Unfair Competition Law, California Business and Professions Code § 17200, *et seq.* (as to all Defendants)

128. Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

129. The Fiduciary Defendants are required to adhere to the requirements of California's Unfair Competition Law (the "UCL"), Cal. Business and Professions Code § 17200, in connection with their management of the Schwab DAF on behalf of clients.

130. The UCL prohibits, among other things, any unlawful business act or practice. Defendants engaged in unfair competition in violation of the UCL by violating each of the following. Each of these violations constitutes an independent and separate violation of the UCL.

    **A. Breaches of Fiduciary Duties at Common Law as to Fiduciary Defendants.** *See supra ¶¶ 116-123.*

    **B. Third-Party Contribution to Breach of Fiduciary Duties at Common Law as to Schwab Corporation.** *See supra ¶¶ 124-127.*

    **C. California Corporation Code § 5231**

131. The Fiduciary Defendants violated fiduciary duty of prudence under California Corporation Code 5231, by failing to manage the Schwab DAF with the prudence that an ordinarily prudent person would exercise under the circumstances, as described *supra* in paragraph 122 and elsewhere in this Complaint. Because these actions prioritized the profitability of the Schwab Corporation over the charitable objectives of Schwab Charitable, the Fiduciary Defendants also violated the duty of loyalty imposed by California Corporation Code 5231.

## D. Uniform Prudent Management of Institutional Funds Act ("UPMIFA"), Cal. Prob. Code § 18501, *et seq.*

132.   As a section 501(c)(3) nonprofit organization, and as acknowledged in Schwab Charitable's IPS, the Fiduciary Defendants were required to exercise prudent and appropriate care toward Schwab Charitable's assets in accordance with UPMIFA.

133.   In addition to incorporating state law fiduciary duties, UPMIFA imposes rules as to how institutional funds shall be managed. Among these requirements is that an institution "may incur only costs that are appropriate and reasonable in relation to the assets, the purposes of the institution, and the skills available to the institution." Cal. Prob. Code § 18503(c)(1). Additionally, "[a]n institution may pool two or more institutional funds for purposes of management and investment." Cal. Prob. Code § 18503(d).

134.   As described throughout this Complaint, the Fiduciary Defendants failed to incur only costs that are appropriate and reasonable in relation to the assets of, the purposes of, and the skills available to Schwab Charitable. The Fiduciary Defendants failed to pool assets among individual accounts to obtain favorable institutional pricing for the underlying mutual funds of investment pools. In addition, the Fiduciary Defendants failed to properly review the marketplace for better-performing, lower-cost capital preservation and passive investment options when selecting the Schwab DAF's money market fund and index funds, instead utilizing inferior options affiliated with Schwab Corporation. Further, Defendants caused donors to pay excessive administrative fees and allowed Schwab Corporation to retain excessive revenue sharing payments.

135.   Each of the above actions described in paragraph 134 and elsewhere in this Complaint demonstrate that the Fiduciary Defendants failed to manage the Schwab DAF in accordance with UPMIFA and in violation of Cal. Prob. Code §§ 18501-10.

136.   As a result of Defendants' breaches of fiduciary duties and violations of UPMIFA, Plaintiff has suffered injury in fact and an economic detriment. "There are innumerable ways in which economic injury from unfair competition may be shown." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011). For example, "[a] plaintiff may (1) surrender in a transaction more, or

acquire in a transaction less, than he or she otherwise would have" or "(2) have a present or future property interest diminished[.]" *Id.*

137.    Here, Plaintiff surrendered more in the transaction, because higher fees were paid for the exact same investment services, and acquired less, because Defendants' imprudence reduced the amount of money that can be directed towards charitable causes. Additionally, Plaintiff had a property interest diminished. Courts have consistently held that donors maintain some property interest where they have the right to determine who is able to use and enjoy the property, even if title has passed. *Connelly v. Bank of Am. Nat. Tr. & Sav. Ass'n*, 138 Cal. App. 2d 303, 305-07 (1956) (collecting cases). Plaintiff's robust advisory rights are reduced where the amount of assets that can be directed is diminished. Therefore, Defendants are additionally in violation of California's unlawful business and unfair competition statute, Cal. Bus. & Prof. Code § 17200.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Pinkert, individually and as representative of the Class defined herein, prays for relief as follows:

A.  A determination that this action may proceed as a class action under Fed. R. Civ. P. 23;

B.  Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.  A declaration that Defendants Schwab Charitable, the Board, and the Committee have breached their fiduciary duties under common law and/or California state law;

D.  A declaration that Defendants Schwab Charitable, the Board, and the Committee violated UPMIFA and the California Corporation Code and, in turn, the UCL;

E.  A declaration that Defendant Schwab Corporation is jointly liable for the Fiduciary Defendants' breaches of their fiduciary duties and other unlawful conduct as a knowing participant in and beneficiary of such fiduciary breaches and unlawful conduct;

F.  An order compelling Defendants to personally make good all losses resulting from the breaches of fiduciary duties and violations of state laws described above;

G.  An order granting equitable restitution, disgorgement of profits, and other appropriate equitable monetary relief against Defendants such as surcharge or constructive trust;

1      H. An order enjoining Defendants from any further violations of their legal obligations to

2        members of the Class;

3      I. An award of pre-judgment interest;

4      J. An award of attorneys' fees and costs pursuant to California Code of Civil Procedure

5        § 1021.5, and/or the common fund doctrine; and

6      K. An award of such other and further relief as the Court deems equitable and just.

Dated: October 30, 2020            **NICHOLS KASTER, LLP**

                                   By: /s/ Matthew C. Helland
                                   Matthew C. Helland

                                   **COUNSEL FOR PLAINTIFF AND THE PROPOSED CLASS**

**CLASS ACTION COMPLAINT**