David C. Marcus (SBN 158704)
david.marcus@wilmerhale.com
Christopher T. Casamassima (SBN 211280)
chris.casamassima@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: +1 213 443 5300
Facsimile: +1 213 443 5400

ALAN E. SCHOENFELD (*pro hac vice*)
alan.schoenfeld@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
Telephone: +1 212 937 7294
Facsimile: +1 212 230 8888

ANDREW S. DULBERG (*pro hac vice*)
andrew.dulberg@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
Telephone: +1 617 526 6000
Facsimile: +1 617 526 5000

*Attorneys for Defendants Schwab Charitable
Fund, Schwab Charitable Board of Directors, and
Schwab Charitable Investment Oversight
Committee*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| PHILIP PINKERT, individually and on behalf of a class of similarly situated individuals, and on behalf of the general public,<br><br>     Plaintiff,<br><br>     v.<br><br>SCHWAB CHARITABLE FUND, CHARLES SCHWAB & CO., SCHWAB CHARITABLE BOARD OF DIRECTORS, and SCHWAB CHARITABLE INVESTMENT OVERSIGHT COMMITTEE,<br><br>     Defendants. | Case No. 3:20-cv-07657-LB<br><br>**NOTICE OF MOTION, MOTION TO DISMISS, AND MEMORANDUM OF POINTS AND AUTHORITIES ON BEHALF OF DEFENDANTS SCHWAB CHARITABLE FUND, SCHWAB CHARITABLE BOARD OF DIRECTORS, AND SCHWAB CHARITABLE INVESTMENT OVERSIGHT COMMITTEE**<br><br>HEARING DATE: May 13, 2021<br>TIME: 9:30 a.m.<br>COURTROOM: B – 15th Floor<br>JUDGE: Hon. Laurel Beeler |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION TO DISMISS ............................................................... 1

STATEMENT OF RELIEF REQUESTED ........................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

I.      INTRODUCTION ............................................................................................................... 1

II.     STATEMENT OF ISSUES TO BE DECIDED ....................................................... 3

III.    BACKGROUND .................................................................................................................. 3

        A.      The Fund .......................................................................................................... 3

        B.      This Lawsuit ..................................................................................................... 6

IV.     ARGUMENT ........................................................................................................................ 7

        A.      Pinkert Lacks Standing To Sue ................................................................. 7

                1.      Pinkert lacks Article III standing ............................................... 7

                2.      Pinkert lacks standing to sue under California law.................. 9

        B.      Pinkert Fails To State A Claim ............................................................... 15

                1.      Count I fails to state a claim because the applicable
                        fiduciary duties are governed by statute, not common law ..... 15

                2.      Count III fails to state a claim because Pinkert's allegations
                        cannot overcome the business judgment rule's presumption
                        of good faith and sound judgment ........................................... 18

                3.      Pinkert fails to plead sufficient facts from which to infer a
                        breach of applicable fiduciary duties ...................................... 21

V.      CONCLUSION ................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AccuImage Diagnostics Corp. v. Terarecon, Inc.*,
    260 F. Supp. 2d 941 (N.D. Cal. 2003) ....................................................................17

*Armenian Assembly of America, Inc. v. Cafesjian*,
    772 F. Supp. 2d 20 (D.D.C. 2011) ........................................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................................13

*Banks v. Northern Trust Corp.*,
    2020 WL 1062144 (C.D. Cal. Mar. 5, 2020) .........................................................22

*Davis v. Salesforce.com, Inc.*,
    2020 WL 5893405 (N.D. Cal. Oct. 5, 2020)....................................................20, 23

*Dorman v. Charles Schwab Corp.*,
    2018 WL 6803738 (N.D. Cal. Sept. 20, 2018) ......................................................22

*Etienne v. Kaiser Foundation Hospital*,
    2012 WL 92610 (N.D. Cal. Jan. 11, 2012) ..............................................................3

*Fairbairn v. Fidelity Investments Charitable Gift Fund*,
    2018 WL 6199684 (N.D. Cal. Nov. 28, 2018) ..................................................12, 13

*Flaa v. Hollywood Foreign Press Association*,
    2020 WL 8256191 (C.D. Cal. Nov. 20, 2020)..........................................................4

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) .................................................................................22

*Horn v. Azusa Pacific University*,
    2019 WL 9044606 (C.D. Cal. Jan. 14, 2019) ...........................................................3

*James v. Paton*,
    2016 WL 1449207 (W.D. Wash. Apr. 13, 2016).....................................................19

*Kong v. Trader Joe's Co.*,
    2020 WL 5814102 (C.D. Cal. Sept. 24, 2020) .............................................20, 21, 22, 23

*Loomis v. Exelon Corp.*,
    658 F.3d 667 (7th Cir. 2011) ............................................................................22, 23

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................................7, 8

*National Foundation, Inc. v. United States*,
    13 Cl. Ct. 486 (1987) ......................................................................4, 5, 7

*Northstar Financial Advisors Inc. v. Schwab Investments*,
    779 F.3d 1036 (9th Cir. 2015) ...............................................................7

*Schaffer v. Clinton*,
    240 F.3d 878 (10th Cir. 2001) ...............................................................9

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017).............................................................................8

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ...............................................................13

*Stern v. Lucy Webb Hayes National Training School*,
    381 F. Supp. 1003 (D.D.C. 1974) ........................................................16

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) .................................................................5

*Vasconcellos v. Sara Lee Bakery*,
    2013 WL 6139781 (N.D. Cal. Nov. 21, 2013) ....................................14

*Vaughn v. Bay Environmental Management, Inc.*,
    567 F.3d 1021 (9th Cir. 2009) ...............................................................9

*Viralam v. Commissioner of Internal Revenue*,
    136 T.C. 151 (2011)............................................................................4, 7

*W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008)...................................................................7

*White v. Chevron Corp.*,
    2017 WL 2352137 (N.D. Cal. May 31, 2017),
    *aff'd*, 752 F. App'x 453 (9th Cir. 2018)...................................20, 22, 23

**State Cases**

*American Center for Education, Inc. v. Cavnar*,
    80 Cal. App. 3d 476 (1978) .................................................................10

*Berg & Berg Enterprises, LLC v. Boyle*,
    178 Cal. App. 4th 1020 (2009) ............................................................19

*Brown v. Memorial National Home Foundation,*
    162 Cal. App. 2d 513 (1958) ....................................................................................9, 11

*Carl J. Herzog Foundation, Inc. v. University of Bridgeport,*
    699 A.2d 995 (Conn. 1997) .............................................................................................11

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,*
    20 Cal. 4th 163 (1999) ...............................................................................................14, 15

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    68 Cal. App. 4th 445 (1998) ...........................................................................................17

*Finley v. Superior Court,*
    80 Cal. App. 4th 1152 (2000) .........................................................................................19

*Hardman v. Feinstein,*
    195 Cal. App. 3d 157 (1987) ...........................................................................................10

*Holt v. College of Osteopathic Physicians & Surgeons,*
    61 Cal. 2d 750 (1964) ......................................................................................................10

*In re Vaccine Cases,*
    134 Cal. App. 4th 438 (2005) .........................................................................................14

*Klein v. Anaheim Memorial Hospital Association,*
    2009 WL 3233914 (Cal. Ct. App. Oct. 8, 2009) (unpublished) .............................10

*Kwikset Corp. v. Superior Court,*
    51 Cal. 4th 310 (2011) .....................................................................................................15

*L.B. Research & Education Foundation v. UCLA Foundation,*
    130 Cal. App. 4th 171 (2005) ...................................................................................14, 17

*Lee v. Interinsurance Exchange,*
    50 Cal. App. 4th 694 (1996) ...........................................................................................19

*Lynch v. John M. Redfield Foundation,*
    9 Cal. App. 3d 293 (1970) .........................................................................................10, 16

*O'Hara v. Grand Lodge Independent Order of Good Templars of California,*
    213 Cal. 131 (Cal. 1931).............................................................................................10, 12

*Pacific Scene, Inc. v. Penasquitos, Inc.,*
    46 Cal. 3d 407 (1988) ......................................................................................................17

*Patton v. Sherwood,*
    152 Cal. App. 4th 339 (2007) ...........................................................................10, 14, 17

*People ex rel. Ellert v. Cogswell*,
   113 Cal. 129 (1896) ..................................................................................11

*Pierce v. Lyman*,
   1 Cal. App. 4th 1093 (1991) ...................................................................18

*Styles v. Friends of Fiji*,
   373 P.3d 965 (Nev. 2011) ....................................................................7, 18

**Statutes, Rules, and Regulations**

26 U.S.C.
   §170 ..................................................................................................4, 5, 7
   §4966(d)(2)(A) ...............................................................................*passim*

Cal. Bus. & Prof. Code
   §17200 ...........................................................................................7, 14, 18
   §17204 ..................................................................................................15
   §17510.8 ................................................................................................18

Cal. Corp. Code
   §309 ......................................................................................................17
   §5056 .....................................................................................................11
   §5142 ..............................................................................................*passim*
   §5230(b) ................................................................................................17
   §5231 ........................................................................................8, 17, 19
   §5233(c) .................................................................................................10
   §5250 .....................................................................................................10
   §5710(b) ................................................................................................11

Cal. Gov't Code §12598(a) .................................................................10, 15

Cal. Prob. Code
   §18501, *et seq.* .....................................................................................18
   §18503 .............................................................................................20, 23

Fed. R. Civ. P.
   12(b)(1) ...................................................................................................1
   12(b)(6) ..........................................................................................1, 9, 23
   23.1 .......................................................................................................11

**Other Authorities**

3 Ballantine & Sterling, California Corporation Laws (2020) ...........................16, 17, 19

3A Fletcher Cyclopedia of the Law of Corporations ..................................................19

Abbott & Kornblum, *The Jurisdiction of the Attorney General Over Corporate Fiduciaries
   under the New California Nonprofit Corporation Law*, 13 U.S.F. L. Rev. 753 (1979) ....16, 17

Articles of Incorporation of the Schwab Philanthropy Fund (Jan. 4, 1999),
  https://businesssearch.sos.ca.gov/document/retrievePDF?Id=02129372-4718625 ..................3

Department of the Treasury, *Report to Congress on Supporting Organizations
  and Donor Advised Funds* (Dec. 2011), https://www.treasury.gov/resource-
  center/tax-policy/Documents/Report-Donor-Advised-Funds-2011.pdf. ........................ *passim*

Joint Committee on Taxation, Pension Protection Act of 2006, Title XII: Provisions
  Relating to Tax Exempt Organizations, 2006 WL 4791686 (Aug. 3, 2006) ........................4, 6

National Conference of Commissioners on Uniform State Laws, Uniform Prudent
  Management of Institutional Funds Act (2006), https://bit.ly/2M2OWnt .............................21

Restatement (Third) of Trusts (Am. Law Inst. 2012). .......................................................8, 10, 18

Schwab Charitable Fund, *Investment Options* (last visited Feb. 26, 2021),
  https://www.schwabcharitable.org/investment-options ...........................................................22

Schwab Charitable Fund, *Program Policies* (updated Nov. 2020),
  https://www.schwabcharitable.org/public/file/P-5252372 ......................................5, 6, 12, 22

Schwab Charitable Fund Form 990 (FY 2019),
  https://www.schwabcharitable.org/public/file/P-64757 ...........................................................4

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on May 13, 2021, at 9:30 a.m. in Courtroom B of the United States District Court located at 450 Golden Gate Avenue, San Francisco, CA 94102, before the Honorable Laurel Beeler, Defendants Schwab Charitable Fund, Schwab Charitable Board of Directors, and Schwab Charitable Investment Oversight Committee (the "Charitable Defendants") will and hereby do respectfully move to dismiss the First Amended Complaint ("FAC") filed by Plaintiff Philip Pinkert, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). This motion is based on the accompanying Memorandum of Points and Authorities, and such other authorities and argument as may be submitted in any reply at or before the hearing.

## STATEMENT OF RELIEF REQUESTED

The Charitable Defendants hereby move to dismiss the FAC in its entirety.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Philip Pinkert is a donor to Schwab Charitable Fund, a 501(c)(3) nonprofit public charity and California nonprofit public benefit corporation that sponsors a donor-advised fund ("DAF"). Schwab Charitable Fund's DAF works as follows under the terms of the Internal Revenue Code: When Pinkert makes donations to the Fund, he irrevocably relinquishes all ownership and control over his contributions. The Fund then maintains Pinkert's donations and any associated gains in a separately identified account, over which Pinkert has only defined "advisory privileges," 26 U.S.C. §4966(d)(2)(A)—the prerogative to make nonbinding recommendations regarding investments and distributions. The upshot is that while Pinkert may exercise advisory privileges, it is the Fund—not Pinkert—that has exclusive ownership and control over the assets in his associated account. Indeed, it is Pinkert's irrevocable relinquishment of ownership and control that enables him to claim an immediate tax deduction for his donations to the DAF.

Pinkert filed suit alleging that the Charitable Defendants have failed to prudently and loyally manage the Fund's assets. The Charitable Defendants moved to dismiss, explaining that Article III of the Constitution and the California statute governing nonprofit corporations each deprives Pinkert of standing to sue over the management of charitable assets that don't belong to

him but instead belong to the Fund.  That motion also showed that Pinkert's substantive claims—even if he had standing to bring them—were inadequately pled.

Pinkert amended his complaint, adding some details around the margins.  But none of his insubstantial edits cures the fact that this lawsuit is fatally misconceived.

Most elementally, Pinkert cannot overcome the fundamental rule that Article III prohibits a party from suing over injuries to another party.  If the Fund was mismanaged and its charitable assets were squandered as a result, that involves an injury to the Fund—which owns the assets—and the Fund's potential charitable beneficiaries.  It does not involve any injury to anyone else.  Settled Article III case law makes clear that donors like Pinkert have no standing to sue for such injury.

California law is to the same effect.  In part to protect the State's public charities from wasting resources on costly litigation, California vests the Attorney General with principal responsibility for addressing potential mismanagement of a charitable corporation's assets.  Beyond the Attorney General, suits for mismanagement of a charitable corporation's assets can be brought by relators, directors, or officers of the charity.  Cal. Corp. Code §5142(a).  Pinkert is none of these.  And *donors* cannot sue unless they retain "reversionary, contractual, or property interest[s]" in the charitable corporation's assets, *id.*, which Pinkert does not.  Pinkert accordingly lacks standing as a matter of California statutory law.

These standing defects are incurable, and none of Pinkert's amendments does (or could do) anything to address them.  And even with respect to the defects in his original complaint that Pinkert could *theoretically* cure—like including sufficient factual allegations to show that the Charitable Defendants have breached an applicable fiduciary duty—Pinkert's amendments come up short.

Despite having the benefit of the Charitable Defendants' previous motion to dismiss, Pinkert's FAC continues to proceed from legally mistaken premises about the fiduciary duties that the directors of a charitable corporation owe under California law; to whom the directors owe those fiduciary duties; the standard by which the business judgments of those directors are measured; and the proper application of corporate law principles to charitable corporations.  These errors

defeat both of his causes of action against the Charitable Defendants.

Having filed an amended complaint that fails to fix any of the key deficiencies in his original complaint, dismissal with prejudice is now plainly warranted.

## II.   STATEMENT OF ISSUES TO BE DECIDED

A.   Whether Pinkert lacks standing to sue the Charitable Defendants under Article III of the U.S. Constitution;

B.   Whether Pinkert lacks standing to sue the Charitable Defendants for alleged mismanagement and disloyal management of the Fund's assets under California statute; and

C.   Whether Pinkert's causes of action against the Charitable Defendants (Counts I and III) fail to state a claim.

## III.   BACKGROUND

### A.   The Fund

Schwab Charitable Fund is organized as a public benefit corporation (i.e., a public charity) under California law.  *See* Articles of Incorporation of the Schwab Philanthropy Fund, §II (Jan. 4, 1999); *see also* FAC ¶30.[1]  The Fund sponsors a DAF, which the Internal Revenue Code defines as a "fund or account (i) which is separately identified by reference to contributions of a donor or donors, (ii) which is owned or controlled by a sponsoring organization [i.e., a public charity], and (iii) with respect to which a donor … has … advisory privileges with respect to the distribution or investment of amounts held in such fund or account by reason of the donor's status as a donor." 26 U.S.C. §4966(d)(2)(A); *see also* FAC ¶¶5-6, 9.

DAFs fulfill an "important" role in the charitable sector.  FAC ¶4.  They democratize philanthropy by making it easier for anybody with a smartphone to donate a wide variety of assets to charitable causes and engage in longer-term, strategic giving.  *See* Department of the Treasury, *Report to Congress on Supporting Organizations and Donor Advised Funds* 50 (Dec. 2011)

---

[1] Available at: https://businesssearch.sos.ca.gov/document/retrievePDF?Id=02129372-4718625.  The Court may take judicial notice of "records of state and federal agencies and other undisputed matters of public record," *Etienne v. Kaiser Foundation Hospital*, 2012 WL 92610, at *1 n.2 (N.D. Cal. Jan. 11, 2012), including articles of incorporation filed with a state agency, *see Horn v. Azusa Pacific University*, 2019 WL 9044606, at *5 (C.D. Cal. Jan. 14, 2019) (taking judicial notice of nonprofit organization's articles of incorporation filed with the California Secretary of State).

1   ("Treasury Report")[2]; FAC ¶¶4-5.  For instance, DAFs offer donors the potential to immediately

2   claim charitable tax deductions while giving them time to consider the charitable causes they wish

3   to support.  *See* FAC ¶4.  In recent decades, DAFs have grown in popularity, and they now account

4   for the donation of billions of dollars to charitable causes each year.  In fiscal year 2019, for

5   example, the Fund alone received over $4.36 billion in charitable contributions and distributed

6   $2.48 billion to other charitable organizations.  *See* Schwab Charitable Fund Form 990 (FY 2019).[3]

7          As required by federal tax law, the Fund maintains donors' contributions to the Fund in

8   separately identified accounts, and although donors relinquish all legal title to and control over the

9   funds in the associated accounts, they are granted defined opportunities to advise on how the funds

10  in those accounts are invested among specified investment pools and ultimately distributed to other

11  charitable causes.  *See* 26 U.S.C. §4966(d)(2)(A); FAC ¶6.

12         Donors who contribute to the Fund's DAF may claim charitable tax deductions for the

13  amounts that they contribute.  *See* 26 U.S.C. §170(a), (c), (f)(18); FAC ¶4.  To do so, U.S. tax law

14  requires that they make "completed gift[s]" and "relinquish[] dominion and control over the

15  donated property."  *Viralam v. Commissioner of Internal Revenue*, 136 T.C. 151, 162 (2011);

16  *accord National Foundation, Inc. v. United States*, 13 Cl. Ct. 486, 492-493 (1987).

17  Correspondingly, it requires that the Fund assume "exclusive legal control" over the donated

18  assets.  26 U.S.C. §170(f)(18)(B); *see also* Treasury Report at 2.  Thus, although donors can make

19  "*nonbinding recommendations* concerning the distribution or investment of [donated] assets," they

20  cannot retain any "enforceable rights" over donated assets, Joint Comm. on Taxation, Pension

21  Protection Act of 2006, Title XII: Provisions Relating to Tax Exempt Organizations, 2006 WL

22  4791686, at *64, *67 (Aug. 3, 2006) ("Joint Committee Report") (emphasis added); *see* Treasury

23  Report at 82 (advising Congress that it is appropriate to continue treating donations to DAFs as

24  deductible charitable contributions because donors have only a "non-binding advisory

25  _____

26      [2] Available at: https://www.treasury.gov/resource-center/tax-policy/Documents/Report-Donor-Advised-Funds-2011.pdf.

27      [3] Available at: https://www.schwabcharitable.org/public/file/P-6475739.  The Court may

28  take judicial notice of the Fund's publicly available tax filings.  *See Flaa v. Hollywood Foreign Press Association*, 2020 WL 8256191 (C.D. Cal. Nov. 20, 2020) (taking judicial notice of two Form 990s).

relationship" with the DAF sponsoring organization and "the sponsoring organization … —not the donor—is the legal owner of the contributed assets and controls how those assets are invested and disbursed"); *National Foundation*, 13 Cl. Ct. at 493 (DAF entitled to tax-exempt status in part because DAF assumed control of contributions and donors had "no legal recourse" for return of their contributions if the DAF refused to honor their requests).

The Fund advises its donors in writing that they cede all ownership and control over the assets that they contribute to the Fund.  For instance, the Fund's *Program Policies* inform donors that, in accordance with federal law, "contributions [to the Fund] are both irrevocable and unconditional," and all contributions received by the Fund are "subject to the exclusive legal authority and control of [the Fund] as to their use and distribution."  Schwab Charitable Fund, *Program Policies* at 9 (updated Nov. 2020) ("*Program Policies*"); *accord id.* at 4.[4]  The *Program Policies* further advise donors that they cannot make contributions subject to any material restrictions or conditions.  *Id.* at 12.  Therefore, the *Program Policies* note, a donor cannot reserve "a right to control or direct distributions" and cannot impose "[a]ny other condition that prevents Schwab Charitable from exercising exclusive legal control over the use of contributed assets to further its exempt purposes."  *Id.*  The *Program Policies* additionally underscore that "Schwab Charitable retains final authority over the distribution of all grants and may decline or modify a grant recommendation that is inconsistent with these *Program Policies*, or for any other reason." *Id.* at 22.  When a donor contributes to the Fund, the Fund also provides the donor with a "contemporaneous written acknowledgment" that the Fund has assumed "exclusive legal control over the assets contributed," as required by U.S. tax law in order for the donor to claim a charitable deduction.  26 U.S.C. §170(f)(18)(B); *accord* Treasury Report at 26-27.

The Fund is governed by a seven-person Board, FAC ¶31, composed of individuals with extensive corporate experience, FAC ¶49.  The Board has established an Investment Oversight Committee, which includes at least three members of the Board, to review and select investment

---

[4] Available at: https://www.schwabcharitable.org/public/file/P-5252372.  Because Pinkert relies heavily on the *Program Policies* in his complaint, *see* FAC ¶¶53-54, 60-61, 64, the *Program Policies* are incorporated by reference, and the Court may consider them in ruling on the motion to dismiss, *see United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

1    options for the Fund's assets.  FAC ¶32.  The Fund's Board and Committee have selected fourteen

2    diverse investment options for the Fund's assets, FAC ¶56, including five index funds, a money

3    market fund, several actively managed pools, and several asset-allocation pools (e.g., a Socially

4    Responsible Balanced Pool).  FAC ¶¶18, 57.  Consistent with governing tax regulations, donors

5    can make nonbinding recommendations about how the funds in associated accounts should be

6    invested among the fourteen investment options.  *See* 26 U.S.C. §4966(d)(2)(A); Joint Committee

7    Report at *65; FAC ¶62; *Program Policies* at 16.[5]

8         **B.    This Lawsuit**

9         Pinkert filed suit against the Charitable Defendants and Charles Schwab & Co.

10   ("CS&Co."), supposedly on behalf of tens of thousands of the Fund's donors and "on behalf of the

11   general public."  FAC ¶¶1, 116.[6]  He alleges that the Charitable Defendants have breached their

12   fiduciary duties to carefully and loyally manage the Fund's assets in selecting investment options

13   and in negotiating the fees that the Fund pays for custodial and brokerage services.  Specifically,

14   Pinkert alleges that the Charitable Defendants have selected index funds and a money market fund

15   for which there are at least some cheaper alternatives available, FAC ¶¶18, 75, 81, 84-85, and that

16   the Charitable Defendants have selected "retail" share classes of some funds when they could have

17   qualified for cheaper "institutional" share classes of the same funds, FAC ¶¶88-97.  He further

18   alleges that the Charitable Defendants have failed to negotiate "marketplace rates" for custodial

19   and brokerage services that CS&Co. provides to the Fund, FAC ¶¶19-20, 104, and have allowed

20   CS&Co. to receive "grossly excessive" compensation for the services it provides, FAC ¶¶16, 126.

21   He contends that through this conduct, the Charitable Defendants have sought to benefit CS&Co.

22   to the detriment of the Fund, *see* FAC ¶16, and that CS&Co. is a "knowing contributor to and

23   beneficiary of" the Charitable Defendants' breaches of their fiduciary duties, FAC ¶129.

24        Pinkert asserts claims for: (1) breach of the fiduciary duties of care and loyalty supposedly

25

26   _____

        [5] Donors with $250,000 or more in an associated account may request to work with a
27   professional account manager and recommend alternative investment options.  *See* FAC ¶17 n.6.

28        [6] Pinkert seeks to represent a class that generally includes "[a]ll account holders of Schwab
     Charitable Donor-Advised Fund accounts that have had a balance in any of the investment pools
     at any time on or after October 30, 2016."  FAC ¶115.

1   imposed under the common law of trusts (Count I); and (2) violation of California's Unfair

2   Competition Law (UCL), Bus. & Prof. Code §17200, based on unlawful breaches of common-law

3   and statutory fiduciary duties (Count III).  He seeks declaratory, injunctive, and other equitable

4   relief.

5   **IV.   ARGUMENT**

6       **A.   Pinkert Lacks Standing To Sue**

7           **1.   Pinkert lacks Article III standing.**

8         Pinkert voluntarily relinquished all legal title to and control over the assets that he

9   contributed to the Fund, in exchange for immediate tax deductions for his contributions.  *See* FAC

10   ¶35 (acknowledging the Fund "takes legal title" to all donated assets and that donations are

11   "irrevocable"); *see also* 26 U.S.C. §170(f)(18)(B); *id.* §4966(d)(2)(A); *Viralam*, 136 T.C. at 162;

12   *National Foundation*, 13 Cl. Ct. at 492-493; Treasury Report at 2, 82; *supra* at pp. 4-5.  That simple

13   and incontrovertible fact deprives him of Article III standing to sue.

14         To establish Article III standing, Pinkert must allege that *he* has suffered a concrete and

15   cognizable injury from the conduct he challenges.  *See Lujan v. Defenders of Wildlife*, 504 U.S.

16   555, 560 (1992).  Pinkert's complaint, however, is that the Charitable Defendants have poorly

17   managed assets that belong *to the Fund*, *see* FAC ¶¶2-3, 35—assets in which he retains zero

18   ownership or control interest.  One party, however, cannot sue for injury to another.  *See Northstar*

19   *Financial Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1043 (9th Cir. 2015) (plaintiff who

20   owned no shares in fund could not sue fund manager for failure to adhere to investment policies

21   absent an assignment of a shareholder's claims); *W.R. Huff Asset Management Co., LLC v. Deloitte*

22   *& Touche LLP*, 549 U.S. 100, 108 (2d Cir. 2008) (same).  Because the assets Pinkert says were

23   mismanaged don't belong to him, and because the misconduct alleged in the FAC could only have

24   harmed the Fund and its potential charitable beneficiaries, Pinkert cannot establish a cognizable

25   economic injury resulting from the alleged mismanagement.  *Cf. Styles v. Friends of Fiji*, 373 P.3d

26   965, 2011 WL 488951, at *1 (Nev. Feb. 8, 2011) (table) (DAF donor could not establish damages

27   stemming from DAF sponsor's failure to create separate account "because once [the donor] made

28   the unrestricted gift, he no longer had any interest in or control over the donation").

1    This insurmountable hurdle follows from the tax law governing DAFs.  Pinkert nonetheless

2    asserts a handful of supposed injuries that would give him a sufficient stake to bring this lawsuit

3    about injuries to the Fund's assets.  None suffices.

4        First, Pinkert suggests that he has suffered and continues to suffer personal economic injury

5    because, as a result of the Charitable Defendants' alleged mismanagement, he must "contribute

6    more to his Schwab DAF [account] to achieve his charitable goals."  FAC ¶29.  But Pinkert doesn't

7    allege that he had a specific "charitable goal" when he donated to the Fund, or that he had a "legally

8    protected interest" in achieving any such goal if he had one, *Lujan*, 504 U.S. at 560.[7]  Nor does

9    Pinkert specify by how much the alleged misconduct caused him to fall short of achieving his goal,

10   or give any particulars about any donation that he made to the Fund to compensate for the shortfall.

11       Further, even if Pinkert could posit some cognizable economic injury, he still would lack

12   standing to invoke this Court's jurisdiction.  It's a cardinal rule of standing that even where a

13   litigant can establish a cognizable injury stemming from the challenged conduct, he also ordinarily

14   "must assert his own legal rights and cannot rest his claim to relief on the legal rights of third

15   parties."  *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017) (quotation marks and

16   alternation omitted).   Pinkert, however, seeks to assert the legal rights of third parties—in

17   particular, the legal rights of the Fund and its potential charitable beneficiaries.  As discussed

18   further below, under California law, a public benefit corporation's directors owe fiduciary duties

19   with respect to the management of the corporation's assets *to the corporation and its charitable

20   purposes and beneficiaries*—not to the charity's donors.  *See, e.g.*, Cal. Corp. Code §5231;

21   Restatement (Third) of Trusts, §93 cmt. b (Am. Law Inst. 2012); *infra* at pp. 9-10, 16-18.  Pinkert

22   thus cannot claim to be suing to vindicate his *own* rights.  And he offers no potential justification

23   for dispensing with the ordinary rule that he cannot assert the rights of third parties not before the

24   Court.

25   _____

26       [7] Pinkert does not allege that the Fund made any promises or representations about the

27   gains it expected to earn on his donations.  Moreover, Pinkert has no legal right to direct or
     otherwise control the distribution of the assets that he donates to the Fund or any gains that the
     Fund earns on his donations; as discussed, the Fund assumes exclusive legal control over all assets

28   contributed to the Fund.  Pinkert thus cannot claim a legal right to provide a specific level of
     support to the charities of his choice when he donates to the Fund.

1     Second, Pinkert stresses that he has several "privileges" over the administration of his DAF

2 account—for instance, the privilege to recommend a name for the account and the privilege to

3 advise on how the assets in the associated account are invested and distributed. FAC ¶¶60-64.

4 But Pinkert does not say that the Charitable Defendants' alleged misconduct has deprived him of

5 these privileges. Indeed, he does not allege he has been deprived of these privileges at all—and

6 he has not been, as he has had every opportunity to exercise them.

7     Third, Pinkert alludes to a possible reputational interest sufficient to give him standing,

8 alleging that "because [his] donations are made under the Pinkert Family Trust name, each

9 donation confers recognition from his community and peers." FAC ¶28. But he fails to allege any

10 facts suggesting that the Charitable Defendants' purported mismanagement of the Fund's assets

11 has injured his reputation or imminently threatens to injure his reputation in any concrete way. *See*

12 *Schaffer v. Clinton*, 240 F.3d 878, 885 (10th Cir. 2001) (plaintiff failed to adequately allege

13 reputational injury where he pointed to no "concrete evidence of a loss of credibility or other

14 reputational injury").

15         **2.**     **Pinkert lacks standing to sue under California law.**

16     Charitable corporations such as the Fund are organized for, and hold their assets for, the

17 benefit of the public. In part to protect charitable resources against waste from lawsuits, California

18 limits by statute the persons who can sue to redress mismanagement of a charitable corporation's

19 assets. A donor like Pinkert is not among them. As a result, his complaint should be dismissed

20 for lack of statutory standing. *See Vaughn v. Bay Environmental Management, Inc.*, 567 F.3d

21 1021, 1024 (9th Cir. 2009) (lack of statutory standing requires dismissal for failure to state a claim

22 under Rule 12(b)(6)).

23         **a.**     **Pinkert is not among the parties authorized by statute**

24               **to sue regarding mismanagement of a California public**

25               **benefit corporation's charitable assets.**

26     A California public benefit corporation is said to hold its assets subject to a "charitable

27 trust," and its directors must manage its assets to further its charitable purposes. *See Brown v.*

28 *Memorial National Home Foundation*, 162 Cal. App. 2d 513, 521 (1958), *superseded by statute*

*on other grounds, as recognized in Patton v. Sherwood*, 152 Cal. App. 4th 339 (2007); *American Center for Education, Inc. v. Cavnar*, 80 Cal. App. 3d 476, 486 (1978), *superseded by statute on other grounds, as recognized in Patton*, 152 Cal. App. 4th 339; *see also* FAC ¶10.  Claims of improper or disloyal management sound in breach of a charitable trust.  *See Lynch v. John M. Redfield Foundation*, 9 Cal. App. 3d 293, 298 (1970); *see also* Restatement (Third) of Trusts §93.

California statutory law carefully limits who can bring such claims.  California vests the state Attorney General with "primary responsibility" for supervising public benefit corporations and for "protect[ing]" their assets.  Cal. Gov't Code §12598(a); *see also* Cal. Corp. Code §5250.  Aside from the Attorney General and persons granted "relator" status by the Attorney General, California confers standing to pursue actions to "enjoin, correct, obtain damages for … or to otherwise remedy a breach of a charitable trust" involving a public benefit corporation only on: (1) the corporation; (2) a member of the corporation acting in the name of the corporation; (3) a director or officer of the corporation; and (4) "[a] person with a reversionary, contractual, or property interest in the assets subject to [the] charitable trust."  Cal. Corp. Code §5142(a); *see also* Cal. Corp. Code §5233(c).

These statutory provisions, which reflect longstanding common-law principles,[8] advance the State's purpose of preserving charitable resources, as "any rule giving ordinary donors standing to sue a charitable entity every time they disagreed with how the organization carried out its charitable purposes could bring charitable activities to a screeching halt," *Klein v. Anaheim Memorial Hospital Association*, 2009 WL 3233914, at *7-8 (Cal. Ct. App. Oct. 8, 2009) (unpublished).  Pinkert's intent to pursue his claims as a class action underscores the point.  If Pinkert had standing, so would tens of thousands of other donors.  *See* FAC ¶116.  And that would open the door to countless other donor lawsuits, jeopardizing charitable assets and undermining charitable giving.  *See Klein*, 2009 WL 3233914, at *7.  *Cf. Hardman v. Feinstein*, 195 Cal. App. 3d 157, 162 (1987) ("Th[e] limitation on standing [in lawsuits alleging mismanagement of a

---

[8] *See O'Hara v. Grand Lodge Independent Order of Good Templars of California*, 213 Cal. 131, 139-140 (Cal. 1931), *superseded by statute on other grounds, as recognized in Patton*, 152 Cal. App. 4th 339; *Holt v. College of Osteopathic Physicians & Surgeons*, 61 Cal. 2d 750, 753 (1964); *Cavnar*, 80 Cal. App. 3d at 498.

charitable trust] arises from the need to protect the trustee from vexatious litigation, possibly based on an inadequate investigation, by a large, changing, and uncertain class of the public to be benefited."); *see also Carl J. Herzog Foundation, Inc. v. University of Bridgeport*, 699 A.2d 995, 1002 (Conn. 1997) (expanding standing to include "a new class of litigants, donors," would undermine protections for charitable institutions and pose a risk of subjecting charitable institutions to "lengthy and complicated litigation"). And Pinkert's effort to sue "on behalf of the general public" (FAC ¶1) is not his to make. Only the Attorney General can sue on behalf of the general California public to vindicate the public's interest in the prudent and loyal management of charitable assets. *See Brown*, 162 Cal. App. 2d at 537; *People ex rel. Ellert v. Cogswell*, 113 Cal. 129, 136 (1896). In short, California law expressly—and rightly—authorizes only a narrow category of persons to sue for alleged breaches of the charitable trust.

Pinkert fails to allege that he falls within that category. He does not allege that he is a director or officer of the Fund, *see* Cal. Corp. Code §5142(a)(2), (3), and he is not. He also does not allege that he is a "member" of the corporation entitled to sue on the corporation's behalf, *see* Cal. Corp. Code §5142(a)(1); *id.* §5056 (defining "member"), and he is not. And even if he had made such allegations, he nowhere alleges that he complied with the requirements for suing on the corporation's behalf, including that he tried to secure relief from the Board prior to filing suit, *see* Cal. Corp. Code §5710(b); Fed. R. Civ. P. 23.1, and he did not.[9]

Nor does Pinkert plausibly allege a "reversionary, contractual, or property interest" in the assets subject to the charitable trust, Cal. Corp. Code §5142(a)(4), that is, a "reversionary, contractual, or property interest in the Fund's assets. As discussed, he irrevocably ceded all legal ownership and control over the assets that he donated to the Fund. *See supra* at pp. 4-5.

Although Pinkert's initial complaint alleged that he retained a property interest in the assets that he donated because he retains the "right" to determine who is able to use and enjoy those assets, he has backed away from that allegation. Rightly so: Not only was the authority on which he relied wholly inapposite, but (more importantly) he cannot plausibly claim to have any "right" to determine who is able to use and enjoy the Fund's assets. As a matter of tax law, Pinkert was

---

[9] *See* CS&Co. Br. 13-15.

required to relinquish *all* legal interest in *and* control over the assets that he donated to the Fund. *See supra* at pp. 4-5. He retains only defined privileges that permit him to make nonbinding recommendations regarding the investment and distribution of the assets. Indeed, underscoring this point made plain in the applicable tax law, the Fund advised him of this fact in writing, explaining in its *Program Policies* that U.S. tax law does not permit a donor to reserve "a right to control or direct distributions" and that a donor cannot impose "[a]ny other condition that prevents Schwab Charitable from exercising exclusive legal control over the use of contributed assets to further its exempt purposes." *Program Policies* at 12.

Pinkert also cannot claim any contractual interest in the Fund's assets, Cal. Corp. Code §5142(a)(4). Even if Pinkert has a contractual relationship with the Fund that entitles him to, for instance, receive statements confirming his contributions and make recommendations regarding distributions, that is not what this case is about. The case is about alleged mismanagement of the Fund's assets, and Pinkert simply does not have any contractual rights to the Fund's assets—as discussed, under U.S. tax law, he could never have such rights. And because he retains no such rights, the Charitable Defendants do not owe *him* any fiduciary duties with respect to the investment and management of the Fund's assets; they owe those duties *to the Fund and its charitable purposes*. California law has long recognized that a donor in such position has no standing to complain about a charity's disposition of its assets. *See O'Hara v. Grand Lodge Independent Order of Good Templars of California*, 213 Cal. 131, 139-140 (1931) (noting that "the only person who can object to the disposition of … trust property is one having some definite interest *in the property*," and explaining that where a donor has "parted with [his] interest in" and "control over" donated assets, the donor does not "belong[] to the class intended to be benefited" by the charitable trust and has no standing to complain as to the disposition of the trust's assets (emphasis added)).

### b. *Fairbairn* does not support standing here.

Pinkert's complaint relies on *Fairbairn v. Fidelity Investments Charitable Gift Fund*, 2018 WL 6199684 (N.D. Cal. Nov. 28, 2018). *See* FAC ¶68. *Fairbairn* does not support his standing here. In that case, two donors sued Fidelity Charitable, a Massachusetts charitable trust that

1   sponsored a DAF, claiming that it mishandled the sale of 1.93 million shares of stock the donors

2   had contributed.  *See* 2018 WL 6199684, at *2.  The donors alleged that Fidelity disregarded

3   promises specifically made *to them* about the way the stock would be sold.  *See id.*  They also

4   alleged that, as a result, Fidelity liquidated the shares for "tens of millions of dollars less" than it

5   could have, reducing their tax deduction.  *Id.*  The essence of the donors' tort and contract claims

6   was that Fidelity assumed specific duties to the plaintiffs individually with respect to the stock

7   sale, which it then breached.  *See id.*  The court held that the donors had standing to pursue their

8   claims.  *See id.* at *5-7.

9          The claims there, however, were not based on Fidelity's general fiduciary duties to manage

10   its assets with care and loyalty; the claims depended on specific and unique promises that Fidelity

11   allegedly made to the plaintiffs directly and specifically in soliciting their donation.  The district

12   court underscored this fact in language that distinguishes Pinkert's claims:   In *Fairbairn*,

13   "Plaintiffs' claim [wa]s *not* a general claim that Fidelity Charitable mismanages its DAF accounts,

14   but rather that Fidelity Charitable negligently mismanaged *their* account in which they had specific

15   and unique future rights," 2018 WL 6199684, at *7 (first emphasis added).  Here, in contrast,

16   Pinkert proclaims that he is bringing—"on behalf of the general public"—a general claim that the

17   Charitable Defendants broadly mismanage the Fund's assets.  *See* FAC ¶1; *see id.* ¶3 (alleging

18   "mismanagement of *the Schwab DAF*" (emphasis added)).   Unlike the plaintiff donors in

19   *Fairbairn*, he also alleges no unique promises made to him and no unique harm to his associated

20   DAF account.  Quite the opposite, he alleges that his claims are "typical" of those shared by tens

21   of thousands of other donors alleged to have held Schwab Charitable accounts at the end of 2018.

22   FAC ¶¶116-117.[10]

23        [10] To the extent Pinkert contends *Fairbairn* should be construed to suggest that a DAF
24   donor's advisory privileges are sufficient to confer standing to sue for mismanagement of
     charitable assets, the Court should not follow it, for several reasons.  *First*, the district court there
25   accepted as true the plaintiffs' allegations that they retained significant future "rights" with respect
     to the assets that they donated.  *See* 2018 WL 6199684, at *6-7.  This Court, however, is not
26   required to accept "a legal conclusion couched as a factual allegation," *Ashcroft v. Iqbal*, 556 U.S.
     662, 678 (2009) (quotation marks omitted), nor is it required to accept "allegations that contradict
27   matters properly subject to judicial notice," *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988
     (9th Cir. 2001).  As discussed, per federal law and the Fund's Program Policies, Pinkert was
28   required to and agreed to relinquish all legal title to and control over the assets that he donated,

### c.     Pinkert lacks standing to sue under the UCL.

Pinkert also cannot repackage his claims under the UCL to end-run statutory standing restrictions.   *See* FAC ¶¶133-145.   The UCL proscribes "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code §17200.   The UCL's "unlawful" prong "borrows violations of other laws" and makes them "independently actionable" under the UCL.   *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999) (quotation marks omitted).   But the California Supreme Court has held that a plaintiff cannot circumvent bars to relief under other laws by "recasting" his claims under the UCL.   *Id.* at 182 (quotation marks omitted).   So if the California legislature has elsewhere "permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination" by allowing plaintiffs to proceed under the UCL instead.   *Id.*  Under this rule, courts have dismissed UCL claims premised on violations of other laws where plaintiffs would be barred from suing directly under those other laws.   *See, e.g.*, *In re Vaccine Cases*, 134 Cal. App. 4th 438, 457-458 (2005) (plaintiff could not bring UCL claim premised on violations of Proposition 65 where plaintiff failed to comply with Proposition 65's pre-suit notice requirements for private actions); *Vasconcellos v. Sara Lee Bakery*, 2013 WL 6139781, at *4 (N.D. Cal. Nov. 21, 2013) (plaintiff could not bring UCL claim premised on violations of the California Labor Code where plaintiff failed to allege compliance with administrative exhaustion requirements for pursuing claims directly under the applicable Labor Code provisions).

As discussed, the California legislature has expressly considered which parties can sue to

---

and he retains only unenforceable rights to make nonbinding recommendations.  *See supra* at pp. 4-5. As a result, as the Department of Treasury observed in advising Congress that it is appropriate to continue to allow DAF donors to claim deductions for their donations, "donors to DAFs … are like donors to other public charities," as both give up legal title and control over how the donated assets are "invested and disbursed," and DAF donors' "non-binding advisory relationship does not alter this legal relationship."  Treasury Report at 80, 82.  *Second*, the court in *Fairbairn* did not analyze California Corporations Code §5142(a)'s restrictions on standing to pursue claims for breach of a charitable trust.  *Third*, the district court relied on *L.B. Research & Education Foundation v. UCLA Foundation*, 130 Cal. App. 4th 171 (2005), to conclude that the plaintiffs had standing.  California courts have, however, recognized that the relevant discussion in *L.B. Research* is "dicta," *Patton*, 152 Cal. App. 4th at 343.  *L.B. Research* also involved materially different circumstances, including a donor who gave a conditional gift.  Donations to the Fund, of course, are not conditional.

SCHWAB CHARITABLE DEFENDANTS'
MOTION TO DISMISS AND MEMO OF LAW

enjoin or otherwise remedy alleged mismanagement of a charitable corporation's assets.  It has made the legislative judgment that the California Attorney General should bear principal responsibility for pursuing such claims, and that only a limited category of additional persons should be permitted to do so.  *See* Cal. Gov't Code §12598(a); Cal. Corp. Code §5142(a); *see also supra* at p. 10.  That judgment reflects California's long-expressed desire to balance the public's interest in adequate oversight of charitable corporations and charitable trusts and the public's interest in protecting charitable corporations and charitable trusts from costly lawsuits.  *See supra* at pp. 10-11.  Pinkert does not fall within the limited category that the legislature has authorized to sue.  *See supra* at pp. 11-12.  And he cannot undermine that legislative judgment simply by "recasting" his claims under the UCL, *Cel-Tech Communications*, 20 Cal. 4th at 182.

Pinkert's UCL claim also fails that statute's separate statutory standing requirements.  A private party can maintain a UCL claim only if the party has "lost money or property as a result of the unfair competition," Cal. Bus. & Prof. Code §17204—that is, only if the party has suffered an economic injury, *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011).  As explained, Pinkert has suffered no economic injury from the Charitable Defendants' purported misconduct because he irrevocably relinquished all legal interest in and control over the assets that he contributed to the Fund.  Any subsequent mismanagement of the Fund's assets could not have caused him to lose money or property, *see supra* at p. 7, and so he lacks statutory standing under the UCL.

## B.     Pinkert Fails To State A Claim

Pinkert asserts two claims against the Charitable Defendants.  Count I alleges that the Charitable Defendants have breached fiduciary duties of care and loyalty imposed under the common law of trusts.  Count III alleges that the Charitable Defendants have committed unlawful business acts or practices by breaching the common-law fiduciary duties imposed on them as well as by breaching statutorily imposed fiduciary duties.  Both counts fail to state a claim.

### 1.     Count I fails to state a claim because the applicable fiduciary duties are governed by statute, not common law.

Count I asserts that the Charitable Defendants have breached the fiduciary duties of care

and loyalty imposed on them under the common law of trusts because the Fund's directors have acted imprudently and disloyally in selecting investment options for the Fund's assets and in negotiating custodial- and brokerage-service fees.  This claim fails for two reasons.

*First*, the directors' duties with respect to managing the Fund's assets are not governed by the common law of trusts:  Although California courts historically subjected charitable corporations' directors to the common law of trust's stringent standards of care and loyalty, California now subjects charitable corporations' directors to less stringent *statutory* standards, comparable to those imposed on directors of for-profit corporations.  That is, the legislature has abrogated the common-law trust duties of care and loyalty that were previously applied to charitable corporations' directors and replaced them with less stringent corporate-law standards.

Before 1980, the law was unclear whether corporate-law or trust-law duties governed a charitable corporation's directors.  *See Stern v. Lucy Webb Hayes National Training School*, 381 F. Supp. 1003, 1013 (D.D.C. 1974).  Although the "modern trend [was] to apply corporate rather than trust principles," *id.*, the California Attorney General's Office took the position that trust law's "strict" standards of care and loyalty applied, Abbott & Kornblum, *The Jurisdiction of the Attorney General Over Corporate Fiduciaries under the New California Nonprofit Corporation Law*, 13 U.S.F. L. Rev. 753, 773-775 (1979) ("Abbott & Kornblum"), and California courts typically followed suit, with little analysis, *see, e.g.*, *John M. Redfield Foundation*, 9 Cal. App. 3d at 298.

In 1978, however, the California legislature enacted a comprehensive statutory scheme governing charitable corporations and other nonprofits.  *See* CS&Co. Br. 8-9; Abbott & Kornblum at 753-754.  Members of the California Attorney General's office observed at the time that "[i]t was in the area of spelling out the duties and obligations of directors of public benefit corporations [and] other nonprofit corporations holding charitable assets that the drafters of the new law spent considerable time and effort."  Abbott & Kornblum at 773.  Ultimately, the legislature opted to subject charitable corporations' directors to the standards of care and loyalty that apply to for-profit corporations' directors.  *See* 3 Ballantine & Sterling, California Corporation Laws §406.01[1] (2020) ("Ballantine & Sterling"); Abbott & Kornblum at 773-775.  To that end, the

legislature enacted standards of care and loyalty that mirror the standards applied to the directors of for-profit corporations. *Compare* Cal. Corp. Code §5231, *with id.* §309. And it expressly exempted the directors of charitable corporations from the standards applicable to trustees. *See* Cal. Corp. Code §5230(b); Ballantine & Sterling §406.01[1]; Abbott & Kornblum at 773-774. So, in California, "the same general standard of conduct" applies to directors of charitable corporations and for-profit corporations, and "the duties and liabilities of directors under the Trust Law do not apply." Ballantine & Sterling §406.01[1]; *accord* Abbott & Kornblum at 773-774.

These statutorily imposed duties of care and loyalty preempt any common-law fiduciary duties of care and loyalty that might previously have applied. *See Pacific Scene, Inc. v. Penasquitos, Inc.*, 46 Cal. 3d 407 (1988) (common-law cause of action to recover assets from the shareholders of a dissolved corporation was preempted by legislature's enactment of a comprehensive statutory scheme governing corporation dissolutions); *AccuImage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941 (N.D. Cal. 2003) (common-law claim for misappropriation of trade secrets preempted by adoption of statute governing the relevant subject matter); *see also* Abbott & Kornblum at 774 (noting that after the passage of the Nonprofit Corporations Law, "directors are held to statutory standards of conduct"); Ballantine & Sterling §406.01[5] (similar).

Pinkert's complaint cites two cases to support the proposition that a DAF's directors are subject to common-law trust duties. But neither case helps him. *L.B. Research* addressed whether a party who contributed $1 million to establish an endowed chair at UCLA Medical School could sue to enforce the terms of the contribution. *See* 130 Cal. App. 4th 175. The court concluded that the party had standing because it had given the money pursuant to a contract with a condition subsequent. *See* at 179-180. The court's discussion of charitable trusts was, as subsequent courts have noted, "dicta." *Patton*, 152 Cal. App. 4th at 343. The other cited case, *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445 (1998), did not deal with a nonprofit public benefit corporation at all. *See id.* at 451; *see also* CS&Co. Br. 9-10.

In short, Count I, which is premised exclusively on breaches of common-law fiduciary

duties of care and loyalty, should be dismissed.[11]

*Second*, even looking to the common law, Pinkert fails to allege facts showing that the Fund's directors breached any fiduciary duty they might have owed to him.  To state a claim for breach of a common-law fiduciary duty, a plaintiff must allege that the defendant breached a fiduciary duty owed to him, causing him damage.  *See Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1101 (1991).  Even under the now inapplicable common law, a charity's directors did not owe donors with no reversionary interests in the charity's assets any fiduciary duties in managing the charity's assets.  Instead, at common law, when a charity solicits a contribution from a donor, the charity owes the donor a limited fiduciary duty to use the contribution for the purposes for which it was sought.  *See* Cal. Bus. & Prof. Code §17510.8.  Pinkert does not allege a breach of that duty.  Instead, he alleges that the Fund's directors have breached their duties to carefully and loyally manage the Fund's assets—duties that, at common law, were owed to the organization's charitable beneficiaries, not to its donors.  *See* Restatement (Third) of Trusts, §93 cmt. b.  So Pinkert fails to state a claim for breach of a common-law fiduciary duty owed to him.[12]

## 2. Count III fails to state a claim because Pinkert's allegations cannot overcome the business judgment rule's presumption of good faith and sound judgment.

In Count III, Pinkert alleges that the Charitable Defendants are liable for "unlawful" business acts or practices, Cal. Bus. & Prof. Code §17200, based on their having breached (1) common-law fiduciary duties of care and loyalty; and (2) statutory duties of care and loyalty under the Uniform Prudent Management of Institutional Funds Act (UPMIFA), Cal. Prob. Code §18501, *et seq.*  To the extent the claim rests on breaches of now inapplicable common-law fiduciary duties, it fails for the reasons discussed above, *see supra* at pp. 16-18.  To the extent this

---

[11] For the reasons discussed *infra* in Part IV.B.3, even if the legislature had not displaced the stringent fiduciary duties of care and loyalty previously imposed under the common law of trusts, Pinkert's allegations would still fail to allege a breach of such duties.

[12] For the reasons discussed *supra* in Part IV.A.1, Pinkert also fails to state a claim for breach of a common-law fiduciary duty because he does not and cannot claim to be entitled to any damages as a result of the challenged conduct.  *See Styles*, 373 P.3d 965, 2011 WL 488951, at *1; *supra* at p. 7.

1    claim rests on breaches of applicable statutory duties of care and loyalty that the Fund's directors

2    owe to the Fund and its charitable causes, the law presumes that the directors have acted in good

3    faith and based on sound and informed judgment, and Pinkert's allegations fail to overcome that

4    presumption.

5         As discussed, California applies corporate law principles, including corporate standards of

6    care and loyalty, to charitable corporations and their directors.  *See supra* at pp. 16-17.  Those

7    principles include the "business judgment rule."  *See* Cal. Corp. Code §5231; Ballantine & Sterling

8    §406.01[1].[13]  The business judgment rule establishes a presumption that a corporation's directors

9    act in good faith, with sound and informed judgment, and it generally "insulates" corporate

10   decisions from "court intervention."  *Lee v. Interinsurance Exchange*, 50 Cal. App. 4th 694, 714-

11   715 (1996); *accord Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1045 (2009).

12   Overcoming the presumption requires "affirmative allegations of facts which, if proven, would

13   establish fraud, bad faith, overreaching or an unreasonable failure to investigate material facts."

14   *Lee*, 50 Cal. App. 4th at 715; *Berg & Berg Enterprises*, 178 Cal. App. 4th at 1045.  "Interference

15   with the discretion of directors is not warranted in doubtful cases."  *Lee*, 50 Cal. App. 4th at 715.

16        Pinkert's allegations come nowhere close to overcoming the presumption.  Although he

17   insinuates that the Fund's directors have acted under conflicts of interest and put CS&Co.'s

18   interests before the Fund's, *see, e.g.*, FAC ¶¶15-16, that suggestion rests on pure speculation rather

19   than concrete factual allegations.  He alleges that "several" of the directors previously worked at

20   or are presently "affiliated with" CS&Co.  FAC ¶15.  But he does not allege that a majority of the

21   directors is conflicted.  And his allegations are far too cursory to even indicate that "several" of

22

23        ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

24   [13] Although there do not appear to be any reported decisions in which California courts
     have addressed the applicability of the business judgment rule in the context of California public
     benefit corporations, California courts have held that the rule applies in the context of suits
25   involving the management of nonprofit mutual benefit corporations.  *See Finley v. Superior Court*,
     80 Cal. App. 4th 1152, 1157, 1161 (2000).  There is no apparent reason why the rule should not
26   also apply in the context of suits involving the management of public benefit corporations.
     Notably, courts in other jurisdictions have concluded that the rule applies in the context of suits
27   related to the management of charitable corporations.  *See, e.g.*, *James v. Paton*, 2016 WL
     1449207, at *2 (W.D. Wash. Apr. 13, 2016); *Armenian Assembly of America, Inc. v. Cafesjian*,
28   772 F. Supp. 2d 20, 103-104 (D.D.C. 2011); *see also* 3A Fletcher Cyclopedia of the Law of
     Corporations §1037.50.

the directors have divided loyalty for transactions with CS&Co.[14]  No allegation suggests that any director's prior employment with CS&Co. would create a material financial interest in transactions with CS&Co., or give the director any other reason to favor CS&Co.'s interests over the Fund's. Likewise, the bare allegation that some of the directors are "affiliated" with CS&Co., with no explanation as to the nature of the purported affiliations, is insufficient to infer conflicts of interest.[15]

Pinkert's allegations that cheaper investment funds, share classes, and custodial and brokerage services were available, *see, e.g.*, FAC ¶¶18-21, also fail to overcome the presumption of the directors' informed and sound business judgment.  There is, for instance, no requirement that directors select the cheapest investment funds and share classes available.  On the contrary, in selecting investment options, directors, like trustees, may reasonably consider factors other than price, *see White v. Chevron Corp.*, 2017 WL 2352137, at *12 (N.D. Cal. May 31, 2017) (granting motion to dismiss against trustees), *aff'd*, 752 F. App'x 453 (9th Cir. 2018), and may select more expensive share classes for legitimate reasons, such as to pay for services, *see Kong v. Trader Joe's Co.*, 2020 WL 5814102, at *4 (C.D. Cal. Sept. 24, 2020) (same); *White*, 2017 WL 2352137, at *14; *Davis v. Salesforce.com, Inc.*, 2020 WL 5893405, at *5 (N.D. Cal. Oct. 5, 2020) (same). Consequently, the mere existence of cheaper investment funds and share classes offers no basis for inferring that the directors unreasonably failed to research investment options and no basis for inferring that the directors committed a gross abuse of discretion in selecting investment options. Likewise, directors are not required to seek out the lowest-cost options for services; they are required only to ensure that "costs … are appropriate and reasonable."   Cal. Prob. Code §18503(c)(1).  Pinkert does not allege the fees that the Fund pays to CS&Co., directly or indirectly. Even if he had, the mere existence of lower-cost service providers, *see* FAC ¶104—with no allegation about the range of market rates for such services or even the median or mean rates for

---

[14] As CS&Co. points out in its brief, the allegation that "several" of the Fund's directors previously worked at or are presently "affiliated with" CS&Co. is also false.  *See* CS&Co. Br. 6 & n.4.

[15] Pinkert also alleges that "every person working for Schwab Charitable is actually an employee of [CS&Co.]."  FAC ¶15.  He does not offer any plausible allegations as to how this has any bearing on the loyalty (or not) of the Fund's directors.

1    such services—cannot support an inference of gross negligence or overreach.  *See Kong*, 2020 WL

2    5814102, at *5.  Motions to dismiss are routinely granted based on the same allegations in cases

3    applying even more stringent standards of care and loyalty.  *See infra* at pp. 21-23.  In the end,

4    Pinkert merely seeks to second-guess the business judgments of the Fund's directors.  The business

5    judgment rule precludes him from doing so.

6              **3.      Pinkert fails to plead sufficient facts from which to infer a breach of**

7                        **applicable fiduciary duties.**

8              Pinkert's allegations also fall short of plausibly suggesting that the Charitable Defendants

9    have breached their fiduciary duties under UPMIFA.

10             Pinkert alleges that the Fund's directors have breached their fiduciary duties of care under

11   UPMIFA in three ways: (1) investing in index funds and a money market fund for which there are

12   at least some cheaper and comparable alternatives, FAC ¶¶18, 75, 81, 84-87; (2) investing in some "retail" class shares when the Fund could qualify for cheaper "institutional"

13

14   class shares of the same funds, FAC ¶¶21, 88-97; and (3) failing to negotiate "marketplace rates"

15   for custodial and brokerage services that CS&Co. provides to the Fund, FAC ¶¶19-20, 104.  None

16   of these allegations supports a plausible claim for breach of fiduciary duty.

17             As an initial matter, Pinkert suggests that UPMIFA imposes trust-like standards on the

18   Fund's directors.  FAC ¶11.  It does not.  Although the drafters drew upon trust law's prudent

19   investor rule, they recognized that charitable corporations' directors are not subject to trust

20   standards, that they are subject to "the business judgment standard under corporate law," and that

21   although "[t]rust precedents have routinely been found to be helpful" in defining the scope of their

22   duties, trust precedents are not considered "binding authority in corporate cases."  National

23   Conference of Commissioners on Uniform State Laws, Uniform Prudent Management of

24   Institutional Funds Act 13-14 (2006) ("UPMIFA Final Report"), https://bit.ly/2M2OWnt.

25             Ultimately, however, the precise degree of difference between the corporate-law and trust-

26   law standards imposed on the Fund's directors is immaterial because Pinkert's allegations are

27   deficient even looking to cases applying trust law's strict standards of care and loyalty, including

28   cases arising under the Employee Retirement Income Security Act (ERISA).  For instance, courts

---

have recognized that even trustees need not "scour the market to find and [select] the cheapest possible fund[s]," *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (affirming grant of motion to dismiss), and that trustees may consider factors other than price when selecting investment funds, *see, e.g.*, *White*, 2017 WL 2352137, at *11.[16]   Courts have thus concluded that the mere existence of allegedly comparable and cheaper investment funds does not show that a trustee has failed to exercise reasonable diligence and effort in evaluating investment options or imprudent judgment in selecting investment options.  *See White*, 2017 WL 2352137, at *14*; Kong*, 2020 WL 5814102, at *4; *Dorman v. Charles Schwab Corp.*, 2018 WL 6803738, at *3 (N.D. Cal. Sept. 20, 2018) (granting in part motion to dismiss); *see also Banks v. Northern Trust Corp.*, 2020 WL 1062144, at *6 (C.D. Cal. Mar. 5, 2020) (granting defendant summary judgment).  The same conclusion must apply even more so where the claims involve less stringent standards of care applicable to corporate directors, which are at issue here.[17]

As for Pinkert's assertion that the Fund has invested in retail share classes of some funds for which there are cheaper institutional share classes available, courts have recognized that a trustee may validly prefer retail share classes over institutional share classes.  Retail share classes may, for instance, offer greater liquidity than institutional share classes.  *See Loomis v. Exelon Corp.*, 658 F.3d 667, 672 (7th Cir. 2011); *White*, 2017 WL 2352137, at *11.  Further, a trustee

---

[16] Consistent with the latter recognition, the Fund's directors consider a range of factors in selecting investment funds, including, among others: "[t]he stability and strength of the mutual fund investment company"; "[l]ong-term risk/return profile"; "[p]eer ranking"; "[s]ize (assets under management)"; and "[t]he length of time the fund has been managed by the portfolio manager or committee." *Program Policies* at 16.

[17] Pinkert's reliance (*see* ECF No. 45 at 3) on cases involving employer-sponsored benefit plans is also misplaced.  With employer-sponsored benefit plans, employees have no choice but to invest in the plan offered to them, and the risk is heightened that an employer may fail to act with reasonable diligence and care in selecting good and reasonably priced investment options.  In contrast, as Pinkert's own allegations underscore, donors have a robust market of DAFs to choose from, *see* FAC ¶43, and many DAFs, including the Fund, publicly disclose information about the pools in which they invest, including the operating expense ratios for those pools, *see* FAC ¶¶78, 84, Schwab Charitable Fund, *Investment Options*, https://www.schwabcharitable.org/investment-options (website relied on and incorporated in Pinkert's complaint, *see* FAC ¶84, that provides information on the investment pools in which the Fund invests, including the annual operating expense ratios for those pools).  Information about alternative funds that the DAFs could invest in is also readily available. *See, e.g.*, FAC ¶¶18, 81, 85-86, 94-97.  This market cultivates competition among DAFs for donors and makes it far less plausible in this context that DAF sponsors will select uncompetitive mutual funds or unduly expensive share classes or that they will incur excessive fees and costs.

may invest in more expensive share classes as part of legitimate arrangements for compensating providers of administrative, custodial, and/or brokerage services. *See Loomis*, 658 F.3d at 672-673; *White*, 2017 WL 2352137, at *14; *Davis*, 2020 WL 5893405, at *5. Given this, "ample authority holds that merely alleging that a [fiduciary] offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach," *White*, 2017 WL 2352137, at *14, and courts have dismissed claims based on allegations strikingly similar to Pinkert's here, *see Davis*, 2020 WL 5893405, at *4-5 (dismissing claim of imprudence based on allegations that defendant failed to offer lower-cost share classes that were "identical … in every way except for their lower cost" (quotation marks omitted)).

Finally, Pinkert's allegation that the Fund sometimes indirectly compensates CS&Co. for custodial and brokerage services at a rate higher than it could hypothetically have negotiated from alternative service providers is entirely speculative. Pinkert never says what CS&Co. receives—directly or indirectly—from the Fund, nor does he allege what constitutes "market" rates or even the median or mean rates for similar custodial and brokerage services. There is therefore no basis in the Complaint to infer that the fees that the Fund pays to CS&Co.—directly or indirectly—are unreasonable or excessive or that the Charitable Defendants' process of negotiating any fees was deficient. *See* Cal. Prob. Code §18503(c)(1) (persons managing institutional funds have duty to ensure costs are "appropriate and reasonable"); *Kong*, 2020 WL 5814102, at *5 (dismissing claim where plaintiff failed to offer allegations suggesting the recordkeeping fees were excessive in relation to the services provided).

In sum, contrary to Pinkert's contentions, *see, e.g.*, FAC ¶¶48, 51-52, the Fund's directors are not governed by trust law's standards of care; they are governed by less stringent corporate standards, *see supra* at pp. 16-17. But even looking at cases applying trust law's stricter standards, his allegations cannot state a plausible claim to relief. Necessarily, then, his allegations also cannot state a plausible claim to relief under the applicable corporate-law standards. His claims must therefore be dismissed under Rule 12(b)(6).

## V.      CONCLUSION

The FAC should be dismissed in its entirety with prejudice.

DATED: February 26, 2021

Respectfully submitted,

By: */s/ David C. Marcus*
DAVID C. MARCUS
CHRISTOPHER T. CASAMASSIMA
WILMER CUTLER PICKERING HALE
   AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: +1 213 443 5300
Facsimile: +1 213 443 5400

ALAN E. SCHOENFELD (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
Telephone: +1 212 937 7294
Facsimile: +1 212 230 8888

ANDREW S. DULBERG (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
Telephone: +1 617 526 6352
Facsimile: +1 617 526 5000

*Attorneys for Defendants Schwab Charitable
Fund, Schwab Charitable Board of
Directors, and Schwab Charitable
Investment Oversight Committee*