Matthew C. Helland, CA Bar No. 250451
helland@nka.com
NICHOLS KASTER, LLP
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

Paul J. Lukas, MN Bar No. 22084X*
lukas@nka.com
Kai H. Richter, MN Bar No. 0296545*
krichter@nka.com
Brock J. Specht, MN Bar No. 0388343*
bspecht@nka.com
Jennifer K. Lee, MN Bar No. 0399012*
jlee@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878

*admitted *pro hac vice*

ATTORNEYS FOR PLAINTIFF AND THE
PROPOSED CLASS

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| Philip Pinkert, individually and on behalf of a Class of similarly situated individuals, and on behalf of the general public,<br><br>        Plaintiff,<br><br>    v.<br><br>Schwab Charitable Fund, Charles Schwab & Co., Schwab Charitable Board of Directors, and Schwab Charitable Investment Oversight Committee.<br><br>        Defendants. | **Case No. 3:20-cv-07657-LB**<br><br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS SCHWAB CHARITABLE FUND, SCHWAB CHARITABLE BOARD OF DIRECTORS, AND SCHWAB CHARITABLE INVESTMENT OVERSIGHT COMMITTEE'S MOTION TO DISMISS**<br><br>**CLASS ACTION** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATEMENT OF ISSUES TO BE DECIDED ................................................................ 3

FACTUAL BACKGROUND ............................................................................................ 3

I.    SCHWAB CHARITABLE AND ITS DONOR-ADVISED FUND ............................. 3

II.   PLAINTIFF'S SCHWAB DAF ACCOUNT ..................................................... 4

III.  DEFENDANTS' MISMANAGEMENT OF THE SCHWAB DAF ........................... 5

    A.  Defendants' Near Exclusive Consideration of Investment Options from Schwab & Co.'s OneSource Platform ........................................................................ 5

    B.  Defendants' Disloyal and Imprudent Selection of Overpriced, Underperforming Schwab & Co. Index Funds and Money Market Fund ................................. 6

    C.  Defendants' Disloyal and Imprudent Selection of Overpriced Third-Party Mutual Funds that Paid Excessive Fees to Schwab & Co. ........................................ 7

ARGUMENT ..................................................................................................................... 8

I.    PLAINTIFF HAS STANDING TO SUE ................................................................ 8

    A.  Plaintiff Has Article III Standing .......................................................... 8

        1.  Plaintiff Maintained Property and Contractual Interests in His Schwab DAF Account Assets, Which Were Injured by Defendants' Conduct ..................... 8

        2.  Plaintiff Maintained Reputational and Expressive Interests in His Schwab DAF Account Assets, Which Were Injured by Defendants' Conduct ........... 12

    B.  Plaintiff Has Statutory Standing .......................................................... 13

        1.  Cal. Corp. Code § 5142 Grants Standing to Donors Like Plaintiff Who Have Property and Contractual Interests in the Charitable Trust Assets ................. 13

        2.  Because Plaintiff's Property Interests Were Diminished, Plaintiff has Standing under the Unfair Competition Law (UCL) ..................................... 14

        3.  Plaintiff Has a "Special Interest" in the Charitable Trust Sufficient to Give Him Standing under California Common Law ............................................. 14

II.   PLAINTIFF HAS STATED A CLAIM FOR BREACH OF FIDUCIARY DUTIES ............................. 15

    A.  The Corporations Code's Text and Structure Evince a Legislative Intent to Preserve Common Law Causes of Action Brought by Donors like Plaintiff ........................... 15

    B.  In Alleging that Defendants Caused the Fund to Invest in More Expensive, Worse Performing Investments in Order to Benefit Schwab & Co., Plaintiff Has Adequately Alleged Breaches of Fiduciary Duties .................................................... 19

III.   PLAINTIFF HAS STATED A CLAIM FOR VIOLATION OF THE UCL.........................................22

    A.   Plaintiff has Alleged Underlying Unlawful Conduct, Including Violations of UPMIFA.................................................................................................................22

    B.   The Business Judgment Rule Does Not Apply Because the Circumstances of Defendants' Conduct Inherently Raise an Inference of a Conflict of Interest ...........22

    C.   Even if the Business Judgment Rule Did Apply, Plaintiff Adequately Alleges that Defendants Unreasonably Failed to Undertake a Reasonable Inquiry.......................24

CONCLUSION ...................................................................................................................25

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS**          **3:20-CV-07657-LB**

1

## TABLE OF AUTHORITIES

2

**Cases**

3
*Benninghoff v. Sup. Ct.,*
   136 Cal. App. 4th 61 (2006) ........................................................................... 10

4
*Bouvy v. Analog Devices, Inc.,*
   2020 WL 3448385 (S.D. Cal. June 24, 2020) ............................................... 20

5

6
*California Ass'n of Health Facilities v. Dep't of Health Servs.,*
   940 P.2d 323 (Cal. 1997) ............................................................................... 16

7
*Cal. Chamber of Commerce v. State Air Resources Bd.,*
   10 Cal. App. 5th 604 (2017) ................................................................... 10, 11

8

9
*Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.,*
   973 P.2d 527 (1999) ....................................................................................... 22

10
*Cimini v. Jaspan Schlesinger Hoffman LLP,*
   2007 WL 173893 (E.D.N.Y. Jan. 19, 2007) ................................................. 12

11

12
*Danvers Motor Co. v. Ford Motor Co.,*
   432 F.3d 286 (3d Cir. 2005) .......................................................................... 12

13
*Davis v. Salesforce.com, Inc.,*
   2020 WL 5893405 (N.D. Cal. Oct. 5, 2020) ................................................ 21

14

15
*Env't L. Found. v. State Water Res. Control Bd.,*
   26 Cal. App. 5th 844 (2018) .......................................................... 2, 16, 18

16
*Estate of Sigourney,*
   93 Cal. App. 4th 593, 604 (2001) ................................................................. 11

17

18
*Everest Invs. 8 v. McNeil Partners,*
   114 Cal. App. 4th 411 (2003) .................................................................. 22, 24

19
*Fairbairn v. Fidelity Investments Charitable Gift Fund,*
   2018 WL 6199684 (N.D. Cal. Nov. 28, 2018) ............................................. 15

20

21
*Frances T. v. Village Green Owners Association,*
   723 P.2d 573 (Cal. 1986) ............................................................................... 18

22
*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.,*
   528 U.S. 167 (2000) ....................................................................................... 12

23

24
*Habenicht v. Lissak,*
   20 P. 874 (Cal. 1889) ............................................................................... 10, 11

25
*Hoffman v. Connell,*
   73 Cal. App. 4th 1194 (1999) .......................................................................... 9

26

27
*I.E. Assocs. v. Safeco Title Ins. Co.,*
   702 P.2d 596 (Cal. 1985) ............................................................................... 16

28

-iv-

*In re Lau Capital Funding, Inc.*,
    321 B.R. 287 (C.D. Cal. 2005) ........................................................................... 10

*In re Old Canal Financial Corp.*,
    550 B.R. 519 (C.D. Cal. 2016) ........................................................................... 13

*Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*,
    250 F. Supp. 3d 460 (N.D. Cal. 2017) .............................................................. 19

*Kingoschu Fam. Partners, LLC v. Pub. Storage*,
    2014 WL 787830 (Cal. App. Feb. 27, 2014) (unpublished) ........................... 23

*Kong v. Trader Joe's Co.*,
    2020 WL 5814102 (C.D. Cal. Sept. 24, 2020) ................................................. 21

*Kruss v. Booth*,
    185 Cal. App. 4th 699 (2010) ................................................................. 3, 23, 24

*Kwikset Corp. v. Superior Ct.*,
    246 P.3d 877 (Cal. 2011) ................................................................................... 14

*L.B. Research & Educ. Found. v. UCLA Found.*,
    130 Cal. App. 4th 171 (2005) ........................................................................... 15

*Lehman v. Superior Ct.*,
    145 Cal. App. 4th 109 (2006) ........................................................................... 17

*Leyte-Vidal v. Semel*,
    220 Cal. App. 4th 1001 (2013) ......................................................................... 23

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................ 8

*Main v. Am. Airlines Inc.*,
    248 F. Supp. 3d 786 (N.D. Tex. 2017) ............................................................ 20

*Metro. Water Dist. v. Superior Ct.*,
    84 P.3d 966 (Cal. 2004) ..................................................................................... 17

*Moreno v. Deutsche Bank Am. Holding Corp.*,
    2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016) ................................................. 20

*Nelsen v. Principal Glob. Invs. Tr. Co.*,
    362 F. Supp. 3d 627 (S.D. Iowa 2019) ............................................................ 20

*Pacific Gas & Electric Co. v. Hart High-Voltage Apparatus Repair & Testing Co., Inc.*,
    18 Cal. App. 5th 415 (2017) ................................................................. 8, 9, 10, 11

*Pac. Scene, Inc. v. Penasquitos, Inc.*,
    758 P.2d 1182 (1988) ......................................................................................... 16

*Patton v. Sherwood*,
    152 Cal. App. 4th 339 (2007) ........................................................................... 13

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS**    **3:20-CV-07657-LB**

*Poghosyan v. First Fin. Asset Mgmt., Inc.*,
   2020 WL 433083 (E.D. Cal. Jan. 28, 2020) ................................................. 8

*Reed v. Fed. Nat'l Mortgage Ass'n*,
   2015 WL 12911617 (C.D. Cal. Aug. 24, 2015) .......................................... 11

*Righthaven LLC v. Hoehn*,
   716 F.3d 1166 (9th Cir. 2013) .................................................................... 10

*Ritter & Ritter, Inc. v. The Churchill Condo. Assn.*,
   166 Cal. App. 4th 103 (Cal. App. 2008) .................................................... 18

*Robins v. Spokeo*,
   867 F.3d 1108 (9th Cir. 2017) .................................................................... 12

*Roth v. Jelley*,
   45 Cal. App. 5th 655 (2020) ....................................................................... 10

*Scouler & Co., LLC v. Schwartz*,
   2012 WL 12897963 (N.D. Cal. Aug. 23, 2012) ........................................ 24

*Shenker v. Laureate Educ., Inc.*,
   983 A.2d 408 (Md. 2009) ........................................................................... 17

*Sprague v. Edwards*,
   48 Cal. 239 (1874) ..................................................................................... 10

*Terraza v. Safeway Inc.*,
   241 F. Supp. 3d 1057 (N.D. Cal. 2017) .................................................... 20

*Tibble v. Edison Int'l*,
   843 F.3d 1187 (9th Cir. 2016)..................................................... 2, 19, 20, 25

*Union Pac. RR Co. v. Santa Fe Pac. Pipelines, Inc.*,
   231 Cal. App. 4th 134 (2014)....................................................................... 9

*Urakhchin v. Allianz Asset Mgmt.*,
   2016 WL 4507117 (C.D. Cal. Aug. 5, 2016) ............................................ 20

*Van de Kamp v. Gumbiner*,
   221 Cal. App. 3d 1260 (Cal. App. 1990) ................................................... 17

*Velazquez v. Mass. Fin. Servs. Co.*,
   320 F. Supp. 3d 252 (D. Mass. 2018) ........................................................ 20

*White v. Chevron*,
   2017 WL 2352137 (N.D. Cal. May 31, 2017) .......................................... 21

**Rules, Regulations, and Statutes**

15 U.S.C.§ 80a-18(f)(2) .................................................................................... 21

26 U.S.C. § 4966(d)(2)(A)(iii) ........................................................................... 9

17 C.F.R. § 270.18f-3(a)(4)............................................................................... 21

-vi-

Cal. Bus. & Prof. Code § 17200.................................................................................... 22

Cal. Corp. Code § 5047.5(c)(4)................................................................................... 17

Cal. Corp. Code § 5047.5(g) ....................................................................................... 18

Cal. Prob. Code § 18503 ............................................................................................. 25

Cal. Prob. Code § 18503(b).......................................................................................... 22

**Other Authorities**

CharlesSchwab Corp., Carrie Schwab-Pomerantz,
    https://www.aboutschwab.com/carrie-schwab-pomerantz................................. 23

IRS, Donor-Advised Funds Guide Sheet Explanation (July 31, 2008),
    https://www.irs.gov/pub/irs-tege/donor_advised_explanation_073108.pdf ................... 24

MetWest Total Return Bond Prospectus https://www.tcw.com/-/media/Downloads/Products/
    US-Funds/MetWest-Funds/Fund-Prospectus/MWFund-Pro.pdf ...................................... 21

National Conference of Commissioners of Uniform State Laws, Uniform Prudent
    Management of Institutional Funds Act .......................................................................... 22

Rest. (Third) of Trusts § 78 ......................................................................................... 19

Schwab Charitable Fund, *Program Policies* (updated Nov. 2020),
    https://www.schwabcharitable.org/public/file/P-5252372 ................................. 11

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS**          **3:20-CV-07657-LB**

## INTRODUCTION

For more than 20 years, Schwab Charitable Fund ("Schwab Charitable") has sponsored a donor advised fund (the "Schwab DAF" or the "Fund") to promote charitable giving. Schwab Charitable has promoted Schwab DAF accounts as akin to "private foundations" to great success, and with more than $15 billion in assets, the Schwab DAF is now one of the ten largest nonprofit entities in the country. And yet, Schwab Charitable does not manage the Fund loyally or prudently with a commitment to its charitable purpose. Instead, Schwab Charitable, through the Schwab Charitable Board of Directors ("Directors") and the Schwab Charitable Investment Oversight Committee ("Committee,") (collectively, "Defendants"), has managed the Fund with an eye towards promoting the financial interests of Charles Schwab & Co. ("Schwab & Co."), upon which Schwab Charitable and the Fund are wholly dependent.

As explained below, Defendants have done this in several ways. To put it simply, Defendants have selected the Fund's underlying investment options in order to maximize the fees Schwab & Co. receives for investment management and administrative services. As a result, the Fund has invested in higher-priced investment options (several of which are Schwab-affiliated mutual funds), when identical (if not superior) alternatives were available on the broader marketplace for significantly less cost. This misconduct has caused tens of millions of dollars to be diverted out of Fund accounts (and ultimately away from beneficiary charities) into the pockets of Schwab & Co.

Faced with detailed allegations of this brazen misconduct, Defendants deflect and obfuscate. They argue that donors who contributed to a Schwab DAF account with the intention of starting a "legacy of generosity for generations," in fact surrendered their money entirely to Schwab Charitable and retained no interest whatsoever in its use or disposition. That is, even if Schwab Charitable has been abusing the Fund to profit Schwab & Co., Defendants argue, donors have no recourse because their money belongs to Schwab Charitable. Defendants go further and argue that even if donors could sue to protect their interests, their conduct is entirely permissible because the trustees of the Schwab DAF—a charitable trust—are not subject to fiduciary duties. Rather, they are given a "presumption of good faith" and are subject only to the business judgment rule. Defendants are wrong on all fronts.

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS**      **3:20-CV-0765-LB**

First, Defendants' constitutional standing argument rests on the flawed assumption that in surrendering legal title to account assets, donors lost all property interests in their assets. That misstates longstanding property law. With robust advisory privileges, including the right to invest their account assets and direct distributions to charities, donors maintained significant contractual and property interests in their account assets. *See infra I.A.1*. Donors also maintained cognizable reputational and expressive interests in their account assets, as making charitable contributions through an account confers community recognition as a donor. *See infra I.A.2.* In reducing the value of donors' accounts and diverting account assets away from donors' charitable giving to Schwab & Co., Defendants' misconduct injured these legal interests. Further, because donors like Plaintiff maintained property and contractual interests in the Fund's assets, they have statutory standing to bring breach of charitable trust claims under California Corporations Code § 5142 and unlawful business practice claims under California's Unfair Competition Law. *See infra I.B.1 and I.B.2.* Finally, Plaintiff's advisory privileges are sufficient to give him a "special interest" in the charitable trust to confer standing under California common law. *See infra I.B.3.*

Second, Defendants assert without any legal authority or analysis that Plaintiff's common law breach of fiduciary duty claims have been preempted by the California Corporations Code. Defendants' assertions fall "far short of overcoming the presumption that a statute does not supplant the common law." *Env't L. Found. v. State Water Res. Control Bd.*, 26 Cal. App. 5th 844, 867 (2018). There is neither explicit nor implicit preemption and courts have held that the same language in the Corporations Code does not preempt existing common law claims. *See infra II.A.*

Third, in arguing that Plaintiff has failed to plead a common law claim, Defendants ignore the Ninth Circuit's unequivocal mandate that "cost-conscious management is fundamental to prudence in the investment function." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016). But more importantly, Defendants do not even address Plaintiff's allegations of disloyalty. Plaintiff alleges not only that Defendants selected more expensive and inferior investment options, *but that they did so in order to benefit Schwab & Co.* This is more than adequate to state a claim for breach of common law and statutory fiduciary duties. *See infra II.B., III.A.*

Finally, Plaintiff has stated a claim for unlawful conduct under California's Unfair

-2-

Competition Law based on the underlying breaches of fiduciary duties, including breaches of the Uniform Prudent Management of Institutional Funds Act (UPMIFA). Because Schwab Charitable is wholly dependent upon Schwab & Co., these "circumstances inherently raise an inference of conflict of interest" and therefore Schwab Charitable is not entitled to the protections of the busines judgment rule. *Kruss v. Booth*, 185 Cal. App. 4th 699, 728 (2010). Schwab Charitable's "actions benefiting a third party" while "harming [the Schwab DAF]" cannot be shielded by a presumption of good faith. *Id.*; *see infra III.B.* But even if the business judgment rule did apply, Plaintiff's allegations show that a reasonable and adequate investigation into marketplace alternatives would have revealed that the Fund would be better served by unaffiliated investment alternatives, and thus are sufficient to rebut the presumption of good faith under the business judgment rule. *See infra III.B.* For all of these reasons, Defendants' motion should be denied.

## STATEMENT OF ISSUES TO BE DECIDED

1.    Does Plaintiff have standing to pursue his claims as a donor to the Schwab DAF?

2.    Has Plaintiff plausibly alleged that Defendants breached their common law and statutory fiduciary duties?

3.    Does California Corporations Code § 5110 *et seq.* preempt Plaintiff's common law breach of fiduciary duty claim with respect to the Directors?

4.    Has Plaintiff stated a cognizable claim against Defendants for unlawful business practices under California's Unfair Competition Law?

5.    Does the business judgment rule apply to Plaintiff's statutory claims given the conflicts of interest here? If the business judgment rule does apply, does Plaintiff adequately allege that the Directors' failure to investigate alternative service providers for the Fund was unreasonable?

## FACTUAL BACKGROUND[1]

### I.    SCHWAB CHARITABLE AND ITS DONOR-ADVISED FUND

Like many financial institutions today, Schwab & Co. has an affiliated entity that is a charitable corporation, Schwab Charitable, which in turn sponsors the Schwab DAF. *ECF No. 50*

---

[1] For more background on Schwab & Co.'s role in the fiduciary breaches, Plaintiff respectfully directs the Court to Plaintiff's Response to Schwab & Co. and incorporates that discussion herein.

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS          3:20-CV-0765-LB**

1   ("*FAC*") *¶¶ 13-15*. Although Schwab & Co. and Schwab Charitable are distinct legal entities,

2   without Schwab & Co., there would be no Schwab Charitable or Schwab DAF. *Id.* In 2010, Schwab

3   & Co. made the initial investments necessary to create the Schwab DAF, which has more than $15

4   billion in assets. *Id.* That relationship continues today, with Schwab & Co. providing virtually all

5   administrative, custodial, and brokerage services for the Schwab DAF. *Id. ¶¶ 13-15, 45, 46.* Indeed,

6   every person working for Schwab Charitable is an employee of Schwab & Co. *Id. ¶ 15.* As a result

7   of this close, codependent relationship, Schwab Charitable does not act independently, focused on

8   its charitable purpose, but instead seeks to maximize Schwab & Co.'s revenues by making

9   imprudent investment decisions and paying excessive administrative fees for the benefit of Schwab

10  & Co. *Id. ¶ 16.*

11      Schwab DAF donors are permitted to invest their account into any of fourteen investment

12  pools. *FAC ¶ 56.* While donors can choose among the fourteen investment pools, Schwab Charitable

13  selects the investment underlying each investment pool, thereby determining the investment

14  management fees charged to donors' accounts. *Id.* The fourteen underlying investment options

15  comprise five lower-cost passively managed funds that track a benchmark index of a particular asset

16  class (commonly referred to as index funds), eight actively managed higher-cost mutual funds, and

17  one money market fund. *Id. ¶ 57.* Donors' accounts incur investment management fees depending

18  on how the account is invested and a separate administrative fee that covers the expenses of

19  operating a donor's account. *Id. ¶¶ 54, 55.* It is no coincidence that Schwab Charitable has

20  contracted with Schwab & Co. to provide administrative services, and has selected underlying

21  mutual funds that pay revenue sharing fees to Schwab & Co. *FAC ¶¶ 15, 46, 71, 72.*

22  **II.   PLAINTIFF'S SCHWAB DAF ACCOUNT**

23      Plaintiff has held a Schwab DAF account on behalf of the Pinkert Family Trust since

24  approximately 2007. *FAC ¶ 27.* Plaintiff did not open an account to support Schwab & Co., but

25  rather to advance his own philanthropic goals, support organizations that are personally meaningful

26  to him and his family, and to cultivate the family value of charitable giving. *Id. ¶ 28.* Although

27  Plaintiff surrendered legal title to his account assets upon depositing them in his account, he still has

28  substantial interests in his account by virtue of his advisory privileges. Indeed, since opening his

-4-

account, Plaintiff has directed how his account assets have been invested and distributed. *Id. ¶¶ 27, 29*. Schwab Charitable recognizes that the privilege of directing donations "is the most important and fulfilling feature" of the Schwab DAF. *Id. ¶ 61*. At Plaintiff's direction, and only his direction, donations have been made in the name of the Pinkert Family Trust from his Fund account to several charities, including At Home in Greenwich, an organization that helps seniors live in their homes as they age. *Id. ¶ 29*. Plaintiff also volunteers as a driver for this organization and has served on its finance committee. *Id.* Another organization he has supported through his Fund account is Jewish Family Services in Greenwich, which provides services to poor families emigrating to the United States. *Id.* Financially supporting this organization is an expression of a shared family value of supporting immigrant communities in America. *Id.*

## III.   DEFENDANTS' MISMANAGEMENT OF THE SCHWAB DAF

Schwab Charitable, through the Committee, manages the Schwab DAF by selecting service providers, including for administrative and investment management services. *FAC ¶ 32*. As alleged in the FAC, at every opportunity, Schwab Charitable has managed the Schwab DAF with an eye towards maximizing revenues for Schwab & Co. to the detriment of account holders and beneficiary charities. *Id. ¶¶ 15-23*. Defendants' imprudent and disloyal conduct has diverted tens of millions of dollars out of Schwab DAF accounts into the pockets of Schwab & Co. Defendants have accomplished this in three ways: (1) by considering almost exclusively investment options available on Schwab & Co.'s OneSource platform, which caused the Schwab DAF to pay excessive administrative and investment fees to Schwab & Co., *Id. ¶¶ 69-74*; (2) selecting only Schwab-affiliated index and money market funds, when nearly identical marketplace alternatives were significantly less expensive and better performing, *FAC ¶¶ 75-87*; and (3) selecting retail higher-priced share classes for unaffiliated mutual funds, when the Fund would have qualified for lower-priced institutional share classes, thereby causing it to pay excessive fees to Schwab & Co. for no valid reason, *Id. ¶¶ 88-100*.

### A.   Defendants' Near Exclusive Consideration of Investment Options from Schwab & Co.'s OneSource Platform

Schwab & Co. offers the Schwab Mutual Fund OneSource service ("OneSource"). This

-5-

platform is marketed to individual investors and allows them to invest in thousands of mutual funds without paying a transaction fee when buying and selling shares of those funds. *FAC ¶ 69.* However, it is not free. Instead of charging transaction fees, the mutual funds on the OneSource platform have higher expense ratios. *Id. ¶ 70.* To have their mutual funds offered on OneSource, investment management firms pay Schwab & Co. revenue sharing payments of 0.40% per year. *Id. ¶ 71.* These fees are passed along to investors through higher expense ratios associated with those funds. *Id. ¶¶ 94 & n.41, 101, 103, 04.*

An institutional investor like the Fund, with more than $15 billion in assets, has no need to invest in mutual funds through a platform such as OneSource, which is aimed at individual investors who pay retail prices for mutual funds. *Id. ¶¶ 73, 98, 101, 104.* Despite this, throughout much of the relevant period, in selecting underlying investment options for the Schwab DAF's investment pools, Defendants almost exclusively considered mutual funds offered on the OneSource platform. *FAC ¶ 74.* As a result, Schwab DAF account holders paid higher fees to Schwab & Co. without receiving any services in return, and none of these fees were rebated to donors or the Schwab DAF. *Id. ¶¶ 71, 72, 104.* Because of Defendants' insistence on utilizing funds held on Schwab & Co.'s OneSource platform, the underlying mutual funds in the Schwab DAF investment pools were more expensive than comparable, and sometimes even identical, investment options the Schwab DAF could have utilized from the broader marketplace. *Id. ¶ 74.*

## B. Defendants' Disloyal and Imprudent Selection of Overpriced, Underperforming Schwab & Co. Index Funds and Money Market Fund.

Index funds track identical or similar market-based indices. Therefore, index funds from various investment managers are functionally the same and there is strong competition among them based on fees. *FAC ¶¶ 77, 80.* Schwab Charitable offers donors the option to invest in five index pools, and has selected only index funds managed by Schwab & Co. to underlie those pools. *Id. ¶¶ 57, 75.* For each Schwab-affiliated index fund selected by Schwab Charitable, there was a marketplace alternative tracking the same index for a significantly smaller fee, sometimes as little as half or less the cost of the Schwab-affiliated index fund. *Id. ¶¶ 84-86.* For example, as of the beginning of 2017, the Schwab Treasury Inflation Protected Securities Index Fund charged 0.19%

per year, while the Fidelity Inflation-Protected Bond Index Fund, which tracks the same index, charged only 0.06%, and as expected, the lower expenses resulted in superior performance. *Id. ¶ 85.* What is more, some Schwab-affiliated index funds performed worse than marketplace alternatives (*i.e.*, failed to track the underlying index as well). *Id. ¶ 86.* As highlighted in the FAC, the Schwab Small Cap Index fund materially underperformed the comparable Fidelity Small Cap Index fund for seven years. *Id. ¶¶ 86, 87.* Defendants' selection and retention of the Schwab Government Money Market Fund suffers from the same flaws. It charges fees two to three times higher than marketplace alternatives and provides donors inferior returns. *Id. ¶ 82.* There is simply no prudent or reasonable justification for Defendants to utilize Schwab-affiliated index and money market funds, when superior, less expensive alternatives are available that provided the exact same set of services.

### C. Defendants' Disloyal and Imprudent Selection of Overpriced Third-Party Mutual Funds that Paid Excessive Fees to Schwab & Co.

Even when using unaffiliated mutual funds, Defendants seized opportunities to transfer money from Schwab DAF accounts to Schwab & Co. Many mutual funds offer multiple types of shares, known as "classes." Other than their expense level, all share classes of a fund are identical, investing in the same underlying securities, with the same investment manager, and sharing common investment objectives and policies. *FAC ¶ 88.* Therefore, differences in investment returns between share classes are solely attributable to differences in their expense levels. *Id.* Institutional investors like the Schwab DAF have access to the lowest-cost share class, whereas individual investors are typically only eligible for retail-priced, higher-cost share classes. *Id. ¶¶ 88, 89.* The OneSource platform, typically targeted at individual investors, does not offer low-cost share classes that institutional investors generally utilize. *Id. ¶¶ 73, 89, 91.* Thus, in selecting underlying investment options from the OneSource platform, Defendants also caused the Schwab DAF to pay higher fees associated with higher-cost share classes. *Id. ¶¶ 89, 101.* And because Schwab Charitable charged Schwab DAF accounts a separate administrative fee, no additional services were received in return for the additional cost. *Id. ¶¶ 54, 100.* The excessive fees did not serve the Schwab DAF in any way, and only served to benefit Schwab & Co. Based on the foregoing and on his First Amended Complaint ("FAC"), Plaintiff asserts claims of breach of fiduciary duties against Schwab Charitable.

## ARGUMENT[2]

### I.   PLAINTIFF HAS STANDING TO SUE

#### A.   Plaintiff Has Article III Standing

The Supreme Court has reduced the constitutional standing inquiry to three elements. First, a plaintiff "must have suffered an injury in fact," that is, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation and quotations omitted). Second, "there must be a causal connection between the injury and the conduct complained of" that is "fairly traceable to the challenged action of the defendant." *Id.* Finally, it must be "likely ... that the injury will be redressed by a favorable decision." *Id.* At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, *id.* at 561, as "federal courts have reiterated that injury in fact is not a substantial or insurmountable hurdle.... Rather, it suffices for federal standing purposes to allege some specific, identifiable trifle of injury." *Poghosyan v. First Fin. Asset Mgmt., Inc.*, 2020 WL 433083, at *7 (E.D. Cal. Jan. 28, 2020) (citation and quotations omitted). Here, Defendants dispute only the first element—that Plaintiff has suffered an injury in fact. As explained below, Plaintiff maintained robust legally protected interests—including property, contractual, reputational, and expressive interests—that were all injured as to him by Defendants' fiduciary breaches. This is sufficient to demonstrate injury in fact.

#### 1.   Plaintiff Maintained Property and Contractual Interests in His Schwab DAF Account Assets, Which Were Injured by Defendants' Conduct.

Defendants argue that because Plaintiff "relinquished all legal title" to his assets, he lacks Article III standing to sue. *See ECF No. 55 ("Defs' Br.") at 7*. However, the persons with a property interest in something go beyond just its "legal owner": "California law recognizes a wide range of interests are included in the bundle of sticks that constitutes 'property' and those sticks may be divided and held (*i.e.*, owned) among multiple persons." *Pac. Gas & Elec. Co. v. Hart High-Voltage Apparatus Repair & Testing Co., Inc.*, 18 Cal. App. 5th 415, 426 (2017) ("*PG&E*"); *see also*

---

[2] Plaintiff reincorporates arguments made in Plaintiff's Response to Schwab & Co. in their entirety and does not repeat them here in order to avoid needless repetition.

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS**                    **3:20-CV-0765-LB**

1   *Hoffman v. Connell*, 73 Cal. App. 4th 1194, 1200 (1999) ("taxpayer had a cognizable "property

2   interest" in trust despite not being its "owner"). An "interest" in property "is defined as follows:

3   'Collectively, the word includes any aggregation of rights, privileges, powers, and immunities;

4   distributively, it refers to any one right, privilege, power, or immunity." *PG&E*, 18 Cal. App. 5th at

5   427. The most "essential and beneficial" of interests is "the right to *use* the physical thing to the

6   exclusion of others." *Union Pac. RR Co. v. Santa Fe Pac. Pipelines, Inc.*, 231 Cal. App. 4th 134,

7   157 (2014) (emphasis in original).

8        Here, Plaintiff has enjoyed robust advisory privileges since he opened his account. He has

9   directed all donations from his account to advance his own philanthropic goals and has specifically

10  donated to At Home in Greenwich and Jewish Family Services in Greenwich, among other

11  organizations. *FAC ¶ 29.* Pursuant to his advisory privileges, Plaintiff has also made

12  recommendations regarding how the assets in his account are invested. *FAC ¶¶ 27, 29.* Although

13  the Directors decide how to invest the monies in each pool, the account holder recommends the pool

14  (*i.e.*, the asset class(es)) in which the money will be invested.

15       Defendants claim that Plaintiff cannot have an interest in his Fund account because IRS

16  regulations required Plaintiff to "relinquish all legal title to and control over the assets contributed

17  to the [Schwab Donor-Advised] Fund in exchange for immediate tax deductions for his

18  contributions." *Defs' Br. at 7.* However, "federal tax laws are not intended to determine a party's

19  property rights." *Hoffman*, 73 Cal. App. 4th at 1199. Instead, "'state law creates legal interests and

20  rights," and federal law merely "designate[s] what interests or rights, so created, shall be taxed.'"

21  *Id.* (quoting *Morgan v. Commissioner*, 309 U.S. 78, 80 (1940)). Even so, while IRS regulations may

22  have required Plaintiff to transfer legal title of the assets in his account to Schwab Charitable, those

23  same regulations require Schwab Charitable to provide Plaintiff with concrete interests in his DAF

24  account in order for Schwab Charitable to claim 501(c)(3) status. 26 U.S.C. § 4966(d)(2)(A)(iii)

25  (requiring donor-advised fund to provide donor with "advisory privileges with respect to the

26  distribution or investment of amounts held in such fund"). Similarly, the fact that the Schwab

27  Charitable *Program Policies* grants them "exclusive legal authority and control of [the Fund] as to

28  their use and distribution" does not undermine Plaintiff's property interests. *Defs' Br. at 5.* In

1    determining the rights and interests created by a contract, California courts do not look at the

2    "labels" or "titles" used by the contract, but at the substantive effect of the contract. *See Benninghoff*

3    *v. Sup. Ct.*, 136 Cal. App. 4th 61, 73 (2006) ("'The nature of the instrument is not to be determined

4    by what the parties called it. Its nature is to be determined by its legal effect.'" (quoting *Rosen v.*

5    *E.C. Losch, Inc.*, 234 Cal. App. 2d 324, 331–32 (1965)). As Abraham Lincoln observed, "calling a

6    tail a leg does not make it so." *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1167-68 (9th Cir. 2013).

7        Courts have found that a contract or regulation conferred property interests upon a party

8    under analogous circumstances, despite language explicitly declaring those interests were "not

9    property interests." *See, e.g.*, *PG&E*, 18 Cal. App. 5th at 420 (holding that a "beneficial owner" of

10   electric transformer had property interests and standing to sue, despite language in the contract to

11   the contrary); *Cal. Chamber of Commerce v. State Air Resources Bd.*, 10 Cal. App. 5th 604, 634,

12   648 (2017) (holding that under California's cap-and-trade emissions, program, companies that had

13   purchased carbon trading credits maintained "a valuable property interest—the privilege to pollute

14   California's air—that may be freely sold or traded on the secondary market" notwithstanding

15   language in the regulation explicitly stating that "the allowances confer no property rights");

16   *Habenicht v. Lissak*, 20 P. 874 (Cal. 1889) (holding that a seat on the stock exchange was property

17   of the individual holding it, despite the fact that the bylaws of the exchange stated that all property

18   of the exchange was held in trust for the benefit of members, and that members had no property

19   interest in any property related to the exchange.).

20        Defendants further argue that these are not cognizable property interests because they have

21   "final authority" over donors' recommendations. *See Defs' Br. at 5, 11-12*. But in practice, Plaintiff

22   has directed all the investments of and donations from his account. *FAC ¶¶ 27, 29*. Moreover, under

23   California law, the need to obtain third-party approval to exercise a property interest does not negate

24   the existence of that interest, it simply means that his interest is subject to a condition precedent.

25   *See In re Lau Capital Funding, Inc.*, 321 B.R. 287, 295 (C.D. Cal. 2005); *Sprague v. Edwards*, 48

26   Cal. 239, 249 (1874). And California law is clear: A party with a contingent interest has a legally

27   cognizable interest in the property, even if the contingency (*e.g.*, Defendants' approval of Plaintiff's

28   desired donation or investment) has not yet occurred. *See Roth v. Jelley*, 45 Cal. App. 5th 655, 669

(2020) ("the law has long recognized that a contingent future interest is property no matter how improbable the contingency" (citations and quotations omitted)); *Estate of Sigourney*, 93 Cal. App. 4th 593, 604 (2001) (right to appoint a trustee to charitable trust if the appointed trustee could not serve was a property interest in the charitable trust because "a property interest need not be free from conditions precedent or subsequent which may preclude it from ever becoming a present interest" (citation and quotations omitted)); *Habenicht*, 20 P. 874 (holding that a defendant-debtor's seat on the San Francisco Stock and Exchange Board was a property interest even though his exercise of the right to transfer the seat was subject to approval by a third party). Because the right of a third party to veto a party's exercise of its property interest is irrelevant in determining whether a property interest exists, Schwab Charitable's right to reject Plaintiff's proposed investments and donations does not negate his property interest in his Schwab DAF account.

Plaintiff thus possesses what California courts have described as the "traditional hallmarks of property": "the right to exclude others" from exercising the property interest and the right to "sell, assign or otherwise transfer" the interest. *Cal. Chamber of Commerce*, 10 Cal. App. 5th at 648; *PG&E*, 18 Cal. App. 5th at 426. Under the contract, Plaintiff's advisory privileges are exclusive: "Account holders may restrict account access and privileges to themselves." Schwab Charitable Fund, *Program Policies* at 4 (updated Nov. 2020), https://www.schwabcharitable.org/public/file/P-5252372. Thus, no other party is given advisory privileges, and only Plaintiff can determine which other persons, if any, are permitted to make recommendations or elect investments. *Id.*; *FAC ¶¶ 61-63, 66*. Schwab Charitable recognizes this exclusive privilege as "the most important and fulfilling feature" of the Schwab DAF. *FAC ¶ 61*. Plaintiff's advisory privileges are also transferable. Not only can Plaintiff confer upon another person his advisory privileges, he also can designate whom those privileges pass to in the event of his death. *Id. ¶ 66*.

In breaching their fiduciary duties, Defendants have injured Plaintiff's property interests. They have diverted money away from Plaintiff's account to pay for excessive administrative and investment fees, diminishing the value of property in which Plaintiff has interests. Alleged diminution in the value of property in which the plaintiff has an interest constitutes injury-in-fact under Article III. *See Reed v. Fed. Nat'l Mortgage Ass'n*, 2015 WL 12911617, at *4 (C.D. Cal. Aug.

-11-

24, 2015) (explaining that "diminution of a future property interest" is a "classic form of injury in fact"); *Cimini v. Jaspan Schlesinger Hoffman LLP*, 2007 WL 173893, at *4 (E.D.N.Y. Jan. 19, 2007) (trust grantor suffered "cognizable injury ... as the grantor in the Trust Agreement" as a result of Defendants' breach of fiduciary duty, despite not being trust beneficiary). Plaintiff also has suffered additional economic injury because in order to achieve his philanthropic goals, Plaintiff must now contribute more money to his Schwab Charitable account to make up for the excessive fees that Schwab Charitable caused to be paid out of his account. *FAC ¶ 29.*

### 2. Plaintiff Maintained Reputational and Expressive Interests in His Schwab DAF Account Assets, Which Were Injured by Defendants' Conduct.

In addition to the property interests Plaintiff maintained in his account assets, Plaintiff also had reputational and expressive interests through his account. As alleged, Plaintiff uses his Schwab Charitable account to advance his own philanthropic goals, support organizations that are personally meaningful to him and his family, and to cultivate the family value of charitable giving. *FAC ¶ 28.* All donations made from his account are made under the Plaintiff Family Trust name, thus conferring recognition from his community and peers. *Id.* Because the value of Plaintiff's expressive and reputational interest in his DAF account are directly proportional to the size and number of grants he can recommend, Defendants' actions that diminished the size of his account constitute an injury in fact. These reputational and expressive interests are legally cognizable and sufficient for Article III. *See Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 183-84 (2000) (finding injuries to recreational, aesthetic, and economic interests sufficient for Article III purposes); *Robins v. Spokeo*, 867 F.3d 1108, 1112 (9th Cir. 2017) ("[H]arm to one's reputation ... may be sufficient for Article III standing."). As then-Judge Alito put it: "Injury-in-fact is not Mount Everest." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005).

Indeed, Schwab Charitable characterizes such interests as one of the primary benefits of opening a Schwab DAF account. *FAC ¶ 66.* Schwab Charitable compares Schwab DAF accounts to "private foundations" and describes advisory rights as interests that can be "bequeath[ed]" and allow "a surviving spouse, child, close friend, trustee, or other family member to make grant requests to charities they value. In doing so, [donors] pass their commitment to philanthropy on to the next

-12-

generation." *Id.* Such accounts are described as accounts that "can continue for years—and can even provide a legacy of generosity for generations." *Id.* Schwab Charitable also touts how easy donor-advised funds make it "for donors to bequeath their account and enable others to support charitable causes after their passing." *Id.*

For the same reasons that Plaintiff's property interests are diminished by Defendants' fiduciary breaches, so are Plaintiff's reputational and expressive interests. *See supra 11-12.* In order to financially support At Home in Greenwich to the extent he wishes, Plaintiff must contribute more to his account to make up for excessive fees paid to Schwab & Co. *FAC ¶ 29.* Similarly, in order to express the shared family value of supporting immigrant communities in America through charitable giving, Plaintiff must also contribute more to achieve the same expressive value of donating to Jewish Family Services of Greenwich. *Id.* Thus, Plaintiff is not able to achieve the same reputational and expressive benefits as he otherwise would be able if Schwab Charitable had not breached its fiduciary duties and diminished the value of his account. *FAC ¶¶ 28, 29.*

**B.  Plaintiff Has Statutory Standing**

**1.  Cal. Corp. Code § 5142 Grants Standing to Donors Like Plaintiff Who Have Property and Contractual Interests in the Charitable Trust Assets**

Plaintiff also has statutory standing. California Corporations Code § 5142 makes clear that the universe of parties with standing to sue to enforce charitable trusts includes not only the Attorney General, but also a "person with a reversionary, contractual, or property interest in the assets subject to [the] charitable trust." That is, the Corporations Code explicitly grants Plaintiff standing to bring his claims.[3] Once more conflating legal title with all property interests, Defendants argue that Plaintiff lacks *any* property interest in the charitable trust assets and therefore lacks standing under § 5142. This is wrong. *See supra 8-12.* Because Plaintiff maintains "*a ... property interest*" in the

---

[3] Because a charitable trust is a fiduciary relationship, the fiduciary duties owed by a trustee apply to the investment of the trust assets. Therefore, a breach of charitable trust claim encompasses a breach of fiduciary duty claims against trustees. *See In re Old Canal Financial Corp.*, 550 B.R. 519 (C.D. Cal. 2016); *Patton v. Sherwood*, 152 Cal. App. 4th 339, 342, 344, 347 (2007) (trust provision allowing plaintiff "to bring a claim for breach of trust" provided authority to bring breach of fiduciary duty claim against former trustees of charitable trust);  *see also FAC ¶ 124.*

1  charitable trust assets, he has statutory standing under § 5142.

2      Defendants acknowledge that in opening a Schwab Charitable account, Plaintiff has a

3  contractual relationship with Schwab Charitable. *See Defs' Br. at 12*. In arguing that the privileges

4  created by this contract are insufficient under § 5142, which explicitly confers standing on such

5  people to bring a breach of charitable trust claim, Defendants make the circular argument that

6  "California law has long recognized that a donor ... has no standing to complain about a charity's

7  disposition of its assets." *Defs' Br. at 12*. While all charitable donors may not have standing, in

8  enacting § 5142, the legislature removed any uncertainty as to whether a person who retained a

9  contractual interest in donated property (in this case, Plaintiff's advisory privileges) has standing to

10 sue to enforce a charitable trust by making explicit that indeed they do.

### 2.  Because Plaintiff's Property Interests Were Diminished, Plaintiff has Standing under the Unfair Competition Law (UCL).

13     California Business Code § 17200 *et seq*. (the "UCL") also provides a right of action to "a

14 person who has suffered injury in fact and has lost money or property as a result of [] unfair

15 competition." Two of the "innumerable" ways to show "economic injury" are having "a … property

16 interest diminished" or being "required to enter into a transaction, costing money or property, that

17 would otherwise have been unnecessary." *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 886 (Cal.

18 2011). Plaintiff satisfies both. As detailed above, he has suffered a diminution in a property interest.

19 *See supra 8-12.* And he must also contribute more to his Schwab Charitable account to make up for

20 the excessive fees paid to Schwab & Co. and to achieve the same charitable goals and expressive

21 and reputational interests. *See supra 12.* And because "economic injury is itself a form of injury in

22 fact," if Plaintiff has alleged economic injury "in any nontrivial amount, he ... has also alleged ...

23 injury in fact." *Kwikset*, 246 P.3d at 887. Thus, Plaintiff plainly has standing under the UCL.

### 3.  Plaintiff Has a "Special Interest" in the Charitable Trust Sufficient to Give Him Standing under California Common Law.

26     While the statutory references make clear Plaintiff has standing to sue to enforce a charitable

27 trust, California common law governing charitable trusts has long recognized that those with a

28

-14-

"'sufficient special interest'" may bring suit. *Fairbairn v. Fidelity Investments Charitable Gift Fund*, 2018 WL 6199684, at *5 (N.D. Cal. Nov. 28, 2018) (quoting *Holt v. Coll of Osteopathic Physicians & Surgeons*, 61 Cal. 2d 750, 753 (1964)). Those with such interests include "'donors who have directed that their contributions be used for certain charitable purposes." *Id.* at *6 (quoting *Holt*, 61 Cal. 2d at 754). Accordingly, courts have recognized that donors have standing to sue under California common law. *Id.*; *see also L.B. Research & Educ. Found. v. UCLA Found.*, 130 Cal. App. 4th 171, 180-81 (2005) (holding donor had standing sue to enforce terms of donation).

As explained above, Plaintiff maintained legal interests in his account assets, including by virtue of his robust advisory privileges. *See supra 8-13*. The court in *Fairbairn* found almost the exact set of privileges were sufficient to allege "a special relationship sufficient to confer standing to sue regarding the disposition" of his donation. 2018 WL 6199684, at *6. Specifically, the court found it relevant that:

    a) Fidelity Charitable [held] funds in a dedicated account—and ultimately donate[d] them to charitable organizations—in the donor's name.

    b) The donor ha[d] exclusive advisory rights over the funds—Fidelity Charitable [could not] allow anyone else to dictate where they are donated.

    c) Nor [could] Fidelity Charitable itself even make grants or otherwise take money out of an account without action from the donor.

    d) Fidelity Charitable retain[ed] only a veto power over a donor's decisions, which it [would] exercise only [if] the donor attempt[ed] to use the money for an improper or non-charitable purpose.

*Id*. Plaintiff maintains nearly identical interests, giving him the same "special relationship" with the charitable trust sufficient to give him standing under California common law.

## II.   PLAINTIFF HAS STATED A CLAIM FOR BREACH OF FIDUCIARY DUTIES

### A.   The Corporations Code's Text and Structure Evince a Legislative Intent to Preserve Common Law Causes of Action Brought by Donors like Plaintiff.

Defendants next argue that their conduct is not only untouchable by a Schwab DAF accountholder, but that it is entirely permissible because common law duties owed to charitable trusts have been preempted by the California Corporations Code. *See Defs' Br. at 15-18*. Without even attempting to apply longstanding principles of preemption analysis, Defendants assert "these statutorily imposed duties … preempt any common-law fiduciary duties of care and loyalty that

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS**      **3:20-CV-0765-LB**

1   might previously have applied." *Defs' Br. at 17*. Offering only conclusory assertions, Defendants

2   have "fallen far short of overcoming the presumption that a statute does not supplant the common

3   law." *Env't L. Found.*, 26 Cal. App. 5th at 867.

4          Under California law, it is well established that "there is a presumption that a statute does

5   not, by implication, repeal the common law" and that "statutes should not be interpreted to alter the

6   common law" and the two "should be construed to avoid conflict." *California Ass'n of Health*

7   *Facilities v. Dep't of Health Servs.*, 940 P.2d 323, 331 (Cal. 1997) (citation and quotations omitted).

8   Only when there is "no rational basis for harmonizing [the] two" should a court recognize "repeal

9   by implication." *Id.* Here, the Corporations Code makes no reference to repealing the common law.

10         Absent an explicit legislative reference displacing the common law, courts will find

11  preemption only if they can discern a legislative intent to "occupy the field." *I.E. Assocs. v. Safeco*

12  *Title Ins. Co.*, 702 P.2d 596, 599 (Cal. 1985). Only where "general and comprehensive legislation"

13  "minutely describes" the "course of conduct, parties, things affected, limitations and exceptions,"

14  will a court find an implied legislative intent for a statute to "totally supersede and replace the

15  common law." *Id.* Defendants cannot point to anything evincing a "legislative intent to eviscerate"

16  longstanding common law protections of charitable trusts. *Env't L. Found.*, 26 Cal. App. 5th at 867.

17         In failing to describe or proscribe causes of action or duties owed by directors of charitable

18  corporations to charitable trusts, the Corporations Code is "is incomplete by its own terms." *Id.* at

19  407-08. Such silence disfavors a finding of preemption. *Id.*; *see also I.E. Assocs.*, 702 P.2d at 599.

20  While the Corporations Code does detail certain requirements for charitable organization

21  governance—such as "Meetings and Voting," "Amendment of Articles," "Bankruptcy

22  Reorganizations and Arrangements," and "Involuntary Dissolution,"—it does not "detail[] statutory

23  remedies ... encompassing virtually all claims previously asserted in equity against" individual

24  directors, particularly for breach of charitable trust. *See Pac. Scene, Inc. v. Penasquitos, Inc.*, 758

25  P.2d 1182, 1185 (1988). That is, there is nothing in the Corporations Code touching upon the duties

26  that directors of charitable corporations owe to charitable trusts or the equitable relief Plaintiff seeks

27  here. Based on the statute's silence on duties owed to donors or the trust, there is no reason to glean

28  a legislative intent to supplant existing fiduciary duties and common law claims.

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS**          **3:20-CV-0765-LB**

Section 5231, on which Defendants rely, does not alter this conclusion. It "does not give rise to a liability created by law," nor does it "set forth any duties of a director, fiduciary or otherwise" sufficient to infer field preemption. *Lehman v. Superior Ct.*, 145 Cal. App. 4th 109, 121 (2006) (interpreting Corporations Code § 309 which uses identical language with respect to directors of for-profit corporations). Nor does it demonstrate an intent to supplant existing common law fiduciary duties with the standard applied to directors of for-profit corporations. Similarly, § 5230(b), on which Defendants also rely, only exempts directors from statutory duties of care set forth under the Probate Code. Cal. Corp. Code § 5230(b) and is silent as to common law claims.

Rather than "minutely describ[ing]" statutory claims for breach of charitable trust, the Corporations Code acknowledges existing claims of breach of charitable trust and expands the universe of parties that have standing to bring such a claim. As explained *supra 13-14.*[4] Section 5142 permits not only the Attorney General, but also donors like Plaintiff to "bring an action to enjoin, correct, obtain damages for or to otherwise remedy a breach of a charitable trust."[5] The phrase "breach of a charitable trust" is not defined anywhere in the statute, nor does § 5142 include a reference to any other part of the Corporations Code. "[W]here Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Metro. Water Dist. v. Superior Ct.*, 84 P.3d 966, 971 (Cal. 2004).[6] Had the legislature intended to preempt common law breach of charitable trust claims, it would have either defined such claims or referenced the statutory violations that give rise to such claims in the Corporations Code. Other provisions of the Corporations Code similarly recognize breach of charitable trust claims without any reference to a statutory basis for liability. *See, e.g.*, Cal. Corp. Code. § 5047.5(c)(4). Thus, far

[4] If the Court disagrees and finds § 5142 creates a separate cause of action, Plaintiff respectfully requests leave to amend his Complaint to plead a cause of action under Corporations Code § 5142.
[5] Ten years after the Corporations Code was enacted courts have recognized that "the Attorney General's *common law* authority to supervise charitable trusts ... is well established." *Van de Kamp v. Gumbiner*, 221 Cal. App. 3d 1260, 1270 (1990) (emphasis added).
[6] *Cf. Shenker v. Laureate Educ., Inc.*, 983 A.2d 408, 421 (Md. 2009) (based on "well-established principle that statutes are not presumed to make alterations in the common law other than as may be declared expressly," concluding that a similar Maryland Corporations Code provision "does not provide the sole source of directorial duties, and that other, common law fiduciary duties of directors remain in place and may be triggered by the occurrence of appropriate events.").

-17-

from evincing an intent to displace common law breach of charitable trust claims, the Corporations Code explicitly references them and reflects "a legislative desire not to interfere with the existing law." *Env't L. Found*, 26 Cal. App. 5th at 867.

In arguing that common law claims against charitable organizations are preempted by the Corporations Code, Defendants seek to coopt a legal standard aimed at protecting directors from claims brought by or on behalf of the charitable corporation, to provide near absolute immunity from all conduct. That interpretation is unsupported by the statute and has been rejected by the California Supreme Court. In *Frances T. v. Village Green Owners Association*, a nonprofit condominium association was sued for common law negligence and other claims. 723 P.2d 573, 582-83 (Cal. 1986). The Association argued, like Defendants argue here, that "a director's liability to third persons is controlled by the statutory duty of care he or she owe[d] to the corporation, a standard defined in Corporations Code section 7231" (which sets forth a standard identical to § 5231 but as applied to mutual benefit corporations). *Id.* at 582. The Court rejected that argument. While the Corporations Code was intended to insulate "officers from liability for corporate contracts," the court explained that it was "never intended to insulate officers from liability" for their own conduct that violates common law interests of third parties. *Id. at 583*. The same is true here. Whatever standard the directors owe to Schwab Charitable under § 5231, that statutory standard does not displace the common law duties they owe to the trust and other parties with an interest in the trust.

Finally, nothing in the Corporations Code alters the fiduciary duties that *Schwab Charitable*, the entity, owes with respect to management of the Schwab DAF, and Defendants have not argued otherwise. Thus, even if the Court concludes that the Corporations Code preempts the common law duties owed by the Directors, Plaintiff's common law claims as to Schwab Charitable remain intact. *Cf. Ritter & Ritter, Inc. v. The Churchill Condo. Assn.*, 166 Cal. App. 4th 103, 125 (2008) (imposing liability on the corporate entity, while finding no liability on the part of the directors); *see also* Cal. Corp. Code § 5047.5(g) ("Nothing in this section shall be construed to limit the liability of a nonprofit corporation for any negligent act or omission of a director, officer, employee, agent, or servant occurring within the scope of his or her duties.").

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS          3:20-CV-0765-LB**

**B. In Alleging that Defendants Caused the Fund to Invest in More Expensive, Worse Performing Investments in Order to Benefit Schwab & Co., Plaintiff Has Adequately Alleged Breaches of Fiduciary Duties**

Trustees are subject to the twin fiduciary duties of loyalty and prudence. "The duty of loyalty requires a trustee to administer the trust solely in the interest of the beneficiaries." *Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*, 250 F. Supp. 3d 460, 467 (N.D. Cal. 2017) (citing *Pegram v. Hedrich*, 530 U.S. 211, 224 (2000). This duty is "particularly strict even by comparison to the standards of other fiduciary relationships." Rest. (Third) of Trusts § 78.

"The duty of prudence requires that the trustee 'invest and manage trust assets as a prudent investor would'; that is, by 'exercising reasonable care, skill, and caution,' and by 'reevaluating the trust's investments periodically as conditions change.'" *Johnson*, 250 F. Supp. 3d at 467 (quoting *Tibble*, 843 F.3d at 1197). As the Ninth Circuit has emphasized, "cost-conscious management is fundamental to prudence in the investment function" as "[i]t is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks." *Tibble*, 843 F.3d at 1197-98. The harm from excessive fees is not just caused by the money spent on those fees, "but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Id.* at 1198. Here, Plaintiff has adequately alleged that Defendants breached their fiduciary duties in multiple ways.

Defendants all but ignore Plaintiff's disloyalty allegations, *i.e.*, that Defendants diverted money away from the Schwab DAF to bolster the revenues of Schwab & Co. This is not a case where the plaintiff is merely complaining that fiduciaries failed to "'scour the market to find and select the cheapest possible funds.'" *Defs' Br. at 22* (quoting *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009)). Rather, Plaintiff has adequately alleged that at every turn, Defendants managed the Schwab DAF with an eye towards maximizing revenues for Schwab & Co. to the detriment of the Schwab DAF, its donors, and its beneficiary charities.

As explained above, Defendants selected inferior, more expensive mutual funds that served to benefit Schwab & Co. The Schwab DAF offers five index pool options and a money market pool. *FAC ¶¶ 57, 75*. Defendants selected Schwab-affiliated index funds and a money market fund to underlie those pools, even though unaffiliated alternatives charged lower fees for identical (if not

-19-

superior) performance. *Id.* There was no justification of this disloyal conduct. Allegations that fiduciaries failed to consider lower cost, nearly identical alternatives are sufficient to state a claim for breach of fiduciary duty. *See Main v. Am. Airlines Inc.*, 248 F. Supp. 3d 786, 793–94 (N.D. Tex. 2017) (distinguishing *Hecker*, explaining "courts have denied motions to dismiss where plaintiffs alleged that the defendants failed to consider lower cost funds with identical styles and stocks"). This is especially so when they are accompanied by claims of disloyalty. *See Nelsen v. Principal Glob. Invs. Tr. Co.*, 362 F. Supp. 3d 627, 638 (S.D. Iowa 2019) (denying motion to dismiss where plaintiff alleged defendants selected proprietary funds with excessive fees); *Velazquez v. Mass. Fin. Servs. Co.*, 320 F. Supp. 3d 252, 259–60 (D. Mass. 2018) (same); *Moreno v. Deutsche Bank Am. Holding Corp.*, 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016) (same); *Urakhchin v. Allianz Asset Mgmt.*, 2016 WL 4507117, at *7 (C.D. Cal. Aug. 5, 2016) (same).

Finally, Plaintiff further alleges that because Defendants largely confined the universe of underlying mutual funds to those offered on Schwab & Co.'s OneSource platform, Defendants caused the Fund to invest in higher cost "retail" share classes of unaffiliated investment options. Had Defendants been willing to consider mutual funds available on the broader marketplace, the Fund could have invested in lower-cost institutional share classes and a loyal and prudent fiduciary would have done so. Such allegations also support a reasonable inference of imprudence. *Tibble*, 843 F.3d at 1198 (a trustee "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost— to products the trustee has already selected"); *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1077 (N.D. Cal. 2017) (denying motion to dismiss where plaintiff alleged "Defendants acted imprudently by selecting the more expensive [share class] option, all else being equal"); *Bouvy v. Analog Devices, Inc.*, 2020 WL 3448385, at *8 (S.D. Cal. June 24, 2020) (same).

Defendants argue that "courts have recognized that a trustee may validly prefer retail share classes over institutional share class." *Defs' Br. at 22.* However, Defendants have offered nothing to warrant such a favorable inference at the pleading stage.[7] *See Terraza*, 241 F. Supp. 3d at 1077.

---

[7] Defendants' suggestion that retail share classes offer greater liquidity, *Defs' Br. at 22*, is false. Mutual fund companies must treat all share classes of the same fund identically in all respects. *See*

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS**                    **3:20-CV-0765-LB**

Indeed, the fact that Defendants have recently changed some of the investment pools to invest in lower-cost share classes supports an inference that there was no valid justification for the retail share class in the first instance. *FAC ¶¶ 92-93*. In the cases Defendants cite, courts found that trustees may invest in a higher share class in order to capture revenue sharing to pay for administrative services. *See Davis v. Salesforce.com, Inc.*, 2020 WL 5893405, at *5 (N.D. Cal. Oct. 5, 2020) (concluding that excessive fees paid on higher-cost share classes were justified because they "were used to pay for recordkeeping and other administrative services provided to the Plan."); *Kong v. Trader Joe's Co.*, 2020 WL 5814102, at *4 (C.D. Cal. Sept. 24, 2020) (dismissing complaint where plaintiff did not allege "whether the investor class share offered other benefits that may have offset any additional costs"). Here, Defendants charge a *separate* administrative service fee to pay for such services, and thus there is no valid consideration justifying the higher fees for the retail share class.[8]

These allegations are also bolstered by claims of disloyalty. Because these mutual funds were selected from the OneSource platform, Schwab & Co. received 0.40% in revenue sharing payments that they otherwise would not have received. *FAC ¶ 71, 72, 104*. This money was all paid to Schwab & Co. and none was rebated to the Fund. *Id.* An institutional investor like the Schwab DAF has no need to invest in funds offered through a "no transaction fee" platform like OneSource and the only reason Defendants did so was to benefit Schwab & Co. *FAC ¶ 98, 101, 104*. These additional allegations further support an inference of imprudence and disloyalty. *White v. Chevron*, upon which Defendants heavily rely, highlights this distinction. In distinguishing the case from *Braden* (where the court denied a motion to dismiss), the *White* court explained that "the claim regarding the selection of retail-class mutual funds in [*Braden*] was accompanied by allegations that the funds paid kickbacks to the plan's trustee." 2017 WL 2352137, at *13 (N.D. Cal. May 31, 2017). The same is true here. The unaffiliated investment managers paid Schwab & Co. 0.40% of assets in exchange for offering those funds on the OneSource platform. It is therefore reasonable to infer that

---

15 U.S.C.§ 80a-18(f)(2); 17 C.F.R. § 270.18f-3(a)(4). The prospectus for each at-issue fund confirms that liquidity and redemption provisions do not differ among share classes. *See, e.g.*, MetWest Total Return Bond Prospectus at 64, 105, https://www.tcw.com/-/media/Downloads/Products/US-Funds/MetWest-Funds/Fund-Prospectus/MWFund-Pro.pdf.
[8] While these fees could have possibly covered custodial services, those could have been obtained for between 0.01% to 0.04% and would not justify the 0.40% fee. *FAC ¶¶ 100 & n.46, 104*.

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS**                     **3:20-CV-0765-LB**

1   Defendants selected the retail share class of these unaffiliated mutual funds because of the 0.40%

2   fee paid to Schwab & Co.

3   **III.   PLAINTIFF HAS STATED A CLAIM FOR VIOLATION OF THE UCL**

4       **A.   Plaintiff has Alleged Underlying Unlawful Conduct, Including Violations of
            UPMIFA.**

6       Plaintiff also has stated a claim that Defendants violated the UCL by engaging in underlying

7   unlawful conduct in violation of their statutory and common law fiduciary duties. *See* Cal. Bus. &

8   Prof. Code § 17200; *Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 539

9   (1999) ("By proscribing 'any unlawful' business practice, section 17200 borrows violations of other

10  laws and treats them as unlawful practices that the unfair competition law makes independently

11  actionable.") (citation and certain quotations omitted). This includes breaches of the statutory duties

12  set forth in UPMIFA, Cal. Prob. Code § 18501, *et seq. See* National Conference of Commissioners

13  of Uniform State Laws, Uniform Prudent Management of Institutional Funds Act at 13, 15

14  (explaining that the section found at Cal. Prob. Code § 18503 "adopts the prudence standard for

15  investment decisionmaking"); *see also supra* 19-22. Defendants' only response is that their actions

16  are shielded under the "business judgment rule." As discussed below, this argument is meritless.

17      **B.   The Business Judgment Rule Does Not Apply Because the Circumstances of
            Defendants' Conduct Inherently Raise an Inference of a Conflict of Interest**

19      Defendants argue that statutory duties of care and loyalty incorporate the business judgment

20  rule and that Plaintiff's allegations have failed to overcome that presumption. *Defs' Br. at 19*. But

21  the business judgment rule does not apply here in light of the Board's conflicts of interest.[9] The

22  business judgment rule is not unlimited and "does not shield actions taken without reasonable

23  inquiry, with improper motives, or as a result of a conflict of interest." *Everest Invs. 8 v. McNeil

24  Partners*, 114 Cal. App. 4th 411, 430 (2003). Here, the Chair of Schwab Charitable Board has a

25  clear conflict of interest because she is the daughter of Charles Schwab, the founder of the Charles

26  Schwab Corporation, and is also a senior vice president of Schwab & Co. *FAC ¶ 31*; *see also*

27  _____

    [9] Even if the Court concludes the business judgment rule does apply to the Directors, it does not
28  shield Schwab Charitable from fiduciary scrutiny under UPMIFA. *See* Cal. Prob. Code § 18503(b)
    (imposing separate duties on persons and institutions); *see also supra 18*.

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS          3:20-CV-0765-LB**

CharlesSchwab Corp., Carrie Schwab-Pomerantz, https://www.aboutschwab.com/carrie-schwab-pomerantz. Further, several Directors are affiliated with Schwab & Co. or worked there prior to working at Schwab Charitable. *FAC ¶ 15*. Defendants argue there is no conflict of interest here because Plaintiff does not adequately allege that "a *majority* of the directors is conflicted." *Defs' Br. at 19* (emphasis added). However, the exceptions to the business judgment rule are not so narrow. Rather, "when circumstances inherently raise an inference of conflict of interest" the business judgment rule does not apply. *Kruss*, 111 Cal. Rptr. 3d at 728. Such circumstances may arise after the alleged exercise of business judgment. *Id.* In particular, "[a]ctions benefiting a third party that are harmful to the [charitable trust] are sufficient to raise an 'inherent inference of conflict of interest.'" *Id.* This would include "paying for assets or services from the third party at an inflated price." *Id.* (citation and quotations omitted).

　　"Here, the complaint alleges that the transactions involved significant conflicts of interest." *Kingoschu Fam. Partners, LLC v. Pub. Storage*, 2014 WL 787830, at *5 (Cal. App. Feb. 27, 2014) (unpublished). Schwab & Co. had an interest in charging Schwab Charitable higher investment and administrative fees, "which was in conflict with the interests of the [charitable trust]." *Id.* Since the court "must accept the truth of the alleged conflicts of interest and the concomitant inference of self-dealing for purposes of deciding whether" to dismiss the complaint, "the business judgment rule does not support" dismissing the complaint. *Id.*

　　The entire relationship between Schwab Charitable and Schwab & Co. is fraught with conflicts. As alleged in the FAC, Schwab & Co. created Schwab Charitable and provided it with the initial investments and contributions necessary to create the Schwab DAF. *FAC ¶¶ 13, 14*. But for Schwab & Co., neither Schwab Charitable nor the Schwab DAF would exist. Further, Schwab & Co "provides administrative and back-office services as necessary to administer and maintain all of the donor-advised accounts," and "all [Schwab Charitable] employees are employed by [Schwab & Co.]." *FAC ¶¶ 45, 46*. Schwab Charitable's name itself may only be used because Schwab & Co. permits Schwab Charitable to use its branding. *Id. ¶ 15*. These circumstances create the reasonable inference that even the "independent" directors may be under the influence of Schwab & Co. *See Leyte-Vidal v. Semel*, 220 Cal. App. 4th 1001, 1015 (2013) (where one party has "the direct or

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS**　　　　　**3:20-CV-0765-LB**

1    indirect unilateral power to" influence directors, there might be "reason to question whether the

2    director[s are] able to consider the corporate merits of the challenged transaction objectively").

3        Indeed, the IRS has warned of potential conflicts of interest in donor-advised funds

4    sponsored by financial institutions, cautioning that in circumstances like this, a donor-advised fund's

5    "ability to enter into arm's length transactions could be impaired." *FAC ¶ 47*.[10] Like California law,

6    the IRS guidance looks beyond technicalities such as official conflicts of interest and looks at the

7    circumstances of the relationship, including whether the donor-advised fund and financial institution

8    "share office space, common phone numbers, promotional literature, or common Internet

9    addresses." IRS DAF Guide Sheet at 14. Defendants may ultimately be able to justify these

10   circumstances with legitimate explanations, but they are not entitled to such favorable inferences at

11   this stage. *Kruss*, 185 Cal. App. 4th at 728 (declining to apply business judgment rule and rejecting

12   defenses that "may be valid [] in other procedural contexts, but on demurrer, the reasonable

13   inferences are drawn in favor of the complaint.").

14       **C.   Even if the Business Judgment Rule Did Apply, Plaintiff Adequately Alleges that**

15            **Defendants Unreasonably Failed to Undertake a Reasonable Inquiry**

16       Even in situations where the business judgment rule does apply, the rule "does not shield

17   actions taken without reasonable inquiry." *Everest Invs. 8*, 114 Cal. App. 4th at 430. Allegations

18   that "'would reasonably call for such an investigation'" or "'allegations of facts which would have

19   been discovered by a reasonable investigation and would have been material to the questioned

20   exercise of business judgment'" will rebut the presumption of good faith afforded under the business

21   judgment rule. *Scouler & Co., LLC v. Schwartz*, 2012 WL 12897963, at *3-4 (N.D. Cal. Aug. 23,

22   2012) (quoting *Berg*, 100 Cal. Rptr. 3d at 897-98). Plaintiff's allegations satisfy both standards.

23   Defendants were blinded by their commitment to Schwab & Co. and they made decisions that would

24   have been "irrational, unsound, [and] unreasonable" following a reasonable investigation. *Id.*, at *4.

25   These are sufficient to overcome the presumption of good faith. *Id*

26       At the outset, trustees are necessarily expected to conduct a reasonable investigation.

27   _____

28   [10] Quoting IRS, Donor-Advised Funds Guide Sheet Explanation (July 31, 2008), https://www.irs.
     gov/pub/irs-tege/donor_advised_explanation_073108.pdf ("IRS DAF Guide Sheet").

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS                    3:20-CV-0765-LB**

UPMIFA requires trustees to "make a reasonable effort to verify facts relevant to the management and investment of the fund." Cal. Prob. Code § 18503. Further, a trustee has an ongoing duty to monitor investments and ensure they remain prudent. *Tibble*, 843 F.3d at 1197. Plaintiff has adequately alleged that this situation is one in which Defendants should have undertaken an adequate investigation, and failed to do so. A reasonable investigation would have revealed that the Schwab DAF would be substantially overpaying for mutual funds on the OneSource platform. As an institutional investor with $15 billion in assets, the Schwab DAF had no reason to consider using such a platform catered to individual investors. *See supra 5-6, 20-21.*

For the same reasons, Plaintiff has adequately alleged facts sufficient to demonstrate that any reasonable, simple investigation would have uncovered several unaffiliated index funds and money market funds that are less expensive and perform better. *See supra 6-7, 19-20.* Had Defendants undertaken such a process, they would have discovered that, unaffiliated index funds outperformed and/or were less expensive than Schwab index funds. Indeed, other trustees have done just this and selected other low-cost Vanguard index funds. *FAC ¶ 78.*

Plaintiff has also alleged facts that could have been discovered by a reasonable investigation. As the Ninth Circuit has made clear "a trustee ... cannot ignore the power the trust wields to obtain favorable investment products ... [that] are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble*, 843 F.3d at 1198 (citations and quotations omitted). Any investigation (much less an adequate one) would have quickly identified for Directors that the Schwab DAF could have invested in identical mutual funds for significantly less and there was no reason for them to pay for retail-priced share classes. *See supra 7, 20-22.* Perhaps the strongest indicator of the unreasonableness of Director's decision to utilize retail share classes is the fact that Defendants have recently changed some of the underlying investment options to lower-priced share classes. *See FAC ¶ 92.* That is, only since being faced with the prospect of class action litigation have Defendants undertaken the reasonable, obvious investigation into offering donors identical investment options with a lower fee.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully asks that Defendants' motion be denied.

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS**                    **3:20-CV-0765-LB**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

Dated: April 2, 2021

**NICHOLS KASTER, LLP**

By: /s/ Kai Richter
    Kai Richter

**COUNSEL FOR PLAINTIFF AND THE
PROPOSED CLASS**

**OPPOSITION TO FUND DEFENDANTS' MOTION TO DISMISS**          **3:20-CV-0765-LB**