Matthew C. Helland, CA Bar No. 250451
helland@nka.com
NICHOLS KASTER, LLP
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

Paul J. Lukas, MN Bar No. 22084X*
lukas@nka.com
Kai H. Richter, MN Bar No. 0296545*
krichter@nka.com
Brock J. Specht, MN Bar No. 0388343*
bspecht@nka.com
Jennifer K. Lee, MN Bar No. 0399012*
jlee@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878

*admitted *pro hac vice*

ATTORNEYS FOR PLAINTIFF AND THE
PROPOSED CLASS

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| Philip Pinkert, individually and on behalf of a Class of similarly situated individuals, and on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>Schwab Charitable Fund, Charles Schwab & Co., Schwab Charitable Board of Directors, and Schwab Charitable Investment Oversight Committee.<br><br>Defendants. | Case No. 3:20-cv-07657-LB<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CHARLES SCHWAB & CO.'S MOTION TO DISMISS**<br><br>**CLASS ACTION** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED .................................................................. 2

FACTUAL BACKGROUND ............................................................................................ 3

    I.    Schwab & Co's Establishment of Schwab Charitable and the Schwab
          Donor-Advised Fund ..................................................................................... 3

    II.   Schwab & Co's Provision of Excessively Priced Services to Schwab
          Charitable ....................................................................................................... 4

ARGUMENT .................................................................................................................... 6

    I.    Legal Standard .............................................................................................. 6

    II.   Plaintiff Has Standing to Sue Schwab & Co. ............................................ 7

        A.  Plaintiff Has Article III Standing ........................................................... 7

        B.  Plaintiff Has Statutory Standing ............................................................. 7

    III.  Plaintiff Has Adequately Alleged Claims for Aiding and Abetting
          Breaches of Fiduciary Duty ......................................................................... 9

        A.  Plaintiff Has Stated Underlying Breach of Fiduciary Duty Claims Against
            Schwab Charitable ................................................................................... 10

        B.  Plaintiff Has Plausibly Alleged Knowledge of the Underlying Fiduciary
            Misconduct by Schwab & Co. ................................................................. 10

        C.  The Fiduciary Breaches Involved Substantial Assistance by Schwab & Co., Which
            Participated in and Benefitted from the Challenged Arrangements ........................ 13

        D.  Because Plaintiff Has Alleged Breaches of the Ongoing Duty to Monitor that
            Occurred Within the Limitations Period, Plaintiff's Aiding and Abetting Claims
            are Timely ................................................................................................ 15

    IV.  Plaintiff Has Adequately Alleged an Unfair Competition Law (UCL) Claim ... 16

CONCLUSION ................................................................................................................ 16

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u>

3

*Aetna Cas. & Sur. Co. v. Leahey Const. Co.*,
    219 F.3d 519 (6th Cir. 2000)..................................................................................... 11, 12

4

5

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
    225 Cal. App. 4th 1451 (2014)..................................................................................... 9, 15

6

*AngioScore, Inc. v. TriReme Med., LLC*,
    70 F. Supp. 3d 951 (N.D. Cal. 2014) ............................................................................... 14

7

8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................ 6

9

*Bader v. Anderson*,
    179 Cal. App. 4th 775 (Ct. App. 2009) .............................................................................. 8

10

11

*Camp v. Dema*,
    948 F.2d 455 (8th Cir.1991) ............................................................................................. 12

12

*Casey v. U.S. Bank. N.A.*,
    127 Cal. App. 4th 1138 (2005)......................................................................................... 14

13

14

*Chavez v. Blue Sky Nat. Beverages Co.*,
    340 Fed. App'x 359 (9th Cir. 2009) ................................................................................... 6

15

*Hughes v. BCI Int'l Holdings, Inc.*,
    452 F. Supp. 2d 290 (S.D.N.Y. 2006) ................................................................................ 9

16

17

*Hurtado Lucero v. IRA Servs., Inc.*,
    2020 WL 553941 (N.D. Cal. Feb. 3, 2020) ................................................................ 11, 12

18

*In re Woodbridge Investments Litig.*,
    2020 WL 4529739 (C.D. Cal. Aug. 5, 2020) .................................................................... 12

19

20

*Johnson v. Canciamilla*,
    2020 WL 5526608 (N.D. Cal. Sept. 15, 2020).............................................................. 6, 10

21

*Kwikset Corp. v. Superior Ct.*,
    246 P.3d 877 (Cal. 2011) .................................................................................................. 16

22

23

*Monsen v. Consolidated Dressed Beef Co., Inc.*,
    579 F.2d 793, 799 (3d Cir. 1978)...................................................................................... 10

24

*Neilson v. Union Bank of Cal., N.A.*,
    2003 WL 27374137 (C.D. Cal. Feb. 20, 2003) ................................................................ 13

25

26

*Neilson v. Union Bank of Cal., N.A.*,
    290 F. Supp. 2d 1101 (C.D. Cal. 2003).................................................................. 9, 10, 11

27

*Osborn v. Irwin Memorial Blood Bank*,
    5 Cal. App. 4th 234 (1992)................................................................................................ 13

28

**OPPOSITION TO DEF. SCHWAB & CO.'S MOTION TO DISMISS          3:20-CV-07657-LB**

*Schmid v. City and County of San Francisco*,
    274 60 Cal. App. 5th 470 (2021)............................................................................................8

*Sheppard v. David Evans & Assoc.*,
    694 F.3d 1045 (9th Cir. 2012)............................................................................................6

*Simi Mgmt. Corp. v. Bank of Am. Corp.*,
    2012 WL 1997232 (N.D. Cal. June 4, 2012) ...................................................................10

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011)............................................................................................6

*Terraza v. Safeway Inc.*,
    241 F. Supp. 3d 1057 (N.D. Cal. 2017) ...........................................................................16

*Tibble v. Edison Int'l*,
    135 S. Ct. 1823 (2015) ..............................................................................................15, 16

*Williams v. Gerber Prods. Co.*,
    552 F.3d 934 (9th Cir. 2008)..............................................................................................6

**Rules, Regulations, and Statutes**

Fed. R. Civ. P. 9(b).................................................................................................................10

Cal. Corp. Code § 5142 ............................................................................................................8

**Other Authorities**

Alan R. Bromberg & Lewis D. Lowenfels, Aiding and Abetting Securities Fraud: A Critical
Examination, 52 ALB. L. REV. (1988) ....................................................................................11

CharlesSchwab Corp., Carrie Schwab-Pomerantz,
    https://www.aboutschwab.com/carrie-schwab-pomerantz...................................................3

IRS, Donor-Advised Funds Guide Sheet Explanation (July 31, 2008),
    https://www.irs.gov/pub/irs-tege/donor_advised_explanation_073108.pdf .......................4

1

**INTRODUCTION**

2      Donor-advised funds ("DAFs") have exploded in popularity in the last two decades. These

3  accounts have grown from holding $2.4 billion in 1995 to more than $72 billion in 2018. During

4  this time, for-profit financial institutions like Charles Schwab & Co. ("Schwab & Co.") have

5  recognized the opportunity presented by DAFs, and "a number of [them] ... formed charitable

6  corporations for the principal purpose of offering donor advised funds..." *ECF No. 50* ("*FAC")* ¶

7  *42* (quoting H.R. Rep. No. 109-455 at 180 (2006)). In 1999, Schwab & Co. did just this. It created

8  Schwab Charitable Fund ("Schwab Charitable"), a nonprofit entity, for the purpose of sponsoring

9  the Schwab Donor Advised Fund ("Schwab DAF" or the "Fund"). Although legally unaffiliated

10  with the Fund, Schwab & Co. made the initial investments and contributions necessary to create the

11  Fund. Among financial institutions, Schwab & Co. was not alone. Today, there are donor-advised

12  funds offered by mutual fund companies such as Vanguard, Fidelity, and Franklin Templeton; by

13  brokerage firms such as Raymond James; and banks, such as Bank of America and Goldman Sachs.

14  The Schwab DAF, with more than $15 billion in assets, is the tenth largest charitable corporation in

15  the country.

16      For more than twenty years, Schwab & Co. has executed this strategy flawlessly and

17  leveraged its close relationship with Schwab Charitable to increase its revenues. Schwab & Co. has

18  been the primary service provider to Schwab Charitable, providing a wide range of administrative

19  services (including online donor services, phone support, grant due diligence and administration,

20  tax filings, among others), custodial and brokerage services, and investment management services.

21  For each of these services, it has extracted greater fees than Schwab Charitable would otherwise

22  have had to pay in an arm's length transaction with unaffiliated service providers. These excessive

23  fees have caused monies to be diverted out of Schwab DAF accounts and into Schwab & Co.'s

24  pockets. As a donor with continuing interests in his account assets, Plaintiff seeks to recover these

25  excessive fees from Schwab & Co. *See infra II.A.*

26      Unable to dispute Plaintiff's allegations that it aided and abetted paradigmatic fiduciary

27  breaches, Schwab & Co. strains to contort Plaintiff's complaint into something entirely different—

28  a derivative action brought by a shareholder—and then argues that he cannot bring such an action

-1-

because, to no one's surprise, he is not a shareholder. Of course, Plaintiff is a donor, and he seeks to recover losses suffered not by Schwab Charitable, but by his own Schwab DAF account. *See infra II.B.* At any rate, the California Corporations Code explicitly gives him standing to bring a direct claim for breach of charitable trust, while recognizing that others may bring such actions derivatively. *Id.*

Further, Plaintiff has more than adequately alleged that Schwab & Co. aided and abetted the fiduciary breaches at issue, and its arguments to the contrary strain credulity. *See infra III.* As elaborated in Plaintiff's Memorandum of Law in Opposition to Defendants Schwab Charitable Fund, Schwab Charitable Board of Directors, and Schwab Charitable Investment Oversight Committee's[1] Motion to Dismiss, *ECF No. 57* ("Plaintiff's Response to Schwab Charitable"), Plaintiff has stated underlying claims for breach of common law and statutory fiduciary duties. *See infra III.A.* Having created Schwab Charitable for the sole purpose of sponsoring the Schwab DAF, funded the Schwab DAF into existence, and then benefited from favorable service contracts with Schwab Charitable, Schwab & Co. cannot now claim that it lacked knowledge of the fiduciary breaches, or was not a substantial factor in the underlying fiduciary breaches. *See infra III.B. and III.C.* And because Plaintiff has alleged a breach of the fiduciaries' ongoing duty to monitor and remove imprudent investments, Plaintiff's claims are timely. *See infra III.D.*

Finally, as argued in Plaintiff's Response to Schwab Charitable's Brief, Plaintiff has stated a cognizable claim under California's Unfair Competition Law. *See infra IV.* For all of these reasons, Schwab & Co.'s motion to dismiss should be denied.

## STATEMENT OF ISSUES TO BE DECIDED

1.   Does Plaintiff have standing to pursue his claims as a donor to the Schwab DAF?

2.   Has Plaintiff plausibly alleged that Schwab & Co. aided and abetted breaches of fiduciary duties by its affiliate charitable organization in connection with the Schwab DAF?

3.   Are Plaintiff's claims of continuing and ongoing misconduct by Defendants in connection with the Schwab DAF timely under *Tibble v. Edison Int'l*, 135 S. Ct. 1823 (2015)?

---

[1] Referred collectively herein as "Schwab Charitable."

**OPPOSITION TO DEF. SCHWAB & CO.'S MOTION TO DISMISS          3:20-CV-07657-LB**

4.      Has Plaintiff stated a cognizable claim against Schwab & Co. under California's Unfair Competition Law?

## FACTUAL BACKGROUND[2]

I.      **SCHWAB & CO'S ESTABLISHMENT OF SCHWAB CHARITABLE AND THE SCHWAB DONOR-ADVISED FUND**

Donor-advised funds appeal to donors as a less administratively burdensome alternative to a private foundation. *FAC ¶ 4.* In serving as a "charitable savings account," DAFs allow donors to claim a present-year tax deduction for making a charitable donation while retaining the flexibility to delay the donation of those assets to future years, and to earn investment income on the assets in the interim. *Id.* Historically, donor-advised funds have supported specific regions (*e.g.*, New York Community Trust, San Francisco Foundation) or particular causes (*e.g.*, Catholic Charities Donor Advised Fund, Stanford University donor-advised fund). *Id.* By contrast, DAFs affiliated with financial institutions give donors broader discretion in selecting charities to support, while providing the same administrative and investment functions of traditional DAFs. *Id. ¶ 12.*

Schwab & Co. is a financial services company that was founded by Charles Schwab in 1971. Today it holds more than $3.5 trillion in total client assets. *FAC ¶ 34.* Through its operating subsidiaries, Schwab & Co. provides a full range of brokerage, custodial, banking, investment management, and financial advisory services to retail and institutional clients. *Id.* Like many other financial institutions, Schwab & Co. has established an affiliated DAF, the Schwab DAF, which is sponsored by Schwab Charitable. *Id. ¶¶ 13-15.* Schwab & Co. made the initial investments and contributions necessary to create the Schwab DAF. *Id. ¶14.* Today, the Schwab DAF has more than $15 billion in assets and is one of the ten largest charities in the United States. *Id. ¶ 13.*

Schwab Charitable's dependence on Schwab & Co. continues to this day. Schwab Charitable's chair, Carrie Schwab-Pomerantz, is the daughter of Charles Schwab and also a Senior Vice President at Schwab & Co. *FAC ¶ 31*; *see also* CharlesSchwab Corporation, Carrie Schwab-Pomerantz, https://www.aboutschwab.com/carrie-schwab-pomerantz. Several other members of the

---

[2] For additional background on the underlying fiduciary breaches, Plaintiff respectfully directs the Court to Plaintiff's Response to Schwab Charitable at 3-7 and incorporates that discussion herein.

**OPPOSITION TO DEF. SCHWAB & CO.'S MOTION TO DISMISS          3:20-CV-07657-LB**

Schwab Charitable Board of Directors are affiliated with Schwab & Co. or worked there prior to working at Schwab Charitable. *FAC ¶ 15*. Indeed, all employees of Schwab Charitable are employees of Schwab & Co. *Id. ¶¶ 15, 45*. Further, Schwab Charitable uses Schwab & Co.'s trademarks. *Id. ¶ 45*.

## II.    SCHWAB & CO'S PROVISION OF EXCESSIVELY PRICED SERVICES TO SCHWAB CHARITABLE

Schwab & Co. has been able to leverage its relationship with Schwab Charitable to win favorable service agreements for Schwab & Co. relating to the Schwab DAF. *FAC ¶¶ 45, 46*. These service contracts were not a mere coincidence of Schwab & Co.'s close relationship with Schwab Charitable, but rather the intended result of that relationship and Schwab & Co.'s "support" for such a charitable organization bearing its own trade name.

When financial service companies are affiliated with DAFs, this can create a significant risk that the DAF may be used to generate profits for the financial services affiliate through the DAF's investment decisions and service provider contracts. *FAC ¶ 12*. For this reason, the IRS warns donors who are considering donating to a DAF that if the fund is "related to or associated with the investment or financial companies" that it has hired as an investment advisor, the fund's "ability to enter into arm's length transactions could be impaired" and there is a potential for conflicts of interest. *Id. ¶ 47* (quoting IRS, Donor-Advised Funds Guide Sheet Explanation (July 31, 2008) at 14, available at https://www.irs.gov/pub/irs-tege/donor_advised_explanation_073108.pdf ("IRS DAF Guide Sheet")); *see also id. ¶¶ 15, 46*. The IRS further advises that in such situations, "it is preferable for the organization to hire independent investment or financial advisors." *IRS DAF Guide Sheet at 14*. Those warnings certainly apply here, where virtually all of Schwab Charitable's service contracts for administrative, custodial, and brokerage services are with Schwab & Co. *FAC ¶¶ 15, 46*. In addition, Schwab & Co. also receives investment management fees in connection with several of the Schwab DAF's underlying investments. *Id. ¶¶ 81-87*.

The fiduciaries of the Schwab DAF have largely limited their selection of underlying investments for the Schwab DAF's investment pools to those offered on Schwab & Co.'s "OneSource" platform. *FAC ¶ 72*. This platform is meant for individual customers looking to invest

-4-

without going through a broker or paying a commission, and offers mutual funds from companies like American Funds, PIMCO, and T. Rowe Price in addition to Schwab & Co. *Id. ¶¶ 69, 70*. Because the investors using OneSource are generally individuals (rather than large institutions), OneSource offers only higher-cost share classes at retail prices.[3] *Id.*  Included in the expense ratios of these higher-cost share classes is a "revenue sharing" fee—often called "shareholder servicing fee," "subaccounting fee," "12b-1 fee" or "sub-transfer agent fee"—which the participating mutual fund companies pay to Schwab & Co. in exchange for offering their mutual funds on OneSource. *Id. ¶¶ 70, 71*. Thus, for all assets invested in unaffiliated mutual funds offered on OneSource, Schwab & Co. receives approximately 0.40% in fees. *Id. ¶ 71*.

Even though the Schwab DAF is a large institutional investor that does not need to go through a retail platform like OneSource, Schwab Charitable has chosen to invest almost exclusively in OneSource funds, to Schwab & Co.'s tremendous benefit. *FAC ¶¶ 72-74*. The 0.40% revenue sharing fee is particularly egregious here, where Schwab Charitable charges a separate administrative service fee, also paid to Schwab & Co. *Id. ¶ 54*. This separate administrative fee covers nearly all administrative services necessary to administer Schwab DAF accounts including online donor services, phone support, grant due diligence and administration, tax filings, quarterly account statements, annual account summaries, and communications. *Id.* The only service not covered by the administrative fee is for brokerage/custodial services (*i.e.*, holding the money and processing trades), which for an institutional investor with billions of dollars in assets would typically cost between 0.01% and 0.04% in the marketplace. *Id. ¶¶ 100 n.46, 101*. Schwab & Co. knowingly received this revenue sharing even though it was not providing services to Schwab Charitable to justify such excessive fees. *Id. ¶¶ 104, 107*. Schwab & Co. also knew that for every unaffiliated fund held by the Schwab DAF, there was a lower-cost but otherwise identical share class available to Schwab Charitable, but nonetheless knowingly received the excessive fees

---

[3] Many mutual funds offer multiple types of shares, known as "classes." Generally, the more expensive share classes are targeted at smaller investors with less bargaining power, while the lower-cost shares are targeted at institutional investors with more asserts, and therefore greater bargaining power. All classes of a fund invest in the same pool of securities, have the same investment manager, and have common investment objectives and policies. Therefore, differences in investment returns between share classes are directly attributable to differences in their fees and expenses. *FAC ¶ 88*.

**OPPOSITION TO DEF. SCHWAB & CO.'S MOTION TO DISMISS          3:20-CV-07657-LB**

1    associated with the higher-cost retail share classes. *Id.* ¶¶ *88-100, 105, 108-10*.

2         Finally, Schwab & Co. has received investment management fees for its own affiliated

3    mutual funds. For six of the Schwab DAF's investment pools (five index pools and a money market

4    pool), Schwab Charitable utilized Schwab-affiliated underlying mutual funds, even though they

5    underperformed and were more expensive than unaffiliated alternatives. *FAC* ¶¶ *75-87*. Schwab &

6    Co. also knew that superior alternatives existed to its proprietary index funds and money market

7    fund because it offers those superior alternatives on its own brokerage platform and to its own

8    institutional clients. *Id.* ¶ *106*. Nonetheless, Schwab & Co. continued to collect the investment

9    management fees associated with these proprietary funds from the Schwab DAF.

10        Based on the foregoing facts and other facts alleged in Plaintiff's First Amended Complaint

11   ("FAC"), Plaintiff asserts claims against Schwab & Co. for aiding and abetting fiduciary breaches

12   (Count 2) and unlawful conduct in violation of California's Unfair Competition Law (Count 3).

13                                    **ARGUMENT**[4]

14   **I.   LEGAL STANDARD**

15        A motion to dismiss "is not a procedure for resolving a contest between the parties about the

16   facts or the substantive merits of the plaintiff's case." *Chavez v. Blue Sky Nat. Beverages Co.*, 340

17   Fed. App'x 359, 360 (9th Cir. 2009) (citation omitted); *Williams v. Gerber Prods. Co.*, 552 F.3d

18   934, 938 (9th Cir. 2008). "If there are two alternative explanations, one advanced by defendant and

19   the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion

20   to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The only

21   question before the Court is whether the complaint sets forth a "'short and plain statement of the

22   claim showing that the pleader is entitled to relief.'" *See Sheppard v. David Evans & Assoc.*, 694

23   F.3d 1045, 1048 (9th Cir. 2012) (quoting Fed. R. Civ. P. 8(a)(2)). To satisfy this standard, all that is

24   required is that the complaint state sufficient factual content that, when accepted as true, "'state[s]

25   a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

26   *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Johnson v. Canciamilla*, 2020

27   _____

28   [4] Plaintiff reincorporates arguments made in Plaintiff's Response to Schwab Charitable in their entirety and does not repeat them here in order to avoid needless repetition.

1    WL 5526608, at *2 (N.D. Cal. Sept. 15, 2020). Here, Plaintiff's allegations are more than sufficient

2    to support his claims against Schwab & Co.

3    **II.     PLAINTIFF HAS STANDING TO SUE SCHWAB & CO.**

4         Schwab & Co. directs its principal arguments to standing. *See ECF No. 54 ("Schwab & Co.*

5    *Br.") at 7-15.* As discussed below, Schwab & Co.'s Article III standing arguments are repetitive of

6    the arguments raised by Schwab Charitable and should be rejected for the same reasons. Schwab &

7    Co.'s statutory standing arguments are also meritless, and rest on the incorrect premise that Plaintiff

8    is pursuing a derivative claim on behalf of Schwab Charitable rather than claims in his own right as

9    a donor. Accordingly, standing is no barrier to Plaintiff's claims here.

10        **A.   Plaintiff Has Article III Standing**

11        Schwab & Co. argues that Plaintiff lacks Article III standing because he has "relinquished

12   all legal title" to the monies in his Schwab DAF account. *See id. at 7.* However, as explained in

13   Plaintiff's Response to Schwab Charitable, the property interests and personal interests that support

14   standing extend far beyond persons with legal title. *See Plaintiff's Response to Schwab Charitable*

15   *at 8-13.* Plaintiff retained several rights to his Schwab DAF account, including rights regarding the

16   disposition of donations, the investment of assets, and the transfer of his accountholder privileges

17   to successors—all of which were prominently marketed by Schwab Charitable in promoting the

18   value of his account. Further, Plaintiff also has reputational and expressive interests in his account.

19   To the extent that the assets in his account are diminished as a result of the unlawful conduct alleged

20   in the FAC, so too are all of these associated interests (which are coextensive with his account)

21   diminished. Accordingly, Plaintiff has an "interest" that supports Article III standing—he is not

22   simply a bystander to his Schwab DAF account.

23        **B.   Plaintiff Has Statutory Standing**

24        For the same reasons that Plaintiff has Article III standing, he also has statutory standing to

25   pursue his claims. California Corporations Code § 5142 expressly grants donors like Plaintiff, who

26   have "a ... property or contractual interest in the assets subject to such charitable trust" the right to

27   "bring an action to enjoin, correct, obtain damages for or to otherwise remedy a breach of a

28   charitable trust." Plaintiff's claims here are founded on underlying breaches of trust by the

-7-

**OPPOSITION TO DEF. SCHWAB & CO.'S MOTION TO DISMISS            3:20-CV-07657-LB**

1   fiduciaries of the Schwab DAF, and are therefore permitted by the statute.[5]  There is nothing in the

2   statute that preempts or forecloses such claims. *See Plaintiff's Response to Schwab Charitable at*

3   *15-18.*

4          Schwab & Co. ignores § 5142 and instead tries to recast Plaintiff's claims as a derivative

5   action while further arguing that Plaintiff cannot sue derivatively. This Catch-22 argument fails

6   because this action is not derivative and does not need to be.[6] "A derivative suit is one in which the

7   shareholder seeks 'redress of the wrong to the corporation.'" *Bader v. Anderson*, 179 Cal. App. 4th

8   775, 793 (2009) (quoting *Klopstock v. Sup. Ct.*, 108 P.2d 906, 908 (1941)). As Defendant explains:

9   To determine whether a plaintiff is seeking derivative relief, California courts consider "'if the

10  gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property

11  without any severance or distribution among individual holders.'" *Schwab & Co. Br. at 11* (quoting

12  *Bader*, 179 Cal. App. 4th at 793).

13         Answering that inquiry here, it is clear Plaintiff's action is not derivative. Plaintiff does not

14  allege an injury to Schwab Charitable, the legal entity. Nor does he allege injury to "the whole body

15  of [Schwab Charitable's] ... property without any severance or distribution among individual

16  holders." That is, he is not alleging Defendants' misconduct "decreased the value of his or her stock"

17  in Schwab Charitable. *See id. at 12*. Rather, he alleges injury to *his* account assets and is seeking to

18  enforce his own interests in those assets. The amount of his injury depends on the amount his own

19  account was invested in the imprudent investment options. If this action were to proceed as a class

20  action, each class member's injury would likewise depend on the amount each class member's

21  account was invested in the affected investment options. Schwab & Co. cannot ignore this by simply

22  recasting Plaintiff's allegations and claims as derivative claims. *See Schwab & Co. Br. at 12*. As

---

23
24  [5] Likewise, Plaintiff has standing to pursue claims of underlying unlawful conduct under the UCL. *See infra 16; see also Plaintiff's Response to Schwab Charitable at 14, 22-25.*

25  [6] To be sure, the Corporations Code recognizes that "the corporation or a member in the name of
26  the corporation" can sue derivatively to remedy a breach of charitable trust. Cal. Corp. Code § 5142.
    But it also recognizes that persons like Plaintiff with contractual or property interests in the trust can
27  sue directly. *See Schmid v. City and County of San Francisco*, 274 60 Cal. App. 5th 470, 494 (Ct.
    App. 2021) ("*Except for persons who may sue in the name of a charitable corporation* or officers
28  or shareholders thereof, and with the exception of the Attorney General, *a plaintiff suing to enforce
    the terms of a charitable trust must hold 'a ... contractual, or property interest in the assets subject
    to such charitable trust.*'") (emphasis added) (quoting Corp. Code. §§ 5142(a)(4); 7142 (a)(4)).

**OPPOSITION TO DEF. SCHWAB & CO.'S MOTION TO DISMISS**          **3:20-CV-07657-LB**

1   one court put it, "Perhaps if the [ ] Defendant[] were given an opportunity to draft plaintiffs'

2   complaint, [it] would have chosen different causes of action. However, [the] laws provide a cause

3   of action to" donors with property or contractual interests to sue for breach of charitable trust and

4   Plaintiff has "adequately alleged just that." *Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290,

5   307-08 (S.D.N.Y. 2006).

6        To the extent that Plaintiff has standing to bring claims against Schwab Charitable for

7   breaches of fiduciary duties in connection with the trust, Plaintiff also has standing to bring a claim

8   against Schwab & Co. for aiding and abetting those fiduciary breaches. Indeed, given that Schwab

9   & Co. is ostensibly a third party to Plaintiff's Schwab DAF account, Schwab & Co.'s argument that

10  the claim against it is a "derivative" claim on behalf of the charitable corporation is particularly ill-

11  conceived.

12  **III.    PLAINTIFF HAS ADEQUATELY ALLEGED CLAIMS FOR AIDING AND ABETTING BREACHES

13           OF FIDUCIARY DUTY**

14       Based on the facts alleged in the FAC, there is no question that Plaintiff has properly pleaded

15  a claim against Schwab & Co. for aiding and abetting fiduciary breaches by Schwab Charitable.

16  Under California law, an entity that "aids and abets the commission of an intentional tort" may be

17  liable if the entity (1) "knows the other's conduct constitutes a breach of duty" and (2) "gives

18  substantial assistance or encouragement to the other to so act." *Am. Master Lease LLC v. Idanta

19  Partners, Ltd.*, 225 Cal. App. 4th 1451, 1475 (2014); *see also Neilson v. Union Bank of Cal.*, N.A.,

20  290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003). Here, Plaintiff alleges precisely that. *See FAC ¶ 105*

21  ("Schwab & Co. has knowledge of and participated in the fiduciary breaches and unlawful conduct

22  outlines above."); *see also id. at ¶¶ 106-110* (providing further detail).

23        Schwab & Co. argues that even though Plaintiff alleges that the underlying fiduciary

24  breaches occurred in order to benefit Schwab & Co. and that Schwab & Co. was a party to all of the

25  service contracts that caused Schwab Charitable to overpay for services, it lacked knowledge and

26  did not substantially assist in the underlying fiduciary breaches. Schwab & Co.'s arguments defy

27  logic and common sense, and certainly are not ripe for resolution at the pleading stage. At the very

28  least, it is *plausible* that Schwab & Co. acted in concert with Schwab Charitable to advance Schwab

-9-

& Co.'s interests instead of those of trust donors and their beneficiaries. *See Johnson*, 2020 WL 5526608, at *2.

### A.   Plaintiff Has Stated Underlying Breach of Fiduciary Duty Claims Against Schwab Charitable

Schwab & Co. argues that Plaintiff has not stated an underlying breach of fiduciary duty claim against Schwab Charitable that would support an aiding and abetting claim. *See Schwab & Co. Br. at 7-8, 16-17*. However, this argument fails for the reasons explained in Plaintiff's Response to Schwab Charitable. *See Plaintiff's Response to Schwab Charitable at 19-22.*

### B.   Plaintiff Has Plausibly Alleged Knowledge of the Underlying Fiduciary Misconduct by Schwab & Co.

Schwab & Co. next challenges the knowledge element of Plaintiff's aiding and abetting claim. *See Schwab & Co. Br. at 17-19.* However, the FAC contains extensive allegations regarding Schwab & Co.'s knowledge of underlying fiduciary breaches and misconduct, *see FAC ¶¶ 105-110, 129-131,* and Schwab & Co. misconstrues applicable pleading standards by demanding greater detail at this stage prior to discovery. *See* Fed. R. Civ. P. 9(b) ("intent, knowledge, and other conditions of a person's mind may be alleged generally"). In assessing allegations concerning an aider and abettor's knowledge, "courts have found pleadings sufficient if they allege *generally* that defendants had actual knowledge of a specific primary violation." *Neilson*, 290 F. Supp. 2d at 1120 (emphasis added). This can be satisfied with allegations of "circumstances indicating conscious behavior by the defendant." *Id.* at 1121. Such allegations must be "[r]ead liberally" and need only be "averred generally" "for purposes of a Rule 12(b)(6) motion." *Id.*; *see also Simi Mgmt. Corp. v. Bank of Am. Corp.*, 2012 WL 1997232, at *6 (N.D. Cal. June 4, 2012). Courts must be wary of defendants "seek[ing] to parse the pleading too finely for Rule 8 purposes." *Neilson*, 290 F. Supp. 2d at 1121.

Of particular relevance here, several courts have reasonably recognized that "financial gain [is] evidence that the aider and abettor knew of and substantially assisted the primary violator's breach of fiduciary duty." *Id.* at 1127–28 (citing cases); *see also Monsen v. Consolidated Dressed Beef Co., Inc.*, 579 F.2d 793, 799 (3d Cir. 1978) ("The 'requirement of knowledge may be less strict

where the alleged aider and abettor derives benefits from the wrongdoing …'"); Alan R. Bromberg & Lewis D. Lowenfels, Aiding and Abetting Securities Fraud: A Critical Examination, 52 ALB. L. REV. 637, 739–48 (1988) (explaining that in aiding and abetting claims, evidence of financial benefit is relevant to "the knowledge or the substantial assistance requirement (or both)").

Plaintiff's allegations demonstrate that not only did Schwab & Co. have "knowledge of the object to be attained," but also that that object was to enrich Schwab & Co. *See Hurtado Lucero v. IRA Servs., Inc.*, 2020 WL 553941, at *5 (N.D. Cal. Feb. 3, 2020) (quoting *Casey v. U.S. Bank. N.A.*, 127 Cal. App. 4th 1138, 1146 (2005)); *Neilson*, 290 F. Supp. 2d at 1120 (finding knowledge adequately pled where "complaint asserts that the Banks knew Slatkin was committing fraud and was breaching his fiduciary duties"). Plaintiff has alleged that because Schwab Charitable "was established with the support of [Schwab & Co.]" and "[a]ll Fund employees are employed by [Schwab & Co.]," Schwab & Co. had knowledge of the underlying conduct that constituted the fiduciary breaches. *FAC ¶ 105*. Specifically, Plaintiff has alleged that in processing the transactions for the Schwab DAF, Schwab & Co. knew all of the mutual funds that the Schwab DAF's investment pools were invested in. *Id.* Plaintiff also alleges that Schwab & Co. knew that "superior alternatives existed to its proprietary money market and index funds" because "it offers all of them on its own brokerage platform." *Id. ¶ 106*. As a recordkeeper, Schwab & Co. further knew that other institutional investors that work with them have selected and offer to their participants these superior index and money market funds from investment managers such as Vanguard, Fidelity, State Street, and Blackrock. *Id.* Such allegations of "active[] participation" in the misconduct supports an inference of knowledge. *Neilson* 290 F. Supp. 2d at 1120; *see also Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 534 (6th Cir. 2000) ("If one is aware that he has a role in an improper activity, then surely he knows that the primary party's conduct is tortious" (citations omitted)).

Plaintiff has also alleged Schwab & Co. knew Schwab Charitable was not utilizing the lowest-cost share class for its investment options, even though it knew other institutional investors were. *FAC ¶ 108*. While Schwab & Co. was receiving fees associated with the Schwab DAF's investment in higher-cost share classes, publicly available SEC filings show Schwab & Co. simultaneously held the lowest-cost share classes of those same funds on behalf of other institutional

-11-

clients. *Id. ¶ 108-10*. Indeed, Schwab & Co. appears to have "recommended the higher cost share classes" to Schwab Charitable. *Id. ¶ 110*. Because Schwab & Co. was party to the custodial services contract with Schwab Charitable, it also knew that Schwab Charitable was paying high expense ratios that included 0.40% in revenue sharing, even though Schwab & Co. was not providing services to Schwab Charitable to justify this fee, particularly since Schwab & Co. was collecting a separate fee for administrative services. *Id. ¶¶ 54, 107*.

Such allegations exceed what is required to satisfy the knowledge requirement in the Ninth Circuit. Courts have held that pleading an aider or abettor's "general knowledge" is sufficient. *Neilson*, 290 F. Supp. 2d at 1121.[7] So too are allegations the defendant "ignore[d] suspicious activity or red flags." *In re Woodbridge Investments Litig.*, 2020 WL 4529739, at *6 (C.D. Cal. Aug. 5, 2020) (citing *In re First All. Mortg. Co.*, 471 F.3d 977, 999 (9th Cir. 2006)). When, as here, a plaintiff not only alleges that the aider or abettor "disregarded red flags" but also provides "[d]etailed allegations pertaining to ... the closeness of" the aider and abettor and the underlying wrongdoer, that is sufficient to state a claim for aiding and abetting. *In re Woodbridge*, 2020 WL 4529739, at *7.

The cases on which Schwab & Co. relies highlight the specificity of Plaintiff's allegations. *See Schwab & Co. Br. at 16, 18-19*. As *Hurtado*, *Casey*, and *Sharp* instruct, when assessing a claim for aiding and abetting breach of fiduciary duty the Court "must first 'identify precisely the breach of fiduciary duty for which'" plaintiff seeks to hold the fiduciaries liable. *Hurtado*, 2020 WL 553941, at *4 (quoting *Casey*, 127 Cal. App. 4th at 1147). Here, "the wrong for which the plaintiff seeks recovery against the defendant[]" is the fiduciaries' selection of inferior, more expensive investment options for the Schwab DAF that benefited Schwab & Co. *Id.* "'[T]he relevant inquiry is whether the plaintiff adequately alleges the defendant[] had knowledge" that the trust fiduciaries were investing in inferior, more expensive investment options that benefited Schwab & Co. *Id.* As

---

[7] Other circuits have adopted a similar "general awareness" standard for pleading knowledge. *See, e.g.*, *Aetna*, 219 F.3d at 534 ("We see no conflict between the position that an aider and abettor must have actual knowledge of the primary party's wrongdoing and the statement that it is enough for the aider and abettor to have a general awareness of its role in the other's tortious conduct for liability to attach."); *Camp v. Dema*, 948 F.2d 455, 460 (8th Cir.1991) ("If a defendant has a general awareness of his role in the primary violator's wrongful activity, however, this may be sufficient to satisfy the knowledge requirement.").

**OPPOSITION TO DEF. SCHWAB & CO.'S MOTION TO DISMISS**          **3:20-CV-07657-LB**

1   explained above, Plaintiff has alleged just this.

2        Indeed, it is hard to imagine how Schwab & Co. could not have known of the fiduciary

3   breaches at issue given its close relationship with Schwab Charitable, especially when those

4   breaches were designed to serve its own interests. While it is theoretically possible that Schwab &

5   Co.'s internal emails and communications with Schwab Charitable (among other discovery) will

6   show that Plaintiff's allegations are unfounded and that Schwab & Co. acted only in the purest of

7   interests, Schwab & Co. is not entitled to such an inference in its favor at this stage. Accepting

8   Plaintiff's allegations as true and drawing all reasonable inferences in favor of Plaintiff, his aiding

9   and abetting claim more than meets the plausibility standard.

### C. The Fiduciary Breaches Involved Substantial Assistance by Schwab & Co., Which Participated in and Benefitted from the Challenged Arrangements

12        Contrary to Schwab & Co.'s arguments, *Schwab & Co. Br. at 19*-20, Plaintiff also has

13   adequately alleged that Schwab & Co, substantially assisted the fiduciary breaches at issue.

14   "'Substantial assistance requires the plaintiff to allege that the actions of the aider/abettor

15   proximately caused the harm on which the primary liability is predicated.'" *Neilson v. Union Bank*

16   *of Cal., N.A.*, 2003 WL 27374137, at *12 (C.D. Cal. Feb. 20, 2003)  (quoting *Cromer Finance Ltd.*

17   *v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001)). "In California, the proximate cause of an

18   injury is something that is a substantial factor in bringing about the injury." *Id.* (citing *Mitchell v.*

19   *Gonzales*, 54 Cal.3d 1041, 1052-53 (1991)). "Conduct can be considered a substantial factor in

20   bringing about harm if it 'has created a force or series of forces which are in continuous and active

21   operation up to the time of the harm' or stated another way, 'the effects of the actor's [] conduct

22   actively and continuously operate to bring about harm to another" *Osborn v. Irwin Memorial Blood*

23   *Bank*, 5 Cal. App. 4th 234, 253 (1992) (quoting Rest. 2d Torts, §§ 433, subd. (b), §§ 439, 433, com.

24   e).

25        Plaintiff has alleged in detail the role that Schwab & Co. had in effecting the breaches of

26   fiduciary duty. Indeed, but for Schwab & Co., there would be no Schwab Charitable, no Schwab

27   DAF, or any fiduciary breaches. As explained, Plaintiff has alleged that Schwab & Co. had a central

28   role in creating Schwab Charitable, funding the Schwab DAF, and providing all the resources to

**OPPOSITION TO DEF. SCHWAB & CO.'S MOTION TO DISMISS          3:20-CV-07657-LB**

operate and sustain Schwab Charitable and the Schwab DAF. *FAC ¶¶ 13-15*. Plaintiff has further alleged that upon establishing the Schwab Charitable, Schwab & Co. became the exclusive service provider for Schwab Charitable, which in turn paid Schwab & Co. excessive fees for those services. *Id. ¶¶ 19, 46*. He has also alleged the Schwab & Co. gladly received the higher investment management fees associated with Schwab-affiliated index funds and money market funds, and revenue sharing fees associated with unaffiliated funds on its OneSource platform. *Id. ¶¶ 20-22, 72, 75, 104*. These allegations support an inference that Schwab & Co. set in motion the forces that made Schwab Charitable an essentially profit-making entity for Schwab & Co., and are sufficient to plead that Schwab & Co. was a substantial factor in the alleged fiduciary breaches.

Schwab & Co. argues that entering into "arm's length negotiations is normal business practice" and therefore cannot satisfy this standard. *Schwab & Co. Br. at 19-20.* But courts do not require that an aider or abettor's substantial assistance be unlawful or improper, and the cases Schwab & Co. relies on make this clear. "[P]rovided that an entity takes *some* action, even routine operations may constitute substantial participation if done with knowledge that the action will further a breach of fiduciary duty." *AngioScore, Inc. v. TriReme Med., LLC*, 70 F. Supp. 3d 951, 960 (N.D. Cal. 2014) (emphasis in original); *see also Casey*, 127 Cal. App. 4th at 1145 ("[C]ommon sense tells us that even 'ordinary business transactions' a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort."). Further, the gravamen of Plaintiff's complaint is that the service agreements between Schwab Charitable and Schwab & Co. were not entered into at arm's-length, but were instead entered into to "'exploit conflicts of interest.'" *AngioScore Inc.*, 70 F. Supp. 3d at 960 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001)). After creating Schwab Charitable for the purpose of sponsoring the Schwab DAF, and leveraging its close relationship with Schwab Charitable to secure favorable contracts that undermined the charitable purposes and other interests of donors, Schwab & Co. cannot plausibly argue that it was not a substantial factor in the underlying fiduciary breaches.

**D.   Because Plaintiff Has Alleged Breaches of the Ongoing Duty to Monitor that Occurred Within the Limitations Period, Plaintiff's Aiding and Abetting Claims are Timely**

Schwab & Co. finally argues that Plaintiff's aiding and abetting claim is time barred because "the cause of action accrued ... in 2007 when Pinkert's donation was first invested." *See Schwab & Co. Br. at 21*. This misapprehends Plaintiff's claim (which does not allege that Defendants absconded with his initial donation) and fails to recognize the ongoing fiduciary duties that apply to management of trust assets.

"The statute of limitations for a cause of action for aiding and abetting ... is the same as the underlying tort. *Am. Master Lease LLC*, 225 Cal. App. 4th at 1478. Where the underlying tort is a breach of fiduciary duty, that can be "three years or four years, depending on whether the breach is fraudulent or nonfraudulent." *Id.* at 1479. For purposes of determining when the cause of action accrued, the Supreme Court has recognized that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble*, 135 S. Ct. at 1828. Because this duty is ongoing, "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within [the limitations period], the claim is timely." *Id.*

Here, Plaintiff alleges that in causing the Schwab DAF to invest in imprudent investment options for the benefit of Schwab & Co., "Defendants failed to employ a prudent process for selecting, *monitoring, and reviewing*" the Fund's underlying investments. *FAC ¶ 126* (emphasis added); *see also, e.g.*, *FAC ¶ 86* ("In other instances, the Schwab fund had a demonstrably poorer track record than another fund in the marketplace, but was *retained* by Schwab Charitable despite this persistent underperformance.") (emphasis added); *FAC ¶ 94* ("The Fiduciary Defendants' failure to *monitor* the investment pools and investigate the availability of institutionally priced share classes cost donors ... millions of dollars in fees each year") (emphasis added). Because this breach "is not limited to the Defendant['s] initial selection of the challenged funds" but includes a failure

1    "to monitor investments and remove imprudent ones," Plaintiff's claim is timely. *See Terraza v.*

2    *Safeway Inc.*, 241 F. Supp. 3d 1057, 1068 (N.D. Cal. 2017) (citing *Tibble*, 135 S. Ct. at 1828-29).[8]

3    **IV.    PLAINTIFF HAS ADEQUATELY ALLEGED AN UNFAIR COMPETITION LAW (UCL) CLAIM**

4            For the reasons set forth in Plaintiff's Response to Schwab Charitable at 14, 22-25, Plaintiff

5    has adequately alleged economic injury sufficient to give him standing under the Unfair Competition

6    Law, Cal. Bus. Code § 17200 *et seq.* An allegation that a person has had a property interest

7    diminished or has been "required to enter into a transaction, costing money or property, that would

8    otherwise have been unnecessary" will satisfy the economic injury standing requirement of UCL.

9    *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 886 (Cal. 2011). In suffering a diminution in his

10   property interests in his Schwab DAF account assets, and having to contribute more to his account

11   to achieve the same charitable goals and expressive and reputational interests, Plaintiff has suffered

12   economic injury. *See Plaintiff's Response to Schwab Charitable at 14.*

13           Moreover, because Plaintiff has adequately alleged an underlying aiding and abetting claim,

14   *see supra 9-14,* Plaintiff has alleged predicate claims sufficient for the UCL.

15           Finally, for the reasons stated above, *see supra 15-16,* Plaintiff's common law and statutory

16   claims for breach of fiduciary duties (and related aiding and abetting claims) are timely and therefore

17   his parallel claims under the Unfair Competition Law are also timely. Under California Business

18   and Professions Code § 17208, a UCL cause of action "shall be commenced within four years after

19   the cause of action accrued." As explained, Plaintiff's cause of action concerns the imprudent and

20   disloyal selection and continued retention of the at-issue funds. These breaches were ongoing and

21   each failure to remove imprudent investment options was a separate violation. *See Tibble*, 135 S.

22   Ct. at 1828.

23                                    **CONCLUSION**

24           For all of the foregoing reasons, Schwab & Co.'s motion to dismiss should be denied.

25

26

27   _____

     [8] The FAC specifically alleges that the underlying failures to properly monitor investments and
28   remove imprudent ones were ongoing and occurred within the previous three years. *See, e.g., FAC*
     *¶¶ 86-87, 92-97.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

Dated: April 2, 2021

**NICHOLS KASTER, LLP**

By: /s/ Kai Richter
    Kai Richter

**COUNSEL FOR PLAINTIFF AND THE
PROPOSED CLASS**

**OPPOSITION TO DEF. SCHWAB & CO.'S MOTION TO DISMISS          3:20-CV-07657-LB**